UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

STUART FORCE, Individually, and as Administrator on
behalf of the Estate of TAYLOR FORCE; ROBBI
FORCE; and KRISTIN ANN FORCE;

ABRAHAM RON FRAENKEL and RACHEL DEVORA
SPRECHER FRAENKEL, Individually, as Joint
Administrators on behalf of the Estate of YAAKOV
NAFTALI FRAENKEL, and as the natural and legal
guardians on behalf of minor plaintiffs A.H.H.F., A.L.F.,
N.E.F., N.S.F., and S.R.F.; TZVI AMITAY FRAENKEL;

SHMUEL ELIMELECH BRAUN and CHANA BRAUN,
Individually, and as Joint Administrators on behalf of the
Estate of CHAYA ZISSEL BRAUN; SHIMSON SAM
HALPERIN; SARA HALPERIN; MURRAY BRAUN;
ESTHER BRAUN;

MICAH LAKIN AVNI and MAYA LAKIN, Individually,
and as Joint Administrators on behalf of the Estate of
RICHARD LAKIN;

MENACHEM MENDEL RIVKIN and BRACHA
RIVKIN, Individually, and as the natural and legal
guardians on behalf of minor plaintiffs S.S.R., M.M.R.,
R.M.R., and S.Z.R.,

                                      Plaintiffs,

                           -against-

FACEBOOK, INC.,

                                    Defendants.

------------------------------------------------------------------- X

Docket no.
16 Civ. _____


**COMPLAINT**

**Jury Trial Demanded**

Plaintiffs, complaining of the defendant, by their attorneys, THE BERKMAN LAW

OFFICE, LLC and NITSANA DARSHAN LEITNER & CO. (Israeli counsel), allege for their

complaint as follows:

## INTRODUCTION

1.      This is an action for damages against Facebook pursuant to the Antiterrorism Act ("ATA") and related claims for having knowingly provided material support and resources to HAMAS, a notorious terrorist organization that has engaged in and continues to commit terror attacks, including the terrorist attacks that killed 29-year-old Taylor Force, 16-year-old Yaakov Naftali Fraenkel, three-month-old Chaya Zissel Braun, and 76-year-old Richard Lakin, and injured Menachem Mendel Rivkin, and the families of these terror victims.

2.      HAMAS is among the most widely-known Palestinian terrorist organizations in the world. In the 1990's and early 2000's, HAMAS gained notoriety for carrying out numerous terrorist bus bombings and dispatching suicide bombers across Israel, and more recently for firing thousands of missiles at Israel's civilian population centers. The United States Government designated HAMAS as a Foreign Terrorist Organization ("FTO") under § 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189, as amended, on October 8, 1997.

3.      HAMAS has recognized the tremendous utility and value of Facebook as a tool to facilitate this terrorist group's ability to communicate, recruit members, plan and carry out attacks, and strike fear in its enemies. For years, HAMAS, its leaders, spokesmen, and members have openly maintained and used official Facebook accounts with little or no interference. Despite receiving numerous complaints and widespread media and other attention for providing its online social media platform and communications services to HAMAS, Facebook has continued to provide these resources and services to HAMAS and its affiliates.

4.      Facebook has knowingly provided material support and resources to HAMAS in the form of Facebook's online social network platform and communication services. HAMAS has used and relied on Facebook's online social network platform and communications services as among its most important tools to facilitate and carry out its terrorist activity, including the

terrorist attacks in which HAMAS murdered and injured the victims and their families in this case. By providing its online social network platform and communications services to HAMAS, Facebook violated federal prohibitions on providing material support or resources for acts of international terrorism (18 U.S.C. § 2339A), providing material support or resources for designated foreign terrorist organizations (18 U.S.C. § 2339B), and financing acts of international terrorism (18 U.S.C. § 2339C), and committed acts of international terrorism as defined by 18 U.S.C. § 2331. Accordingly, Facebook is liable pursuant to 18 U.S.C. § 2333 and other claims to the Plaintiffs, who were injured by reason of an act of international terrorism.

## THE PARTIES

### A.      The Plaintiffs

3.      Plaintiff Stuart Force at all times relevant hereto is and was a citizen of the United States domiciled in South Carolina and the father, heir and personal representative of the estate of Taylor Force, who was also a citizen of the United States at the time of his death.

4.      Plaintiff Stuart Force brings this action individually and on behalf of the estate of Taylor Force.

5.      Plaintiff Robbi Force at all times relevant hereto is and was a citizen of the United States domiciled in South Carolina and the mother of decedent Taylor Force.

6.      Plaintiff Kristin Ann Force at all times relevant hereto is and was a citizen of the United States and the sister of decedent Taylor Force.

7.      Plaintiffs Abraham Ron Fraenkel and Rachel Devora Sprecher Fraenkel at all times relevant hereto are and were the parents, heirs and personal representatives of the estate of their son, Yaakov Naftali Fraenkel, who was a citizen of the United States at the time of his

kidnapping and death; and they are also the parents of minor plaintiffs A.H.H.F., A.L.F., N.E.F., N.S.F., and S.R.F.

8.     Plaintiff Rachel Devora Sprecher Fraenkel is a citizen of the United States domiciled in Israel.

9.     Plaintiffs Abraham Ron Fraenkel and Rachel Devora Sprecher Fraenkel each bring this action individually, as joint administrators on behalf of the estate of Yaakov Naftali Fraenkel, and as the natural and legal guardians on behalf of their minor children, A.H.H.F., A.L.F., N.E.F., N.S.F., and S.R.F.

10.     Plaintiff Tzvi Amitay Fraenkel at all times relevant hereto is and was a United States citizen domiciled in Israel, and the brother of decedent Yaakov Naftali Fraenkel.

11.     Plaintiff A.H.H.F., a minor, at all times relevant hereto is and was a United States citizen domiciled in Israel, and the sister of decedent Yaakov Naftali Fraenkel.

12.     Plaintiff A.L.F., a minor, at all times relevant hereto is and was a United States citizen domiciled in Israel, and the sister of decedent Yaakov Naftali Fraenkel.

13.     Plaintiff N.E.F., a minor, at all times relevant hereto is and was a United States citizen domiciled in Israel, and the sister of decedent Yaakov Naftali Fraenkel.

14.     Plaintiff N.S.F., a minor, at all times relevant hereto is and was a United States citizen domiciled in Israel, and the sister of decedent Yaakov Naftali Fraenkel.

15.     Plaintiff S.R.F., a minor, at all times relevant hereto is and was a United States citizen domiciled in Israel, and the brother of decedent Yaakov Naftali Fraenkel.

16.     Plaintiffs Shmuel Elimelech Braun and Chana Braun at all times relevant hereto are and were the parents, heirs and personal representatives of the estate of their daughter, Chaya Zissel Braun, who was also a citizen of the United States at the time of her injury and death.

17.     Plaintiffs Shmuel Elimelech Braun and Chana Braun are citizens of the United States domiciled in Israel. They each bring claims individually, and as joint administrators on behalf of the estate of Chaya Zissel Braun.

18.     Plaintiffs Shimson Sam Halperin, Sara Halperin, Murray Braun, and Esther Braun at all times relevant hereto are and were citizens of the United States domiciled in Israel, and the grandparents of decedent Chaya Zissel Braun.

19.     Plaintiffs Micah Lakin Avni and Maya Lakin are citizens of the United States domiciled in Israel. They each bring claims individually and as joint administrators on behalf of the estate of their father, Richard Lakin, who was also a citizen of the United States at the time of his injury and subsequent death.

20.     Plaintiffs Menachem Mendel Rivkin and Bracha Rivkin at all times relevant hereto are and were citizens of the United States domiciled in Israel. They each bring claims individually, and jointly as the natural and legal guardians on behalf of their minor children, S.S.R., M.M.R., R.M.R., and S.Z.R., who are also citizens of the United States.

**B.     The Defendant**

21.     The Defendant Facebook, Inc. ("Facebook") is a publicly traded U.S. company incorporated in Delaware, with its principal place of business in Menlo Park, California, and with a substantial office employing more than 1,000 people in the State of New York.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333 and 2334, as this is a civil action brought by nationals of the United States who have been killed or injured by reason of acts of international terrorism, and/or their estates, survivors, and heirs.

23.     This Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2), as there is diversity of citizenship between each of the plaintiffs and the defendant, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

24.     This Court has personal jurisdiction over Facebook as Facebook is at home in the United States because it is a Delaware corporation with its principal place of business in California, and Facebook may be found in this District and has an agent in this District. Facebook maintains a systematic presence in this District, including more than 285,000 square feet of office space and more than 1,000 employees, and it is registered to do business in the State of New York. Moreover, by registering to do business in New York, Facebook consented to personal jurisdiction in New York.

25.     Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(d).

## FACTUAL ALLEGATIONS

## I.     HAMAS:     A     DESIGNATED     FOREIGN     TERRORIST ORGANIZATION

### A.     Background of HAMAS

26.     HAMAS is an offshoot of the radical militant Islamist organization known as the Muslim Brotherhood. The Muslim Brotherhood was founded in Egypt in 1928. The Muslim Brotherhood's mottos include: "Islam is the answer"; and "*Allah* is our objective, the *Qur'an* is the Constitution, the Prophet [Mohammed] is our leader, *jihad* [holy war] is our way, death for the sake of *Allah* is our wish."

27.     When Palestinians launched the "First *Intifada*" (or "uprising") against Israel in December 1987, the leader of the Muslim Brotherhood in Gaza, Sheik Ahmad Yassin formed

*Harakat al-Muqawama al-Islamiyya* (the "Islamic Resistance Movement") to join in the violence against Israel and to establish an alternative Islamist movement to challenge the largely secular Palestinian Liberation Organization's ("PLO") claim as the exclusive leadership of the Palestinians. The Islamic Resistance Movement is known by its Arabic acronym: "HAMAS." The following are the emblem and flag of the terrorist organization HAMAS:

 

28.      From its inception, HAMAS has publicly proclaimed that it is committed to the destruction of the State of Israel, the establishment of an Islamic state in all of historic Palestine, and the elimination of Jews from the land. The preamble to HAMAS's Charter states: "Israel exists and will continue to exist until Islam will obliterate it, just as [Islam] obliterated others before it."

29.      Article 6 of the HAMAS Charter states: "The Islamic Resistance Movement is a distinguished Palestinian movement, whose allegiance is to *Allah*, and whose way of life is Islam. It strives to raise the banner of *Allah* over every inch of Palestine." Article 13 states: "Palestine is an Islamic land . . . Since this is the case, the Liberation of Palestine is an individual duty for every Muslim wherever he may be." Article 15 states: "The day the enemies usurp part of Muslim land, *Jihad* becomes the individual duty of every Muslim. In the face of the Jews' usurpation, it is compulsory that the banner of *Jihad* be raised."

30.     HAMAS is ideologically opposed to efforts to reach a peaceful solution or compromise with Israel. Article 13 of the HAMAS Charter states: "[Peace] initiatives, and so-called peaceful solutions and international conferences are in contradiction to the principles of the Islamic Resistance Movement . . . Those conferences are no more than a means to appoint the infidels as arbitrators in the lands of Islam . . . There is no solution for the Palestinian problem except by *Jihad*. Initiatives, proposals and international conferences are but a waste of time, an exercise in futility."

31.     HAMAS is also steeped in religious anti-Semitism (hatred of Jews). Article 7 of the HAMAS Charter states: "The Day of Judgment will not come about until Muslims fight Jews and kill them. Then, the Jews will hide behind rocks and trees, and the rocks and trees will cry out: 'O Muslim, there is a Jew hiding behind me, come and kill him.'" In Article 22, the Charter blames the Jews for the French Revolution, the Communist Revolution, World War I and World War II, and claims: "There is no war going on anywhere without [the Jews] having their finger in it."

32.     Article 32 of the HAMAS Charter continues as follows:

"Zionism scheming has no end, and after Palestine, they will covet expansion from the Nile to the Euphrates River. When they have finished digesting the area on which they have laid their hand, they will look forward to more expansion. Their scheme has been laid out in the 'Protocols of the Elders of Zion.'

. . .

The HAMAS regards itself as the spearhead and the vanguard of the circle of struggle against World Zionism . . . Islamic groups all over the Arab world should also do the same, since they are best equipped for their future role in the fight against the warmongering Jews."

33.     HAMAS seeks to achieve its goals by carrying out terrorist attacks against Jewish civilians in Israel, the West Bank, and Gaza. HAMAS proudly and openly acknowledges that it

uses terrorism to achieve its political goals. HAMAS employs violence against civilian targets in an effort to coerce, intimidate and influence government decision-makers and the public in Israel to accept HAMAS's demands.

34.     The *Izz al-Din al-Qassam* Brigades (the "*al-Qassam* Brigades") is a constituent paramilitary organization within HAMAS known for carrying out many of HAMAS's terrorist attacks, including shootings, suicide bombings, IED bombings, missile attacks, underground tunnel attacks, and more. HAMAS and the *al-Qassam* Brigades also have other paramilitary units and brigades, often named after prominent HAMAS leaders considered "martyrs" by HAMAS. The following is the emblem of the *al-Qassam* Brigades:



35.     HAMAS also has other constituent organizations and associations that are controlled by HAMAS that operate as part of HAMAS and carry out its activities, including HAMAS's student wing, the Islamic Bloc. The following is the emblem of HAMAS's Islamic Bloc:



36.     Between the time of its founding in December 1987 until the date of the terrorist attacks at issue in this case, HAMAS carried out thousands of terrorist attacks in Israel, the West

Bank, and Gaza, murdering hundreds of Israeli and U.S. citizens, as well as the nationals of many other countries, and wounding thousands more. HAMAS's policy and practice of carrying out terrorist attacks was and is notorious and well known to the public at large and to Facebook.

37.     HAMAS particularly gained notoriety around the world for its use of suicide bombings as a terrorist method. In its effort to derail the 1993 Oslo Accords that established the Palestinian Authority ("PA") in the mid-1990's, and again during the second intifada in the mid-2000's, HAMAS carried out scores of suicide bombings against Israel, killing more than a thousand civilians of many nationalities and injuring many thousands. HAMAS planned and executed these operations *inter alia* to murder and maim as many Jews and Israeli civilians as possible, packing suicide vests with nails and shrapnel and carrying out these bombings on packed buses, at crowded bus stops, restaurants, malls, hotels, and hospitals.

38.     Beginning April 16, 2001, HAMAS gained additional notoriety as a terrorist organization by developing and launching missiles into Israel, indiscriminately targeting civilian population centers. Between April 2001 and April 2012, HAMAS fired more than 12,700 missiles and mortars into Israeli cities, an average of three attacks every single day for 11 years.

39.     Since the Israeli disengagement from Gaza in 2005, HAMAS has also adopted a strategy of building tunnels under the borders between Gaza and Israel and Gaza and Egypt. These tunnels have been used by HAMAS to smuggle money, weapons, and other materials into Gaza for use in terrorist attacks, as well as to travel into Israel to carry out terrorist operations.

40.     On the night of June 25, 2006, HAMAS terrorists tunneled from Gaza into an Israeli army base and attacked Israeli soldiers on the base. The terrorists killed two Israeli soldiers and injured three other Israeli soldiers, including Israeli soldier Gilad Shalit. The terrorists kidnapped Shalit, and held him in captivity in Gaza for more than five years. HAMAS

ultimately released Shalit to Israel in 2012 in exchange for the release of more than 1,000 security prisoners held by Israel, many of whom were HAMAS terrorists. Since the release of Shalit, HAMAS has had planned and attempted many times to abduct Israelis in order to attempt to negotiate the release of more imprisoned HAMAS terrorists.

41.      In the six-year period from 2006 through 2011, HAMAS missiles and mortars killed at least 44 Israelis and injured over 1,600 others.

42.      During 2012, HAMAS fired more than 2,300 missiles and mortars into Israel. Although many missiles were intercepted by Israel's Iron Dome missile defense system and many others did not reach Israeli territory, nevertheless, more than 1,600 HAMAS missiles (excluding mortars) hit Israeli territory during that year.

43.      During the Israeli military action to eliminate rocket-fire from Gaza known as Operation Protective Edge, which ran from July 8, 2014 to August 25, 2014, more than 3,800 HAMAS missiles (excluding mortars) hit Israeli territory.

**B.      Terrorist Designation of HAMAS and its Affiliates**

44.      The Government of Israel officially declared HAMAS a terrorist organization and designated it an "unlawful organization" in September 1989, following the kidnapping and murder of two Israelis earlier that year. Notice of the designation was placed in the official Government of Israel publication, the Announcements and Advertisements Gazette.

45.      Prompted by the horrific wave of Palestinian terrorism following the 1993 Oslo Accords, including numerous suicide bombings carried out by HAMAS, U.S. President Bill Clinton issued Executive Order No. 12947 on January 23, 1995, in which he declared a national emergency to deal with the threat to the United States posed by the "grave acts of violence

committed by foreign terrorists that disrupt the Middle East peace process." 60 Fed. Reg. 5079 (1995).

46.     Executive Order No. 12947 blocked all property and interests in property of specially designated terrorists ("SDT"), including specifically HAMAS. Among other things, Executive Order No. 12947 <u>prohibited</u> "any transaction or dealing by United States persons . . . in property or interests in property of [HAMAS] . . . including the making or receiving of any contribution of funds, goods, or services to or for the benefit of [HAMAS]." This prohibition remains in effect to this day.

47.     On October 8, 1997, the U.S. Secretary of State officially designated HAMAS (including specifically its "*Izz al-Din al-Qassam* Brigades") as a "Foreign Terrorist Organization" ("FTO") pursuant to § 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189, as amended by the AEDPA. 62 Fed. Reg. 52650 (1997). This designation remains in effect to this day.

48.     After the September 11, 2001 terrorist attacks on the United States, U.S. President George W. Bush issued Executive Order No. 13224, declaring a national emergency with respect to the "grave acts of terrorism . . . and the continuing and immediate threat of further attacks on United States nationals or the United States." Executive Order No. 13224 blocked all property and interests in property of "Specially Designated Global Terrorists" ("SDGT"s), prohibited the provision of funds, goods or services for the benefit of SDGT's, and authorized the U.S. Treasury to block the assets of individuals and entities that provide support, services, or assistance to, or otherwise associate with, SDGT's, as well as their subsidiaries, front organizations, agents, and associates.

-12-

49.     The U.S. Secretary of State officially designated HAMAS (including its *Izz al-Din al-Qassam* Brigades) as an SDGT pursuant to Executive Order No. 13224 on October 31, 2001. 67 Fed. Reg. 12633-12635 (2002). This designation remains in effect to this day.

50.     On December 4, 2001, the U.S. Department of the Treasury officially designated the following organizations as SDGT's pursuant to Executive Order No. 13224 for their provision of funding and support to HAMAS: The Holy Land Foundation for Relief and Development; Beit el-Mal Holdings; and Al-Aqsa Islamic Bank. These designations remain in effect to this day.

51.     On May 29, 2003, the U.S. Department of the Treasury officially designated the Al-Aqsa Foundation as an SDGT pursuant to Executive Order No. 13224 for its provision of funding and support to HAMAS. This designation remains in effect to this day.

52.     On August 22, 2003, the U.S. Department of the Treasury officially designated the following HAMAS leaders as SDGT's pursuant to Executive Order No. 13224: Sheik Ahmed Yassin (deceased 2004); Imad Khalil Al-Alami; Usama Hamdan; Khalid Mishaal; Musa Abu Marzouk; and Abdel Aziz Rantisi (deceased 2004). That same day, the Department of the Treasury also officially designated the following organizations as SDGT's for their provision of funding and support to HAMAS: Commite de Bienfaisance et de Secours aux Palestiniens (CBSP); The Association de Secours Palestinien (ASP); The Palestinian Relief and Development Fund, or Interpal; The Palestinian Association in Austria, PVOE; and The Sanabil Association for Relief and Development. These designations remain in effect to this day.

53.     On August 7, 2007, the U.S. Department of the Treasury officially designated the Al-Salah Society and its Director, Ahmad Harb Al-Kurd, as SDGT's pursuant to Executive

Order No. 13224 for supporting and financing HAMAS's terrorist agenda. These designations remain in effect to this day.

54.     On November 12, 2008, the U.S. Department of the Treasury officially designated the Union of Good, an organization created by HAMAS to transfer funds raised by affiliates to HAMAS, as an SDGT pursuant to Executive Order No. 13224. This designation remains in effect to this day.

55.     On March 18, 2010, the U.S. Department of the Treasury officially designated the Islamic National Bank of Gaza, an institution established and controlled by HAMAS, as an SDGT pursuant to Executive Order No. 13224. That same day, the Department of the Treasury also officially designated Al-Aqsa TV, a station financed and controlled by HAMAS, as an SDGT pursuant to Executive Order 13224. These designations remain in effect to this day.

56.     On October 4, 2012, the U.S. Department of the Treasury officially designated the following organizations as SDGT's pursuant to Executive Order No. 13224 for their provision of funding and support to HAMAS: Al-Quds International Foundation and Waqfiya Ri'aya al-Usra al-Filistinya wa al-Lubnanya. These designations remain in effect to this day.

57.     On September 9, 2015, the U.S. Department of the Treasury officially designated the following individuals as SDGT's pursuant to Executive Order No. 13224 for their activity connected with HAMAS: Mohammed Deif; Rawhi Mushtaha; and Yahya Sinwar. These designations remain in effect to this day.

58.     On September 10, 2015, the U.S. Department of the Treasury officially designated the following HAMAS leaders and financiers as SDGT's pursuant to Executive Order No. 13224 for their activity connected with HAMAS: Salih Muhammad Sulayman al-Aruri ("Al-Arouri"); Mahir Jawad Yunis Salah ("Salah"); Abu-Ubaydah Khayri Hafiz Al-Agha ("Al-

-14-

Agha"); Mohammed Reda Mohammed Anwar Awad ("Awad"); and Asyaf International Holding Group for Trading and Investment. These designations remain in effect to this day.

59.     Between 1999 and the dates of the terrorist attacks at issue in this case, the courts of the United States, including this Court, have published a number of decisions finding that HAMAS was responsible for terrorist attacks in which American and Israeli citizens were killed or injured.

## II.     HAMAS'S EXTENSIVE USE OF FACEBOOK

### A.     Facebook's Services

60.     Facebook provides a sophisticated yet easy-to-use internet social media platform and related products and services (collectively, "Services") under the general trade name "Facebook."

61.     Facebook's Services include use of Facebook's computer infrastructure, network, applications, tools and features, communications services, and more.

62.     Among the specialized tools and features Facebook provides as part of its Services are: "Messenger" for texting, chatting with groups, making on-line voice and video calls, recording voice messages, sending videos and pictures, and making payments; "Social Plugins" for integrating Facebook with external websites; "Badges" for sharing information on external websites; various smartphone applications; other tools for monitoring, scheduling, and creating alerts; and more.

63.     Facebook's communications services can be used to post public messages, or privacy settings and messages are available to enable users to communicate privately.

64.     In addition, Facebook permits users to create and follow an unlimited number of accounts.

65.     Facebook provides its Services only to its registered users, who register by inputting identifying information and clicking on a "Sign up" button.

66.     It is not necessary to view any of the "Terms of Service" or other policies or conditions in order to proceed with registration.

67.     Facebook provides its Services to its registered users free of charge.

68.     Facebook does not require users to provide any form of positive identification, so it is simple for users to create anonymous or pseudonym accounts.

**B.     HAMAS and Facebook**

69.     Facebook has played an essential role in HAMAS's ability to carry out its terrorist activities.

70.     It is not merely about content, it is about the sophisticated technological means that Facebook provides to HAMAS to make its terroristic goals a reality.

71.     Simply put, HAMAS uses Facebook as a tool for engaging in terrorism.

72.     The value of Facebook to HAMAS is demonstrated by the many hundreds, probably thousands, of Facebook accounts used by HAMAS, its members, constituent groups, and related entities and affiliates to promote and carry out activities of HAMAS. These HAMAS-related Facebook sites openly display the emblems and symbols of HAMAS and its affiliated entities.

73.     HAMAS's official websites have included hyperlinks (signified by Facebook's symbol "f") to Facebook pages operated by HAMAS, as shown in the following screen shot from HAMAS's primary official Arabic website:

-16-



74.     Many of HAMAS's leaders have Facebook accounts in their own names that they or other HAMAS members use to promote Hamas and carry out the activities of HAMAS, including the following:

a.      Emad El-Alami (Abu Hammam), Member of HAMAS Politburo, personally designated SDGT since August 2003;

b.      Khalil El-Hayya (Abu Osama), Member of HAMAS Politburo;

c.      Osama Hamdan, Member of HAMAS Politburo and head of foreign relations, personally designated SDGT since August 2003,

d.      Ismail Haniyeh (Abu Abed), Vice President of Hamas Politburo and leader HAMAS in Gaza.;

e.      Mousa Abu Marzook, (Abu-'Umar), Vice President of HAMAS Politburo, personally designated SDGT since August 2003;

f.      Mohammad Nazzal, (Abu Bara'), Member of HAMAS Politburo;

g.      Izzat Al-Rishiq (Abu Omar), Member of HAMAS Politburo;

h.      Mahmoud al-Zahhar, (Abu Khaled), Member of HAMAS Politburo;

i.      Yahya Moussa, HAMAS member of Palestinian Legislative Council (PLC).

75.     Many official HAMAS spokesmen have Facebook accounts in their own names that they use to promote and carry out the activities of HAMAS. Profiles of several of these

spokesman and hyperlinks to their Facebook accounts have appeared on HAMAS's official websites. Official Hamas spokesmen who have maintained Facebook accounts which they have used to promote and carry out the activities of Hamas have included, for example:

    a.       Husam Badran;

    b.       Salah Bardawil;

    c.       Fawzi Barhoum;

    d.       Abd al-Rahman Shadid;

    e.       Sami Abu Zuhri;

76.     HAMAS news organizations also maintain Facebook accounts, which they use to promote and carry out HAMAS activities. Some of these HAMAS news organizations maintain multiple Facebook sites, including separate Facebook sites in Arabic and English. HAMAS news organizations that use Facebook to promote and carry out HAMAS activities include, for example:

    a.       Al-Aqsa TV, specifically designated SDGT since March 2010;

    b.       Al-Aqsa Voice (Radio);

    c.       Al-Quds TV;

    d.       Al-Ray;

    e.       Al-Resalah;

    f.       Felesteen (Newspaper);

    g.       Quds News Network;

    g.       Safa (Palestinian Press Agency in Gaza);

    h.       Shehab News Agency.

77.     HAMAS information websites and forums also maintain Facebook accounts, which they use to promote and carry out HAMAS activities. Some of these HAMAS information websites and forums maintain multiple Facebook sites, including separate Facebook sites in Arabic and English. HAMAS information websites and forums that use Facebook to promote and carry out HAMAS activities include the following, for example:

a.      HAMAS Media Office (HAMAS Information Office);

b.      Palestinian Information Center (Palinfo);

c.      Palestine Network for Dialogue (Paldf);

d.      Palestine Plus.

78.     HAMAS subgroups and affiliate organizations also maintain Facebook accounts on which they display their affiliation with HAMAS using various HAMAS emblems, disseminate messages from HAMAS, enlist support for HAMAS, and otherwise promote and carry out HAMAS activities. Such HAMAS subgroups and affiliate organizations that have used Facebook to promote and carry out HAMAS activities include, for example:

a.      HAMAS Division of Refugee Affairs;

b.      HAMAS Prisoners' Leadership (Ahrar Wledna);

c.      HAMAS in the West Bank (Omamah);

d.      Islamic Bloc – HAMAS Student Wing – Kotla;

e.      Izz al-Din al-Qassam Brigades;

f.      Palestinian Authority offices and divisions in Gaza controlled by HAMAS, including for example, the Palestinian Interior Ministry in Gaza;

g.      Raed Attar Rafah Brigade;

h.      Women for Palestine;

79.     In addition, other organizations that have been designated as SDGT's for providing financial support and fundraising to HAMAS also operate Facebook pages, including, for example:

   a.     Commite de Bienfaisance et de Secours aux Palestiniens (CBSP), **specifically designated SDGT since August 2003**;

   b.     Interpal, **specifically designated SDGT since August 2003**;

   c.     Islamic National Bank of Gaza, **specifically designated SDGT since March 2010**.

80.     HAMAS and its affiliated organizations use Facebook's Services in a multitude of ways to promote and carry out HAMAS's activities, including its terrorist activities. The utility of Facebook to HAMAS is only limited to each HAMAS user's imagination and creativity in deploying Facebook's powerful features. The following are some examples of how HAMAS has used Facebook to promote and carry out its terrorist activities.

81.     HAMAS has used Facebook as a method of sharing operational and tactical information with its members and followers. For example, HAMAS-related Facebook pages have posted notices of upcoming demonstrations, road closures, Israeli military actions, and instructions to operatives.

82.     HAMAS has used Facebook as a gateway to other extremist sites and online radical content by linking on Facebook group pages and discussion forums.

83.     HAMAS has used Facebook as a media outlet to spread its extremist ideology, especially to youth, and to recruit followers.

84.     HAMAS has used Facebook as a means of gathering information, intelligence, and reconnaissance from remote sources and locations.

85.     HAMAS has used Facebook to disseminate graphic images, videos, and music to inflame Palestinian emotions and incite violence against Israelis and Jews.

86.     HAMAS has used Facebook to glorify terrorist "martyrs" and develop a "cult of death" among Palestinians living in Gaza and the West Bank.

87.     HAMAS has used Facebook to strengthen organizational links and communications, and to build public support among Palestinians in Gaza and the West Bank.

88.     HAMAS has used Facebook to circumvent the shutting down of conventional media outlets, for example by providing live-streaming of radio and television on Facebook or linking from Facebook to other online sites.

89.     HAMAS has used Facebook to provide hyperlinks to other online sites, postings, media, and other social network media.

90.     HAMAS has used Facebook as a platform from which followers can access not only Facebook postings and comments, but also Twitter feeds, YouTube content, and other online social network media via the Facebook page.

91.     HAMAS has used Facebook to encourage violence through disseminating posters, cartoons, and instructional materials suggesting terrorist acts.

92.     HAMAS has used Facebook as a means to communicate its messages to the broader news media, including through English and Hebrew Facebook pages and posts, and to attempt to spread fear, threaten, intimidate, and coerce the Israeli government, Jews, and Israelis.

93.     HAMAS and its affiliates have used Facebook for fundraising and to generate material support for HAMAS.

94.     HAMAS has used Facebook to promote its political agenda vis a vis other Palestinian groups and leaders, and to give it more of an appearance of legitimacy.

95.     HAMAS has used Facebook to conduct public diplomacy and negotiations with other groups and with countries such as Iran and Egypt.

96.     HAMAS has used Facebook's "hashtag" feature to enable users to locate HAMAS sites and link to other related terrorist content and sites.

97.     Facebook is especially useful to HAMAS because, among other things, it is provided free of charge, allows unlimited accounts and usage, offers the ability to push content to an enormous number of users instantaneously, provides the ability to communicate without disclosing location, enables like-minded users to connect and communicate, affords both public and private communications, and integrates other social media platforms and services.

## III.    THE TERRORIST ATTACKS THAT INJURED THE PLAINTIFFS

### A.    The Kidnapping and Murder of Yaakov Naftali Fraenkel: June 12, 2014

98.     Following the 2012 release of HAMAS prisoners in exchange for abducted Israeli soldier Gilad Shalit, HAMAS used Facebook to gain public favor among Palestinians for its accomplishment in obtaining the release of Palestinian prisoners.

99.     In addition, HAMAS used Facebook to publicize its desire and intentions to kidnap additional Israelis to use (dead or alive) for negotiating the release of additional HAMAS prisoners.

100.    HAMAS also used Facebook to generate popular Palestinian support for HAMAS prisoners, and to raise funds to provide financial support for former and current HAMAS prisoners.

101.    Prior to June 12, 2014, HAMAS planned, conspired and made preparations to kidnap and hold hostage or murder innocent Israeli civilians by means of picking up Israeli hitchhikers in a vehicle designated for that purpose.

102.    Pursuant to this plan, on the night of June 12, 2014, two trained agents, operatives and employees of HAMAS named Marwan Qawasmeh and Amer Abu Aysha ("HAMAS Kidnappers") drove a stolen vehicle with Israeli license plates on roads in Gush Etzion, southwest of Jerusalem, looking for one or more Israeli civilians to kidnap.

103.    At around 10:15 that night, 16-year-old Yaakov Naftali Fraenkel ("Naftali"), together with Israeli teenagers Gilad Shaer and Eyal Yifrah, were waiting at a bus stop in Gush Etzion, looking to hitch a ride in the direction of their homes, where they were planning on spending the weekend.

104.    The HAMAS Kidnappers stopped and picked them up in their stolen vehicle.

105.    Quickly, the HAMAS Kidnappers drew weapons on the three youngsters in the back seat.

106.    Shortly after being abducted in the car, Gilad Shaer managed to place a call to the police stating in a whisper that he had been kidnapped.

107.    As a result of this telephone call, the Israeli police were able to trace the location of the missing boys to the Hebron area.

108.    The HAMAS Kidnappers shot the boys at point blank range in the back seat of the vehicle time that same evening.

109.    They then torched and abandoned the stolen Israeli vehicle, which was found by security personnel with numerous bloodstains.

110.    That same night, the HAMAS Kidnappers deposited the bodies of the three murdered teenagers in a field near Hebron belonging to one of their co-conspirators, Hussam Qawasmeh (A/K/A Hussam Kawasme) ("Qawasmeh").

111.    However, the tragic fate of the three boys was not known until much later.

112.    Soon after the Israeli authorities learned of the kidnapping, the Israel Defense Forces launched a massive military operation referred to as "Brother's Keeper" to return the missing boys.

113.    Search teams were dispatched to locate the teenagers and continuously hunted for them, day and night, throughout the 18-day ordeal.

114.    The entire State of Israel, foreign governments and millions of concerned individuals around the world maintained a prayer vigil as the search continued for the missing boys. Operation Brother's Keeper continued until June 30, 2014 when the bound bodies of the three teens, all executed by close range gunfire, were found in a field near Hebron.

115.    From June 12 to June 30, 2014, Naftali's family members were in agony not knowing the fate of their son and brother.

116.    These feelings of mental anguish and emotional distress were only exacerbated once the bodies were found.

117.    As a result of the Kidnapping and Murder, Naftali's family members have suffered and continue to suffer extreme psychological and emotional harm.

118.    The abduction of the teenagers was met with celebration among many Palestinians in the West Bank and Gaza.

119.    HAMAS publicly proclaimed that the abduction was legitimate, and as an opportunity to increase attacks against Israel and spark a third "intifada."

120.    On June 13, 2014, the day after the abduction, HAMAS spokesman Hussam Badran posted the following statement (in Arabic) on his Facebook page on behalf of HAMAS: "We call upon our people in all parts of the West Bank to confront the occupation, whether as part of mass confrontations or privately-initiated resistance [operations] . . . This is an

-24-

opportunity to widen the circle of confrontation, and restore the West Bank to its natural status as the spearhead of the resistance." The following is a screen-shot of that Facebook post:



121.    On or about August 5, 2014, less than a week after the tragic conclusion of Operation Brother's Keeper, Israel announced that Israeli security forces had arrested Qawasmeh, a known HAMAS operative who had previously served time in Israeli prison for HAMAS related terror activities, in connection with the Kidnapping and Murder. By the time of his arrest, Qawasmeh had shaved his beard and received a fake passport, in what is believed to have been part of a plan to escape to Jordan.

122.    Qawasmeh admitted to having been involved in the planning and preparation of the Kidnapping and Murder.

123.    HAMAS provided Qawasmeh with training, support and funding in connection with the Kidnapping and Murder.

124.    The funding was provided by HAMAS through a HAMAS charity organization was dedicated to raising funds and providing financial support to former and current HAMAS prisoners.

125.    Among other things, Qawasmeh obtained the financing for the attack from HAMAS, he provided the HAMAS Kidnappers with weapons and the stolen Israeli vehicle used in the kidnapping, and he assisted the HAMAS Kidnappers to bury the bodies of the three teens on his recently acquired property near Hebron and to evade police.

126.    On or about September 23, 2014, the two HAMAS Kidnappers, both suspects in the murders, were located in a building in the Hebron area and surrounded by Israeli military forces.

127.    A shootout ensued and both Marwan Qawasmeh and Amar Abu Aysha were killed.

128.    Senior HAMAS officials praised the abduction and called the HAMAS Kidnappers "martyrs" and "heroes."

129.    On or about January 6, 2015, an Israeli court convicted Qawasmeh of the Kidnapping and Murder of Naftali, Gilad Shaer and Eyal Yifrah, and sentenced him to three life terms in prison for the murders.

130.    HAMAS's military wing, the Izz ad-Din al-Qassam Brigades claimed responsibility for the Kidnapping and Murder.

131.    On 20 August 2014, a senior HAMAS leader, Salah al-Arouri, was tape-recorded addressing an Islamic conference in Turkey where he boasted about HAMAS's responsibility for the Kidnapping and Murder.

132.    Al-Arouri has been identified as the terrorist mastermind behind the operation.

133.    HAMAS has used Facebook to glorify the HAMAS Kidnappers, and has even established memorial Facebook pages in their honor.

134.    HAMAS also continues to use Facebook to praise the terrorist operation in which Naftali and the two other Israeli teenagers were abducted and brutally murdered.

**B.     The Murder of Chaya Zissel Braun: October 22, 2014**

135.    HAMAS has long used the Al-Aqsa Mosque as a flash point and rallying cry to stir emotion and anger among Palestinians against Jew and Israelis. For example, on October 9, 2014, HAMAS's Palestinian Information Center used Facebook to announce an action "to reclaim/recapture the blessed Al-Aqsa Mosque":



136.    Prior to October 22, 2014, HAMAS planned, conspired and made preparations to kill and injure innocent Israeli civilians by means of vehicular terror attacks against pedestrians and groups of commuters waiting at bus stops and train stations.

137.    Pursuant to this plan, on the afternoon of October 22, 2014, an agent and operative of HAMAS, Abdel Rahman Shaludi ("Shaludi") drove a car to the Ammunition Hill light rail station in Jerusalem with the intention of causing injury and/or death to Israeli civilians by traveling at high speed and ramming his vehicle into them.

138.    Shaludi had previously served time in Israeli prison for terrorism related offenses. He was the nephew of Mohiyedine Sharif, the former head of the HAMAS military wing and its chief bomb-maker.

139.    As a group of passengers, including plaintiffs Shmuel Elimelech Braun and Chana Braun, who was pushing her infant daughter's stroller, were disembarking from the light rail at

the Ammunition Hill station, Shaludi drove onto the light rail tracks and rammed his vehicle into the crowd of pedestrians.

140.     The vehicle struck three-month-old Chaya's stroller causing her to be thrown some ten meters into the air.

141.     Decedent Chaya Zissel Braun landed on her head on the pavement while her mother, plaintiff Chana Braun, screamed in horror.

142.     Plaintiff Shmuel Elimelech Braun was knocked over and badly injured by the car.

143.     The terrorist attacker, Shaludi, was shot by Israeli police as he attempted to flee the scene and later died of his wounds.

144.     Decedent Chaya Zissel Braun was critically injured in the Terrorist Attack.

145.     When rescue personnel arrived, they found Chaya with no pulse and serious head injuries.

146.     The rescue personnel succeeded in resuscitating Chaya and obtaining a pulse.

147.     They transported her, connected to a ventilator and in critical condition, to the nearby Hadassah Mount Scopus Hospital.

148.     However, baby Chaya did not survive. She was pronounced dead some two hours after her arrival at the hospital.

149.     Chaya Zissel Braun was a long awaited child for the young parents—plaintiffs Shmuel Elimelech and Chaya Braun—who had tried to conceive unsuccessfully for a long time before baby Chaya was born.

150.     Plaintiff Chana Braun suffered psychological and emotional harm.

151.    Plaintiff Chana Braun was pushing baby Chaya's stroller when the car struck. One moment she was walking along the street pushing her darling child; the next moment her baby daughter was smashed to the ground, obviously critically wounded.

152.    Plaintiff Shmuel Elimelech Braun suffered severe physical injuries as well as psychological and emotional harm as a result of the attack. He witnessed the car strike his wife and infant daughter's stroller and saw his infant daughter being thrown some ten meters into the air and land on her head unconscious.

153.    Plaintiffs Shimshon Sam Halperin, Sara Halperin, Murray Braun and Esther Braun learned of the attack shortly after it occurred.

154.    The two sets of grandparents were devastated by the news and were thrown into a state of severe emotional turmoil.

155.    They were crushed to hear that their granddaughter had been murdered like this and were horrified over the injuries to their children.

156.    They all suffered psychological and emotional harm as a result of the attack in which their son and daughter were seriously injured and their granddaughter was brutally killed.

157.    HAMAS has used Facebook to publicly praise the attack and to glorify the attacker as a "martyr" and "hero."

**C.      The Murder of Richard Lakin: October 13, 2015**

158.    116.    In September 2015, HAMAS used Facebook to spread false claims that the Al-Aqsa Mosque in Jerusalem was under attack by "Zionists."

159.    As HAMAS members rioted on the Temple Mount, HAMAS used Facebook to call for Palestinians to defend Al-Aqsa and Jerusalem against Jews and Israelis.

117.    For example, on September 13, 2015, HAMAS leader Mushi al-Masri, a HAMAS MP and spokesman, posted a series of posts (including photos, cartoons, and video) on his Facebook page claiming that the Al-Aqsa Mosque was under attack by "Zionists," and calling for Muslims to defend and liberate Al-Aqsa. These posts included the following:

  

160.    On September 22, 2015, a 19-year-old Palestinian woman dressed in full niqab clothing, Hadeel al-Hashlamon, approached an Israeli soldier, pulled out a knife, and attempted to stab him. In response, she was shot and killed. That same day, HAMAS used Facebook to portray al-Hashlamon as a martyr killed for wearing an Islamic veil.

161.    For example, on September 22, 2015, HAMAS leader Mushi al-Masri posted the following graphic of the al-Hashlamon incident on his Facebook page, calling al-Hashlamon a "martyr" and stating that the Jews would soon disappear:



-30-

162.     Also on September 22, 2015, HAMAS spokesman Izzat al-Risheq posted the following graphics on his Facebook page with hashtags "#Hadeel Hashlamon" and "Martyr of the Niqab [veil]," claiming that Hashlamon was killed because she refused to remove her veil:




163.     Neither al-Masri nor al-Risheq disclosed that Hashlamon had drawn a knife and attempted to stab an Israeli soldier at the time she was shot.

164.     HAMAS later claimed that the knife found at the scene was a fabrication of the Israelis.

165.     On October 1, 2015, HAMAS terrorists murdered a young couple, Rabbi Eitam and Na'ama Henkin, in a brutal roadside shooting attack on their vehicle while they were driving home from a social gathering with their four young children in the back seat.

166.     HAMAS's Palestine Dialogue Forum (PALDF) used Facebook to honor the terrorists.

167.     On October 2, 2015 HAMAS leader Mushi al-Masri also used Facebook to praise the attack as a "heroic operation" and as a "natural response to the crimes of the enemy," including the "Judaization of al-Aqsa" and the "murder of the girl al-Hashlamon," as follows:



168.    The Henkins' murder marked the beginning of a new intense wave of terror attacks in Israel, which have been carried out both by terrorist operatives and by individuals who were incited and encouraged by HAMAS via Facebook to conduct such attacks.

169.    These terror attacks have been carried out by young Palestinians and Arabs, with one of the youngest attackers being just thirteen years old.

170.    The weapons of choice for these murders are knives and cars, with guns, axes, meat cleavers and screw drivers also being used.

171.    HAMAS has used Facebook to openly incite and encourage these attacks, and to praise the terrorists who have carried them out. This wave of violence has been variously labeled as a new "Al Aqsa Intifada," as the "Knife Intifada," and as the "Facebook Intifada."

172.    From the beginning of October 2015 through March 14, 2016, Palestinian and Arab terrorists, including many HAMAS operatives, murdered more than 30 Israelis, and injured more than 400 Israelis.[1]

173.    These attacks have been part of a terror campaign driven by HAMAS's use of Facebook to incite, enlist, organize, and dispatch would-be killers to "stab" and "slaughter Jews."

174.    This campaign has been directed by HAMAS, as well as and other terrorist organizations and the Palestinian leadership.

---

[1] *See* http://mfa.gov.il/MFA/ForeignPolicy/Terrorism/Palestinian/Pages/Wave-of-terror-October-2015.aspx.

175.    HAMAS has taken advantage of the fact that so many young Palestinians use Facebook, as evidenced by the fact that many of the Palestinians who carry out attacks post their thoughts and intentions about attacks before they carry them out.

176.    Palestinian young people are inundated on HAMAS-related Facebook accounts by gruesome images of terrorists deemed "martyrs" by HAMAS, and HAMAS often falsely portrays the terrorists as victims rather than aggressors.

177.    On October 3, 2015, Palestinian terrorist Muhannad Halabi carried out a stabbing attack in the Old City of Jerusalem, murdering two Israelis and wounding two others.

178.    Investigators discovered that Halabi has written on his Facebook page prior to the attack: "As far as I can see, the third intifada has begun . . . What is being done to Al-Aqsa is also being done to our other holy sites. What it being done to the women of Al-Aqsa is also being done to our mothers and sisters. I do not think the [Palestinian] people will accept the humiliation . . . The Palestinian people will wage an intifada. In fact, it is waging an intifada."

179.    On October 7, 2015, female Palestinian terrorist carried out a stabbing attack in the Old City of Jerusalem.

180.    A few hours before the attack, she wrote on her Facebook page: "Mother, where am I going? Mother, I am going to be a martyr [shaheeda]. Our greatest aspiration is to die as a martyr for the sake of Allah."

181.    Also on October 7, 2015, Palestinian terrorist Tamer Varidat carried out a stabbing attack in Petah Tikvah.

182.    Two days earlier, Varidat had changed his Facebook profile picture to a picture of the Al-Aqsa mosque.

183.    On October 10, 2015, HAMAS leader Mushi al-Masri used his Facebook page to disseminate a video of his speech at a rally in Khan Yunis in which he called upon all Palestinian factions to "join the Al-Quds Intifada."

184.    In his speech, al-Masri brandished a knife and stated, "This is our choice. The knife symbolizes the battle of the West Bank and Jerusalem." The video was posted to al-Masri's Facebook page with the message, "In the Khan Yunis rally. We have brought slaughter upon you. We will disperse you. Just wait, oh Sons of Zion":



185.    On October 10, 2015, HAMAS's Islamic Bloc student wing for the Jabaliya Camp in Gaza posted the following graphic, promoting the wave of terrorist attacks against Jews in Israel, for its profile photo on its Facebook site:



186.    On October 11, 2015, a female Palestinian terrorist from Jabel Mukaber named Israa Jabees set off an explosion in her car when she was stopped *en route* to Jerusalem by an Israeli police officer.

187.    Jabees had hand-written notes on her person expressing support for "martyrs" and had been on her way to carry out a major terror attack in Jerusalem.

188.    HAMAS leader Mousa Abu Marzook, a deputy head of Hamas's Politburo who has been a designated SDGT since 2003, often uses his Facebook account to explain HAMAS's positions.

189.    On October 11, 2015, Abu Marzook used his Facebook account to explain why Hamas had decided to refrain from launching rockets into Israel in support of the "Intifada" raging against Israel, despite the fact that many followers had urged HAMAS to do so, writing as follows: "The Intifada will go by without us winning the battle of missiles, and [launching missiles] will only portray us as aggressors and them as victims in the eyes of the world."

190.    On October 12, 2015, HAMAS's "Palestine Plus" Facebook site posted the following cartoon graphic with the Arabic message, "What was taken by force can only be restored by force," and the hashtag "Al-Quds Intifada":



191.    Also on October 12, 2015, HAMAS's "Palestine Plus" Facebook site posted the following photograph with the Arabic message, "Image of the wounded of the day's events in East Gaza by the Israeli occupation":



192.     Also on October 12, 2015, HAMAS's "Palestine Plus" Facebook site posted the following graphic with the Arabic caption "Al-Quds Intifada," and hashtags "#Palestine Rise Up" and "#Al-Quds Intifada":



193.     On the morning of October 13, 2015, agents and operatives of HAMAS, Bilal Abu-Ghanem and Bahaa Allyan, one armed with a gun and the other with a knife, boarded Jerusalem Bus number 78 and, acting on behalf of HAMAS, began shooting and stabbing the passengers (the "Bus 78 Attack").

194.     Two Israelis were killed instantly and at least 16 others were wounded, among them decedent Richard Lakin who succumbed to his wounds two weeks later on October 27, 2015.

195.     Decedent Richard Lakin was shot in the head and stabbed in the face and chest.

196.     He suffered severe injuries and was taken to the hospital in critical condition.

197.    He remained in a medically induced coma and underwent multiple emergency surgeries during the two weeks following the attack before he died.

198.    Plaintiffs Micah Lakin Avni and Manya Lakin, decedent Richard Lakin's children, were devastated by the brutal attack on their father which left him in a coma for two weeks, and by his subsequent untimely death. They suffered severe psychological emotional harm as a result of the attack.

199.    After the Bus 78 Attack, investigators found that one of the attackers, HAMAS operative Bahaa Allyan, had posted a "martyr's will" on his Facebook page in December 2014.

200.    Allyan's "martyr's will" was reposted by HAMAS on various HAMAS-related Facebook accounts to idealize Allyan and encourage more attacks.

201.    It was also discovered that Allyan had posted on his Facebook page photographs of Palestinian terrorists lying dead in puddles of blood after being shot dead in the course of their attacks.

202.    On October 4, 2015, Allyan had complained on his Facebook page that his hometown village of Jabel Mukaber was too complacent and not living up to its reputation for carrying out terrorist attacks against Israelis. (Jabal Mukaber was the home of two Palestinian terrorists who had murdered and mutilated five Jewish men at prayer in a Har Nof synagogue and an Israeli Druze police officer who responded to the attack in November 2014).

203.    In addition, less than two days before carrying out the Bus 78 Attack, Allyan posted a claim on his Facebook page that female Palestinian terrorist Israa Jabees from Jabal Mukaber was not the aggressor when she was injured attempting to carry out an attack on October 11, 2015.

204.    HAMAS praised the Bus 78 Attack, stating it is "a message to anyone who harms our holy places," and calling for a continuation of "the intifada."

205.    On October 13, 2015, following the Bus 78 Attack, HAMAS leader Mushi al-Masri used his Facebook page to post the following cartoon graphic with the hashtag "#Al-Quds Intifada" and the message, "Today is the day of God Almighty":



206.    Al-Masri also used his Facebook page to post the following cartoon graphic on October 13, 2015 with the message, "Arise and Resist" and the hashtag "#Al-Quds Intifada":



207.    HAMAS's "Islamic Bloc" faction created a video reenactment of the Bus 78 Attack and published it the very next day, October 14, 2015, on HAMAS's "Palestine Plus" Facebook page with the message: "#Watch: reenactment video of the bus operation that was carried out yesterday at Jabal Mukaber by the Jerusalem mujahidin (martyr Baha Alyan and

prisoner Bilal Ghanem) prepared by the Information Office of the Islamic Bloc, western Gaza."

The Facebook post appeared as follows:



### D.     The Stabbing and Attempted Murder of Menachem Mendel Rivkin: January 27, 2016

208.     HAMAS continued to use Facebook to promote and incite terrorist attacks against Jews and Israelis through the end of 2015 and in 2016.

209.     The Facebook posts described in this Complaint only relate to a few of the many terror attacks carried during the relevant time of this Complaint, and the Facebook posts herein are only a few examples of numerous Facebook posts by HAMAS and the terrorist attackers.

147.     For example, on October 18, 2015, HAMAS leader Mushi al-Masri used his Facebook page to "share" the following post from Ayman Otoum with a photograph of an injured Israeli soldier and a terrorist on the ground holding a knife with the Arabic message: "All means are permissible in Jihad as long as they bring victory for religion. Sword; or explosion; or bullet; and for them to challenge the knife":



210.    Also on October 18, 2015, HAMAS leader Mushi al-Masri used his Facebook

page to post the message following message in Arabic:

> "Stab – there is no place in your land for an outsider;
> Stab – and be strong and not submissive;
> Stab – and lift your head like a palm tree;
> Stab – in Jerusalem and in Hebron;
> Stab – each occupier and despicable usurper;
> Stab – and glorify the name of your Lord Galilee;
> Stab – do not rest, and live long afterwards;
> #Al-Quds Intifada"



211.    On October 22, 2015, two HAMAS operatives carried out a stabbing attack in

Beit Shemesh, Israel.

212.    The two were wearing Al-Qassam Brigades t-shirts when they carried out the

attack.

213.    Investigators later found that one of the terrorists had changed his Facebook

profile pictures several times in the days before the attack, including: a profile picture of the

terrorist holding a knife; a profile picture of Al-Aqsa mosque with the caption, "I have been blessed with love"; and a profile picture of intifada symbols and a notice reading, "I want to be a martyr [shaheed] for the sake of Al-Aqsa."

214.   HAMAS's Palestine Dialogue Forum (PALDF) used Facebook to post a death notice honoring female terrorist Dania Jihad Irshid, who died on October 25, 2015 attempting to carry out a stabbing attack near the Cave of the Patriarchs in Hebron.

215.   HAMAS's Islamic Bloc in Hebron University posted a HAMAS death notice for "a martyr [shaheed] of Palestine" on its Facebook page for terrorist Human Iss'id, who died on October 27, 2015 attempting to carry out a stabbing attack at the entrance to Hebron.

216.   HAMAS's Islamic Bloc in Jenin posted death notices on its Facebook page honoring two terrorists who died carrying out separate stabbing attacks on November 10, 2015.

217.   HAMAS's Quds News Network and Shehab News Agency each posted notices on their Facebook pages honoring female terrorist Maram Hassouna, who attempted to carry out a stabbing attack with a pickaxe in the village of Anabta on December 1, 2015.

218.   HAMAS's Islamic Bloc at Bir Zeit University posted a notice on its Facebook page honoring terrorist Anas Hamad, who died carrying out a vehicular attack near Ramallah on December 4, 2015.

219.   HAMAS's Palestine Dialogue Forum (PALDF) posted notices on its Facebook page honoring two terrorists who died carrying out separate stabbing attacks on December 24, 2015.

220.   HAMAS's Quds News Network posted a noted on its Facebook page congratulating a terrorist sniper who carried out attacks in Hebron on January 3, 2016, and encouraging more shooting attacks.

221.    HAMAS's Islamic Bloc in Nablus posted a notice on its Facebook page honoring a terrorist who died carrying out a stabbing attack near Hebron on January 12, 2016.

222.    On January 17, 2016, HAMAS's Islamic Bloc at Al-Najah University in Nablus posted pictures glorifying terrorist Bilal Abu-Ghanem, one of the terrorist who carried out the Bus 78 Attack that murdered Richard Lakin.

223.    The same day, another post on the Facebook site honored two of the terrorists who murdered Rabbi Eitam and Na'ama Henkin on October 1, 2015.

224.    At approximately 11:00 p.m. on the night of January 27, 2016, an agent and operative of HAMAS, Abada Abu Ras, arrived armed with a knife at a gas station in Givat Ze'ev just North of Jerusalem and, and, acting on behalf of HAMAS, trailed plaintiffs Menachem Mendel Rivkin and Bracha Rivkin who were on their way to a nearby restaurant, stabbed plaintiff Menachem Mendel Rivkin in his neck and fled (the "Terrorist Stabbing").

225.    Witnesses at the scene chased the terrorist stabber and subdued him until the police arrived to arrest him.

226.    The terrorist hails from the village of Bir Nabala near Jerusalem, a known HAMAS stronghold. He is the son of senior HAMAS operative, Dr. Azziz Abu Ras, who was among the HAMAS members exiled to Marj al-Zohour, Lebanon in the early 1990's.

227.    Plaintiff Menachem Mendel Rivkin was rushed to the hospital in serious condition where he was placed into the intensive care unit. Plaintiff Menachem Mendel Rivkin remained hospitalized for eight days, five of which he was in intensive care.

228.    Plaintiff Bracha Rivkin, who witnessed the attack and its aftermath, suffered severe psychological and emotional injuries as a result of the terrorist stabbing. Plaintiffs S.S.R., M.M.R., R.M.R., S.Z.R., the minor children of Menachem Mendel and Bracha Rivkin also

suffered severe psychological and emotional injuries as a result of the attack in which their parents were assaulted and their father was severely physically injured.

### E.     The Murder of Taylor Force: March 8, 2016

229.    HAMAS continued to use Facebook to promote terrorist stabbing and other attacks against Israelis, and terrorists continued to carry out such attacks.

230.    On the evening of March 8, 2016, an agent and operative of HAMAS, Bashar Mohamed Massalha, aided and abetted by another HAMAS agent and operative, Muhammad Awieda, arrived with a knife at the Jaffa boardwalk, just south of Tel Aviv, and, acting on behalf of HAMAS, began stabbing pedestrians, killing 29-year-old decedent Taylor Force ("Taylor") and seriously injuring at least ten others (the "March 2016 Terrorist Stabbing").

231.    Taylor, a United States army veteran, was on a two-day trip to Israel and the Palestinian territories with a group of M.B.A. students from Vanderbilt University's Owen Graduate School of Management.

232.    At the time of the stabbing attack, he was walking with some of his fellow Vanderbilt classmates along the Jaffa boardwalk, a popular seaside promenade for shopping and leisure along the biblical port. The group was on their way to dinner at a nearby restaurant.

233.    The terrorist-stabber Massalha was shot dead by police after being chased from the Jaffa Port along the Tel Aviv beach promenade.

234.    The terrorist had managed to stab an additional ten other civilians in the rampage.

235.    Massalha was from the village of Hajja near Nablus and had a history of affiliations with HAMAS.

236.    On February 10, 2016, Massalha had posted a video of Palestinians rioting in Qabatiya against Israeli soldiers.

237.    Massalha had also posted many pictures of his pilgrimage to Mecca on his Facebook page, from which he had just returned on March 6, 2016.

238.    Taylor was rushed to the Wolfson Medical Center, but was pronounced dead on arrival.

239.    Taylor's family was devastated to learn the tragic news that their son and brother, Taylor Force, had been killed.

240.    They were shocked to hear of the heinous details of their loved one's unexpected terrorist murder in Israel by a Hamas attacker.

241.    They suffered severe psychological and emotional injuries as a result of the attack.

242.    HAMAS released a statement praising the attack as a "heroic operation" and referring to Massalha as one of its "martyred sons and daughters."

243.    HAMAS's Shehab News Agency posted pictures on its Facebook page honoring Massalha with the caption, "General of the knives."

## IV.    FACEBOOK'S CONDUCT

### A.    Facebook Knowingly Provided Material Support and Resources to HAMAS

244.    HAMAS's reputation as an organization that has engaged in and continues to engage in terrorist acts is widespread and has been reported in the world news media for decades. HAMAS's designation as a Foreign Terrorist Organization is public knowledge that has likewise been widely reported in the world news media.

245.    At all times relevant to this Complaint, Facebook has known that HAMAS is an organization that has engaged in and continues to engage in terrorist activity.

246.    At all times relevant to this Complaint, Facebook has known that HAMAS is designated as a Foreign Terrorist Organization.

247.    Despite this knowledge, Facebook has knowingly provided its social network platform and communications services for years (at least since 2011) to HAMAS, leaders and officials of HAMAS, organizations that are owned or controlled by HAMAS, and organizations and individuals that provide financing and material support to HAMAS, including individuals and organizations that are designated SDGT's.

248.    At times Facebook claims that its own "Community Standards" policy is adequate for responding to complaints about abuse of the Facebook platform, but application of Facebook's policy is not sufficient to bring Facebook into compliance with U.S. law prohibiting the provision of services to designated terrorists.

249.    This is particularly true because Facebook does not actively review Facebook pages and posts, but only responds to complaints is receives from other users.

250.    Most of the HAMAS-related Facebook accounts are in Arabic, and most Israelis (the primary targets of HAMAS terrorism) are not Arabic speakers and are not likely to come across HAMAS-related Facebook pages.

251.    As an example of the application of Facebook's policies, the Washington Examiner reported on July 28, 2014 about a Facebook page entitled, "Death to zionst baby killer israeli jews," *[sic]* which featured "an image of Israeli Prime Minister Benjamin Netanyahu as a vampire with blood dripping down his chin as he feasts on a child." The Washington Examiner reported that, in response to multiple complaints, Facebook issued the following response:



**Facebook**

We reviewed your report of Death to zionst baby killer israeli jews

Thank you for taking the time to report something that you feel may violate our Community Standards. Reports like yours are an important part of making Facebook a safe and welcoming environment. We reviewed the Page you reported for containing hate speech or symbols and found it doesn't violate our Community Standards.

252.   The Washington Examiner subsequently updated its report after Facebook reconsidered and deleted the "Death to zionst baby killer israeli jews" Facebook page. On July 29, 2014, the Washington Examiner reported that Facebook clarified its position as follows:

> Matt Steinfeld, a spokesman for Facebook, explained that pages calling for death to Israel do not automatically cross over into what is considered hate speech under the social network's media standards.

> "Language attacking a country is not considered hate speech in our community standards," Steinfeld wrote in an email.

> He explained that, Facebook's "community standards detail our policy on hate speech, which is defined as direct attacks on people or groups based on their race, ethnicity, national origin, religion, sex, gender, sexual orientation, disability or medical condition. This means that criticism of institutions (countries being a primary example, but it also includes topics of important social and political debate like government authorities, religions, etc.) is permitted."

> He said that [the] page named "Death to Israel and the Zionists" is an example of a page that would fit into this approved category. He said that pages could be reported more than once and, "If the content devolves into direct attacks on people or groups, that would violate the hate speech policy."

> Steinfeld said, despite popular belief, "the number of reports does not have an impact on whether something violates our policies or whether it's removed."

253.    On February 26, 2015, CNN published an article by U.S. Representative Ted Poe, Chairman of the House Subcommittee on Terrorism, Nonproliferation and Trade, and a member of the House Foreign Affairs Committee, entitled, "Time to silence terrorists on social media." In that article, Rep. Poe specifically identified HAMAS as a designated FTO, and explained why social media companies should not provide services to terrorists such as HAMAS, as follows:

> To put it bluntly, private American companies should not be operating as the propaganda megaphone of foreign terrorist organizations.
>
> So what needs to change?
>
> For a start, social media companies themselves need to do more. It is not good enough to only pay attention when bad press threatens a company's public image after something truly horrific is posted online. Instead, companies not only have a public responsibility but a legal obligation to do more. Section 219 of the Immigration and Nationality Act states that it is unlawful to provide a designated foreign terrorist organization with 'material support or resources,' including 'any property, tangible or intangible, or services.'
>
> That's about as comprehensive as you can get.

254.    On October 19, 2015, Israeli Prime Minister, Benjamin Netanyahu, explicitly identified Facebook as the driving force in the current wave of murderous attacks and described the phenomenon as "the integration between extremist Islam with the Internet; Osama Bin Laden meets Mark Zuckerberg."

255.    The Prime Minister noted that the incitement on Facebook is not random; it is being directed and sourced from leaders in the Palestinian Authority, HAMAS, and the Islamic Movement in Israel.

256.    According to the Mayor of Jerusalem, Nir Barkat, "When they interrogate the terrorists, what we see is young people who are incited to a level I have never seen before, and you see that they seek to harm innocents and listen to no one except Facebook and Twitter."

257.     Former Israeli Ambassador to the United States Dore Gold explained that whereas ten years ago, terrorist organization HAMAS would publish a booklet in print with limited impact, today, the same publication can be posted to Facebook and widely disseminated to rapid and devastating effect.

258.     In 2016, HAMAS-related Facebook sites posted a HAMAS music video calling for suicide bombing attacks against Jews and Israelis. The music video featured images of flames and singers in HAMAS terrorist garb dancing in front of a mock-Israeli civilian bus that appeared to have been bombed, while the singers chanted, "It's not an intifada until the roof of the bus flies off." The music video also portrayed a terrorist preparing to carry out a suicide bus bombing, and the video ended with the suicide bomber entering a bus full of Jews to carry out the attack. In response to multiple complaints, Facebook responded that the HAMAS video calling for and depicting the suicide bombing of a bus full of Jews did not violate Facebook's "Community Standards."

**B.     Facebook's Computer Equipment Uniquely Connects Like-Minded Users**

259.     Facebook's online social media platform and communication services are provided to Facebook users via Facebook's own data centers.

260.     Facebook's data centers house thousands of computer servers, which are networked together and linked to the outside world through fiber optic cables.

261.     Whenever a Facebook user shares information on Facebook, Facebook's computer servers in these data centers receive the information and distribute it to the Facebook user's network of Facebook "friends." Information that is input by a Facebook user into Facebook is also stored on Facebook's computer equipment in these data centers as well as on

Facebook's backup storage equipment. Facebook users' Facebook pages are hosted on Facebook's computer equipment in Facebook's data centers.

262.   Facebook enables users to create personal pages with information about themselves, including geographic information, interests and photos. Users create networks of "friends" with whom they share personal posts.

263.   These posts can be in the form of a photo with a caption, sharing a web link or a news article from another website, endorsing or "liking" a product, promoting a Facebook business or group page, etc.

264.   Facebook users can also "like" and share friends' posts, thereby exposing these posts to new networks.

265.   Facebook also enables users to create special "group" pages to promote themselves, their interests and business endeavors.

266.   When creating one of these "group" pages, users are asked to choose a category: such as local business, organization, product, public figure, entertainment or cause.

267.   Facebook users can share these pages with friends, who can then share the pages with their friends, exposing the content to a wide network of people well beyond the original user's own personal contacts.

268.   According to Facebook's "Data Usage Policy," Facebook collects detailed information about its users, including, inter alia, the content they post, type of content they view or engage with, people they communicate with, groups they belong to and how they interact with such groups, visits to third party websites, apps and Facebook partners.

269.    Facebook uses this information in a variety of ways with the ultimate goal of "creating engaging and customized experiences for people." See Facebook Data Usage Policy, available at https://www.facebook.com/about/privacy/.

270.    Facebook's computers execute algorithms which utilize the collected data to suggest friends, groups, products, services and local events, and target ads that will be "as relevant and interesting" as possible to each individual user. This enables Facebook to customize its services to the specific likes and interests of each of its users.

271.    Effectively, Facebook serves as a broker or match-maker between like-minded people, introducing users to one another and to groups and events that they will be interested in based on the information in their user profiles and online activities.

272.    Facebook's algorithms suggest friends based on such factors as friends of friends, group membership, geographic location, event attendance, language, etc. Thus, Facebook actively provides "friend suggestions" between users who have expressed similar interests (for example, by joining groups or "liking" posts with the themes HAMAS, the "Knife Intifada" or stabbing Jews).

273.    Similarly, Facebook actively suggests groups and events to users who have "liked" or shared pages on particular subjects, joined similar groups, and/or attended similar events.

274.    Facebook also actively encourages users to attend events related to their interests in their geographical area, by providing notifications of such events being attended by the users' "friends", group members or taking place in the users' vicinity.

275.    These types of suggestions may appear in a user's newsfeed or on the side margins of the user's Facebook page. Each time a user logs in, Facebook also provides "notifications" about friend, group and event suggestions.

276.    Facebook's algorithms also move posts that are likely to be of interest and garner "likes", shares, and comments, to the top of a user's newsfeed. So, for example, Facebook user who has been vocal in supporting HAMAS or "Al Aqsa Intifada" will be alerted to such posts upon logging into Facebook.

277.    In addition, when a Facebook user clicks on a video clip on Facebook, a box appears on the page recommending other similar videos.

278.    Facebook's targeted advertising algorithms enable all kinds of advertisers, whether for commercial products, business services or causes to reach the most interested audiences.

279.    Advertisers are able to target their ads by "keywords" and interests.

280.    In addition, through "remarketing" and conversion pixels, Facebook enables outside advertisers to target ads to users who have visited the advertisers' web pages in the past.

281.    Thus, for example, if a Facebook user has visited the webpage of an advertiser that supports HAMAS, the advertiser's ads can be directed to the user's Facebook feed.

282.    By providing Facebook's online social network platform and communication services to HAMAS, Facebook is providing to HAMAS use of Facebook's data centers, computer servers, storage and communication equipment, as well as a highly-developed and sophisticated algorithm that facilitates HAMAS's ability to reach and engage an audience it could not otherwise reach as effectively.

### C.   Facebook Has the Ability to Monitor and Block Use of Facebook by HAMAS

283.   The same algorithms that allow Facebook to make matches between people of similar interests could be used by Facebook to flag, review, and remove HAMAS Facebook pages.

284.   Indeed, upon information and belief, Facebook regularly monitors its website for pornographic materials which are removed immediately.

285.   However, Facebook has refused to actively monitor its online social media network to block HAMAS's use of Facebook.

286.   Instead, Facebook knowingly permits HAMAS to use its online social media platform, and only reviews HAMAS's use Facebook in response to third party complaints.

287.   Even when Facebook has received complaints about HAMAS's use of the platform, Facebook has at various times determined that the HAMAS Facebook page did not violate Facebook's policies and permitted the page to remain, or deleted only a portion of the content on the HAMAS Facebook page and permitted the site to remain active.

288.   On a number of occasions has Facebook suspended selected HAMAS-related Facebook pages and later permitted them to become active again, or shut down or blocked a HAMAS Facebook page without making an effort to ensure that the pages are not re-established using another account.

289.   In addition, Facebook will occasionally block pages from appearing in Israel, while allowing them to appear in other geographic locations.

290.   AS   AND   FOR   A   SIXTH   CLAIM   FOR   RELIEF (Failure to Accommodate Educational Disability)

-52-

### AS AND FOR A FIRST CLAIM FOR RELIEF
### (Provision Of Material Support To Terrorists In Violation Of 18 U.S.C.
### § 2339A and 18 U.S.C. § 2333)

291.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

292.    The online social media platform and communication services which Facebook knowingly provided to HAMAS and its related entities and affiliates, including use of Facebook's services, computers and communications equipment, substantially assisted HAMAS in carrying out its terrorist activities, including recruiting, radicalizing, and instructing terrorists, raising funds, creating fear and carrying out attacks, among other things.

293.    These services and equipment constituted material support and resources pursuant to 18 U.S.C. § 2339A, and they facilitated acts of terrorism in violation of 18 U.S.C. § 2332 that caused the deaths and injuries of the decedents and plaintiffs in this case.

294.    Facebook provided these services and equipment to HAMAS, knowing that they were to be used in preparation for, or in carrying out, criminal acts including the acts that injured the plaintiffs.

295.    As set forth more fully above, but for the material support and resources provided by Facebook, the attacks that injured the plaintiffs would have been substantially more difficult to implement.

296.    By participating in the commission of violations of 18 U.S.C. § 2339A that have caused the Plaintiffs to be injured in his or her person, business or property, Facebook is liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have sustained as a result of such injuries.

### AS AND FOR A SECOND CLAIM FOR RELIEF
### (Provision of Material Support and Resources to A Designated Foreign Terrorist Organization In Violation of 18 U.S.C. § 2339b(A)(1) and 18 U.S.C. § 2333(A))

297.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

298.    By knowingly (or with willful blindness) providing its social media platform and communications services, including use of computer and communications equipment, for the benefit of HAMAS, Facebook has provided material support and resources to a designated Foreign Terrorist Organization under the Antiterrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. § 2339B(a)(1).

299.    Facebook knew of (or was willfully blind to) HAMAS's terrorist activities.

300.    Facebook knew (or was willfully blind to the fact) that HAMAS had been designated a Foreign Terrorist Organization by the United States Government.

301.    Facebook's violation of 18 U.S.C. § 2339B proximately caused the damages to plaintiffs described herein.

302.    By knowingly (or with willful blindness) providing material support to a designated Foreign Terrorist Organization, Facebook is therefore civilly liable for damages to plaintiffs for their injuries pursuant to 18 U.S.C. § 2333(a).

### AS AND FOR A THIRD CLAIM FOR RELIEF
### (Negligence – Under the Law of the State of Israel)

303.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

304.     Pursuant to Fed. R. Civ. P. 44.1 plaintiffs hereby give notice of their intention to rely on the law of the State of Israel.

305.     Causes of action in tort in Israeli law are codified in the Civil Wrongs Ordinance (New Version) - 1968, (hereinafter "CWO").

306.     The CWO provides that any person injured or harmed by the civil wrongs (i.e. torts) enumerated in the CWO is entitled to relief from the person liable or responsible for the wrong.

307.     CWO § 35 creates a tort of Negligence.

308.     Under binding precedent of the Israeli Supreme Court, the tort of Negligence also includes intentional and/or reckless conduct.

309.      CWO § 35 provides that a person is liable for the tort of Negligence when he commits an act which a reasonable and prudent person would not have committed under the same circumstances; or refrains from committing an act which a reasonable and prudent person would have committed under the same circumstances; or, in the performance of his occupation, does not use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, and thereby causes damage to another person toward whom, under those circumstances he is obligated not to act as he did.

310.     CWO § 36 provides that the obligation stated in the last sentence of § 35 is toward all persons, to the extent that a reasonable person would have under the same circumstances foreseen that, in the ordinary course of events, they were liable to be injured by the act or omission.

311.   By providing material support to HAMAS, Facebook performed acts which a reasonable and prudent person would not have committed under the same circumstances, within the meaning of the CWO.

312.   Facebook did not, in the performance of its occupation, use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, within the meaning of the CWO, in that, inter alia, Facebook provided material support to HAMAS.

313.   Facebook acted negligently in connection with the decedents and the plaintiffs, toward whom, in the circumstances described herein, Facebook had an obligation not to act it did. Facebook was obligated not to act as it did because a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, persons such as the decedents and the plaintiffs were liable to be harmed by the acts of Facebook described herein.

314.   The behavior of Facebook constitutes Negligence under the CWO, and that negligent behavior was the proximate cause of the harm to decedents (Yaakov Naftali Fraenkel, Chaya Zissel Braun, Richard Lakin, and Taylor Force), to the physically injured plaintiff (Menachem Mendel Rivkin) and to their respective family members – the other plaintiffs herein – which includes: death; severe injuries, pain and suffering; loss of pecuniary support; loss of income; loss of consortium; emotional distress; loss of society and companionship and loss of solatium.

315.   Facebook is therefore liable for the full amount of the compensatory damages due to the estate of the decedents and to each of the plaintiffs herein.

316.   Under Israeli case law a plaintiff harmed by an act of Negligence caused by intentional conduct is entitled to punitive damages.

317.    The conduct of defendants was intentional and malicious, and so warrants an award of punitive damages under Israeli law.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
### (Breach of Statutory Duty under the Law of the State of Israel)

318.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

319.    CWO § 63 creates a civil wrong of Breach of Statutory Duty defined as the failure to comply with an obligation imposed under any legal enactment, if the legal enactment is intended for the benefit or protection of another person, and if the breach of the enactment caused that person damage of the kind or nature of damage intended to be prevented by the enactment.

320.    Under Israel's *Interpretation Ordinance (New Version)*, an "enactment" within the meaning of the CWO is defined as "every law and every regulation," while the terms "law" and "regulation" are defined in turn as acts of the Knesset (Israel's parliament) and of "any authority in Eretz Israel [Hebrew: Land of Israel] or in Israel," respectively.

321.    CWO § 63(b) provides that for purposes of CWO § 63, an enactment is deemed to have been enacted for the benefit or protection of a specific person, if it is intended for the benefit or protection of that person, or for the benefit or protection of persons in general, or of persons of a category or definition to which that specific person belongs.

322.    Facebook breached and failed to comply with obligations imposed upon it by numerous enactments, which were intended for the benefit or protection of persons in general, and for the benefit and protection of persons of the type, category, and definition to which the plaintiffs and the decedents belong, within the meaning of the CWO.

323.    The statutory obligations breached by Facebook include, without limitation, the provisions of the following enactments:

    a.    Sections 1 and 4 of Israel's *Prevention of Terrorism Ordinance*, 5708-1948 (which criminally prohibit praise, support, calls for support of terrorism);

    b.    Sections 134, 136, 144, 145, and 148 of Israel's *Penal Law*, 5737 – 1977 (which criminally prohibit all forms of incitement to violence and terror as well as material support for terrorism).

    c.    Sections 84-85 of Israel's *Defense Regulations (Emergency Period)*, 1945 (which prohibit, among other things, the provision of any service for any unlawful organization, including groups engaged in terrorist activity).

324.    Facebook's conduct described herein breached the enactments listed above, whether or not Facebook's conduct took place in Israel, because Israel has extraterritorial criminal jurisdiction over crimes against the security of the State of Israel and over crimes against the lives and persons of Israeli citizens as such, pursuant to § 13 of Israel's *Penal Law,* 5737 -1977.

325.    All of the enactments listed above are intended for the benefit and protection of persons in general, for the specific benefit and protection of innocent civilians such as the plaintiffs, in that all of the statutory enactments listed above are intended to protect all such persons from terrorist attacks and from all the damages which terrorist attacks are liable to inflict.

326.    Facebook's breach of its statutory obligations was the proximate cause of the harm to the plaintiffs and the deaths of the decedents described herein, and caused plaintiffs damage of the kind and nature intended to be prevented by the statutory enactments which were

breached by Facebook, including: death; severe physical injuries, pain and suffering; loss of pecuniary support; loss of income; loss of consortium; emotional distress; loss of society and companionship and loss of solatium.

327.     Facebook committed the civil wrong of Breach of Statutory Duty under CWO § 63, and is therefore liable for the full amount of the plaintiffs' damages.

328.     Under Israeli case law, a plaintiff harmed by a Breach of Statutory Duty caused by intentional or reckless conduct is entitled to punitive damages.

329.     Facebook's conduct was intentional or reckless, warranting an award of punitive damages.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### (Vicarious Liability Under the Law of the State of Israel)

330.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

331.     Facebook knowingly and intentionally provided material support and resources to HAMAS which enabled, facilitated, supported and assisted HAMAS to carry out the terrorist attacks that killed the decedents and injured the plaintiffs.

332.     Aiding and Abetting principles are recognized in §§ 12 and 15 of the CWO.

333.     Section 12 of the CWO provides that a person who participates in, assists, advises or solicits an act or omission, committed or about to be committed by another person, or who orders, authorizes, or ratifies such an act or omission, is liable for such act or omission.

334.     By providing services to HAMAS, Facebook knowingly and intentionally assisted HAMAS in carrying out the terrorist attacks that killed the decedents and injured the plaintiffs in this case.

-59-

335.    Section 15 of the CWO provides that a person may be liable for the acts or omissions of a party with whom he contracts if he, inter alia, was negligent in selecting the contractor, authorized or ratified the acts of the contractor, or if the contract was entered into for an unlawful purpose.

336.    At the very least, Facebook was negligent in entering into service contracts with HAMAS and its affiliates, who use such services to promote and carry out the activities of HAMAS, knowing the terrorist nature of HAMAS. By allowing HAMAS terrorists to use its services for such unlawful purposes, Defendant ratified the conduct of HAMAS.

337.    Facebook's conduct was intentional and malicious, and so warrants an award of punitive damages under Israeli law.

**WHEREFORE**, the plaintiffs demands that the Court:

(a)    Enter judgment against Facebook and in favor of each plaintiff for compensatory damages in amounts to be determined at trial, but for no less than $1 billion;

(b)    Enter judgment against Facebook and in favor of each plaintiff for punitive damages in amounts to be determined at trial;

(c)    Enter judgment against Facebook and in favor of each plaintiff for treble damages pursuant to 18 U.S.C. § 2333(a);

(d)    Enter judgment against Facebook and in favor of each plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a); and

(e)    Grant such other and further relief as justice requires.

Dated:   Brooklyn, New York
         July 10, 2016

                              Yours,

                              THE BERKMAN LAW OFFICE, LLC
                              *Attorneys for the Plaintiff*

                              by: _____
                                    Robert J. Tolchin

                              111 Livingston Street, Suite 1928
                              Brooklyn, New York 11201
                              718-855-3627

                              NITSANA DARSHAN-LEITNER & CO.
                              *Israeli counsel for the Plaintiffs*
                              By: Nitsana Darshan-Leitner, Adv.
                              10 Hata'as Street
                              Ramat Gan, 52512 Israel
                              Israeli Tel: 011-972-523-513953