UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

 -------------------------------------------------------------------X

RACHELI COHEN, *et al.*,                                              16-cv-04453 (NGG) (lb)

                          Plaintiffs,

               -against-

FACEBOOK, INC.,

                          Defendant.

 -------------------------------------------------------------------X

STUART FORCE, *et al.*,                                               16-cv-05158 (NGG) (lb)

                          Plaintiffs,

               -against-

FACEBOOK, INC.,

                          Defendant.

 -------------------------------------------------------------------X


**PLAINTIFFS' COMBINED MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S MOTIONS TO DISMISS**


# THE BERKMAN LAW OFFICE, LLC

*Attorneys for Plaintiffs*

111 LIVINGSTON STREET, SUITE 1928

BROOKLYN, NEW YORK 11201

718-855-3627

## TABLE OF CONTENTS

Table of Contents...................................................................................................................... i

Table of Authorities ................................................................................................................ iii

INTRODUCTION....................................................................................................................1

STATEMENT OF FACTS ......................................................................................................2

  A. Force v. Facebook (The ATA Lawsuit): Procedural Background............................2

  B. Cohen v. Facebook (The Injunction Lawsuit): Procedural Background..............................2

  C. Factual Background .................................................................................................3

  D. Facebook Knowingly Provides Services to Hamas, a Designated Foreign Terrorist Organization ...........................................................................................................5

ARGUMENT...........................................................................................................................6

Part I - FORCE V. FACEBOOK: THE ATA LAWSUIT......................................................6

  A. Personal Jurisdiction Over Facebook Is Proper Under the ATA ............................6

    1. Personal Jurisdiction Under Fed. R. Civ. P. 4(k)(1)(C) and the ATA............................7

    2. Personal Jurisdiction Over Facebook Satisfies Fifth Amendment Due Process..............9

  B. The Force Plaintiffs Have Stated ATA Claims Against Facebook ......................9

    1. Facebook's Violation of 18 U.S.C. § 2339A and § 2339B Constituted "International Terrorism" Under 18 U.S.C. § 2331 .........................................................10

      a) Facebook Violated §§ 2339A and 2339B..............................................10

      b) Violation of §§ 2339A and 2339B Constitutes "International Terrorism".............15

    2. Plaintiffs Were Injured "by reason of" an Act of International Terrorism....................16

    3. Facebook Aided, Abetted, and Conspired With Hamas .............................19

      a) Aiding and Abetting...............................................................20

      b) Conspiracy .............................................................................24

  C. The CDA Does Not Bar the ATA Claims ...........................................................26

  D. The CDA Does Not Have Extraterritorial Application ......................................30

    1. Plaintiffs' Israeli Tort Claims .........................................................................31

    2. Applicability of Israeli Tort Law ..................................................................33

PART II - COHEN V. FACEBOOK: THE INJUNCTION LAWSUIT ................................36

  A. Facebook Is Subject to Personal Jurisdiction in New York................................36

    1. Facebook Consented to Jurisdiction Via New York's Registration Statute ................37

    2. Facebook Is Subject to Personal Jurisdiction in New York Under CPLR § 301 Because it Does Business in New York .......................................................38

3     Facebook is "At Home" in New York ........................................................... 39

4.    Facebook is Subject to Specific Jurisdiction Under CPLR § 302 ................................ 39

B.   The Cohen Plaintiffs Have Standing to Sue Facebook ............................................... 40

# TABLE OF AUTHORITIES

Cases

*Ahmad v. Christian Friends of Israeli Communities*, 2014 WL 1796322 (S.D.N.Y. 2014) ..... 13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................... 10

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) .................................... 10

*B & M Kingstone, LLC v. Mega Int'l Commercial Bank Co.*, 15 N.Y.S.3d 318 (N.Y. App.

 Div. 2015) ................................................................................................................................ 38

*Bagdon v. Philadelphia & Reading Coal & Iron Co.*, 217 N.Y. 432 (1916) ............................ 37

*Bailen v. Air & Liquid Systems Corp.*, 2014 WL 3885949 (N.Y. Sup. Co. 2014) .................... 37

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120 (2d Cir. 2002) .......... 9

*Beach v. Citigroup Alternative Investments LLC*, 2014 WL 904650 (S.D.N.Y. Mar. 7, 2014) 37

*Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*, 291 F.3d 1000 (7th

 Cir. 2002) ................................................................................................................................ 16

*Brown v. Lockheed Martin Corp.*, 814 F.3d 619 (2d Cir. 2016) ............................................... 38

*Cont'l Indus. Grp., Inc. v. Equate Petrochemical Co.*, 586 F. App'x 768 (2d Cir. 2014) ........ 39

*Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66 (1993) ............................................................... 35

*Daimler AG v. Bauman*, 134 S. Ct. 746 (2014) ........................................................................ 36

*Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011) ..................................................................... 40

*Del Castillo v. PMI Holdings N. Am. Inc.*, 2015 WL 3833447 (S.D. Tex. June 22, 2015) ....... 39

*Devore v. Pfizer Inc.*, 58 A.D.3d 138, 867 N.Y.S.2d 425 (1st Dep't 2008) ....................... 34, 35

*Dorchester Fin. Secs., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81 (2d Cir. 2013) ............................. 7

*E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, (1991) .......................................................... 30

*Elmaliach v. Bank of China, Ltd.*, 110 A.D.3d 192, 971 N.Y.S.2d 504 (1st Dep't ...................... 2013) ........................................................................................................... 33, 34, 35

*Fields v. Twitter*, 2016 WL 4205687 (N.D. Cal. 2016) ............................................... 29

*Finance One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325 (2d Cir. 2005) ................ 33

*Foley Bros., Inc. v. Filardo*, 336 U.S. 281 (1949) ..................................................... 30

*Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533 (1967) ........................................ 39

*Goldberg v. UBS Ag*, 660 F. Supp. 2d 410 (E.D.N.Y. 2009) ............................................ 13, 16

*Greenberg, Trager & Herbst, LLP v. HSBC Bank USA*, 17 N.Y.3d 565 (2011) ..................... 35

*Gucci America, Inc. v. Weixing Li*, 768 F.3d 122 (2d Cir. 2014) ............................................. 9

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ........................................................ passim

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ............................................. 12, 28, 29

*HSA Residential Mortg. Servs. of Texas v. Casuccio*, 350 F. Supp.2d 352 (E.D.N.Y. 2003) ... 34

*In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677 (2d Cir. 2009) ........................ 14

*In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005).................. 8, 9

*IUE AFL-CIO Pension Fund v. Hermann*, 9 F.3d 1049 (2d Cir. 1993) ..................................... 8

*K.T. v. Dash*, 37 A.D.3d 107 (1st Dep't 2006) ......................................................... 36

*Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) ................................................. 30

*Linde v. Arab Bank*, 97 F. Supp. 3d 287 (E.D.N.Y., 2015) ....................................................... 16

*Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005)............................................. 20

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................................ 40

*Mass. v. EPA*, 127 S. Ct. 1438 (2007) ................................................................................ 40

*Matter of Allstate Ins. Co.*, 81 N.Y.2d 219 (1993) ................................................................ 33

*Mejia-Haffner v. Killington, Ltd.*, 119 A.D.3d 912, 990 N.Y.S.2d 561 (2014)........................ 39

*Nader v. Gen. Motors Corp.*, 31 A.D.2d 392 (1st Dep't 1969) ................................................. 35

*Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165 (1939) ......................................... 37

*O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sep. 11, 2001)*, 714 F.3d 118 (2d Cir. ........

2013) ...................................................................................................................................... 17

*Oveissi v. Islamic Rep. of Iran*, 573 F.3d 835 (D.C. Cir. 2009) ................................................ 36

*Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519 (1994) .............................................................. 34

*Rockefeller Univ. v. Ligand Pharms.*, 581 F. Supp. 2d 461 (S.D.N.Y. 2008) .......................... 37

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ..................................................................... 16

*S. Seas Holding Corp. v. Starvest Grp., Inc.*, 13 N.Y.S.3d 853 (2d Dep't 2015) ...................... 39

*Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993) ..................................................... 30

*Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189 (1985) .................................................. 34, 35

*Shiamili v. Real Estate Grp. of N.Y., Inc.*, 17 N.Y.3d 281 (2011) ............................................ 26

*Sokolow v. Palestine Liberation Org.*, 2011 WL 1345086 (S.D.N.Y. 2011) .............................. 8

*Sonera Holdings B.V. v. Cukorova Holding A.S.*, 750 F.3d 221 (2014) .................................... 39

*Stansell v. BGP, Inc.*, 2011 WL 1296881 (M.D. Fla. 2011) ........................................................ 8

*Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414 (E.D.N.Y., 2013) .................... 13, 16, 17

*Stroud v. Tyson Foods, Inc.*, 91 F. Supp. 3d 381 (E.D.N.Y. 2015) ............................................. 7

*Tronlone v. Lac d'Amiante du Quebec, Ltee*, 297 A.D.2d 528, 747 N.Y.S.2d 79 (1st Dep't .......

2002) ...................................................................................................................................... 33

*Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264 (E.D.N.Y. 2016) .................. 7, 8, 9

*Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202 (2d Cir. 2014) ........................................ 13

*Wultz v. Bank of China, Ltd.*, 811 F. Supp. 2d 841 (S.D.N.Y. 2011) .................................. 33, 34

*Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010) ........................ 8, 31, 32, 33, 36

*Wultz v. Islamic Rep. of Iran*, 762 F. Supp. 2d 18 (D.D.C. 2011) ............................................... 9

*Zucker v. Waldman*, 46 Misc. 3d 1214(A), 9 N.Y.S.3d 596 (N.Y. Sup. 2015) ........................ 37

Statutes

18 U.S.C. § 2333 ............................................................................................. 1, 2, 17, 19

18 U.S.C. § 2334 ............................................................................................................ 8

18 U.S.C. § 2339B ................................................................................................ 11, 12, 13

28 U.S.C. § 1404 ............................................................................................................ 2

47 U.S.C. § 230 .......................................................................................... 1, 26, 27, 31

50 U.S.C. § 1701 ............................................................................................................ 5

50 U.S.C. § 1705 ............................................................................................................ 6

8 U.S.C. § 1189 ............................................................................................................ 6

*Defense Regulations (Emergency Period)*, 1945 ...................................................... 32

*Israel Civil Wrongs Ordinance (New Version)—1972* ("CWO") ........................ 31, 32, 33, 34

N.Y. Bus. Corp. Law § 304 .......................................................................................... 37

*Penal Law*, 5737-1977 ................................................................................................ 32

*Prevention of Terrorism Ordinance*, 5708-1948 ...................................................... 32

Other Authorities

CPLR § 301, Alexander, Supplementary Practice Commentaries, McKinney's Cons. ................

 Laws of N.Y. CPLR C301:6 (2015) ...................................................................... 37

New York State Assembly Bill A6714 ...................................................................... 38

Rules

31 C.F.R. § 594.204 ........................................................................................... 6

31 C.F.R. § 595.204 ........................................................................................... 6

CPLR § 301 ................................................................................................. 37, 38

CPLR § 302 ..................................................................................................... 39

Fed. R. Civ. P. 12(b)(6) ................................................................................. 9, 28

## <u>INTRODUCTION</u>

These cases do not concern speech or content. Rather, they seek to hold Facebook—a major U.S. company—responsible for knowingly providing valuable and substantial aid, support, and resources to terrorists in violation of U.S. law.

*Force v. Facebook* seeks damages from Facebook on behalf of five American victims of terrorism and their families pursuant to the U.S. Antiterrorism Act, 18 U.S.C. § 2333 ("ATA"), for aiding and abetting, conspiracy, and providing material support and resources to Hamas, a designated foreign terrorist organization that carried out attacks killing or injuring these victims.

Facebook argues *Force* should be dismissed for lack of personal jurisdiction, failure to state a claim under the ATA, and immunity under the Communications Decency Act of 1996, 47 U.S.C. § 230 ("CDA"). But the ATA authorizes personal jurisdiction nationwide, plaintiffs have sufficiently stated claims under the ATA, and the CDA does not afford immunity for aiding and abetting, conspiring, or providing material support or resources to designated foreign terrorist organizations. The CDA also does not supersede or preempt the ATA, which was enacted and amended after the CDA, nor does the CDA apply outside the territorial jurisdiction of the U.S.

*Cohen v. Facebook* seeks an order enjoining Facebook from providing services to terrorists, who use those services to promote and carry out terrorist activities directed at Jews and Israelis in Israel. The plaintiffs are 20,000 Israelis living in Israel, in the crosshairs of Hamas.

Facebook contends *Cohen* should also be dismissed for lack of personal jurisdiction and CDA immunity, and for lack of standing. But Facebook is also subject to personal jurisdiction by consent via its New York business registration, and Facebook's New York activities support specific jurisdiction. Finally, the *Cohen* plaintiffs have standing because Facebook's actions cause them ongoing injury that can be redressed by the Court granting the relief sought.

## STATEMENT OF FACTS

**A.     *Force v. Facebook* (The ATA Lawsuit): Procedural Background**

*Force* was filed in the U.S. District Court for the Southern District of New York ("SDNY") on July 10, 2016, on behalf of five American terror victims and their families. (DE 1). Facebook's counsel executed a Waiver of Service on July 20, 2016. (DE 7). On September 16, 2016, Facebook filed a "Joint Motion to Transfer" the case to this District, asserting that 28 U.S.C. § 1404(a) affords courts discretion to transfer a case "to any district or division to which all the parties have consented." (DE 16). The court entered a Consent Order transferring the case pursuant to 28 U.S.C. § 1404(a) to this District, "where it might have been brought . . ." (DE 16).

On September 28, 2016, Congress overrode a presidential veto and enacted the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222 (2016), which among other things, amended the ATA to add new subsection 18 U.S.C. § 2333(d) recognizing substantive causes of action for aiding and abetting and conspiracy liability for victims of international terrorism. JASTA § 4. Accordingly, on October 10, 2016, the *Force* plaintiffs filed an Amended Complaint ("*Force*-FAC"), stating claims against Facebook for: ATA liability for aiding and abetting (Count I) and conspiracy (Count II); ATA liability for providing material support and resources to Hamas in violation of 18 U.S.C. §§ 2339A (Count III) and 2339B (Count IV); and three pendant claims for liability pursuant to the Israeli laws of negligence (Count V), breach of statutory duty (Count VI), and vicarious liability (Count VII). (DE 28).

**B.     *Cohen v. Facebook* (The Injunction Lawsuit): Procedural Background**

The *Cohen* lawsuit was originally filed as *Lakin v. Facebook* on October 26, 2015 in New York state court on behalf of 20,000 Israelis, seeking an injunction requiring Facebook to cease providing services to terrorists. (DE 1-1). It was filed during an intense wave of stabbing and other terror attacks in Israel that became known as the "Facebook Intifada" because many attacks

were directed by terrorists using social media, particularly Facebook. The original lead plaintiff, Richard Lakin, was critically injured on October 13, 2015 by two Hamas terrorists who shot and stabbed passengers on a bus in Jerusalem, murdering two men and injuring more than a dozen others. Sadly, Mr. Lakin died from his wounds sustained in the attack on October 27, 2015.

Facebook moved to dismiss the state case, plaintiffs filed a response brief with an attached Amended Complaint, and Facebook filed its reply. However, the case was stayed by operation of law due to the death of Mr. Lakin until a fiduciary could be appointed for his estate. Thereafter, Mr. Lakin's estate and family discontinued their claims in state court without prejudice, and refiled in federal court as part of *Force*. The state court case was re-styled *Cohen v. Facebook*. Facebook then removed the case to this Court. (DE 1).

The *Cohen* Amended Complaint ("*Cohen*-FAC") is based upon claims under Israeli law for negligence (Count I), breach of statutory duty (Count II), and vicarious liability (Count III), as well as claims for prima facie tort (Count IV), intentional infliction of emotional distress (Count V), aiding and abetting (Count VI), conspiracy (Count VII), and declaratory judgment (Count VIII). (DE 1-3, Exhibit A).

## C.    Factual Background

One of the 10 largest U.S. companies, Facebook, traded on the NASDAQ, has a market capitalization of more than $344 billion. Facebook is organized under the laws of Delaware and headquartered in California, but it maintains substantial offices in many places, including New York and Israel. It conducts business and provides products and services throughout the world.

Facebook's primary business is providing a sophisticated yet easy-to-use internet social media platform and related products and services (collectively, "Services") under the general trade name "Facebook." Facebook's Services include use of Facebook's computer infrastructure, network, applications, tools and features, communications services, and more. In the Overview

of its business in its 2013 Annual Report filed with the SEC, Facebook described its business as: "We build technology to enable faster, easier and richer communication." In that same report, Facebook explained that the success of its business and advertising rates are dependent upon the measure of daily and monthly "active users" of Facebook, and that failure to maintain or increase its user base and user engagement could have a material adverse impact on its business. Thus, Facebook has a strong business incentive not to close active user accounts.

In order to create a Facebook page and use its services, a user must register with Facebook and provide identifying information. Besides the information provided upon registration, Facebook by design employs sophisticated data collection and analysis tools to gather specific information about each user, including every detail that can be gleaned from the user's computer, smartphone, or other internet use. Facebook uses this data not only to sell targeted advertising, but also to actively suggest and introduce users to other users, groups, events, notices, posts, articles, videos, and more, that share commonalities with or may be of interest to such users.

This feature of Facebook is extremely valuable, for example, to a retailer or organization with a Facebook page that wants to attract customers or supports to its Facebook page (and thus to its product or cause). This service is likewise extremely valuable to a terrorist group or individual with a Facebook page who wants to attract followers and recruits, since Facebook will actively suggest to users with appropriate interests that they visit the terrorist's Facebook page.

Of course, networking and "brokering" connections between terrorists and followers is only one of many valuable services that Facebook accounts afford terrorists. Facebook's sophisticated platform and services are used by terrorists for communication, logistics, intelligence, public relations, fundraising, and even prestige. Terrorists also use Facebook's services to criminally incite, recruit, and carry out terror attacks against Jews in Israel.

**D.      Facebook Knowingly Provides Services to Hamas, a Designated Foreign Terrorist Organization**

The "Islamic Resistance Movement" popularly known by its Arabic acronym "Hamas," is among the most widely recognized terrorist organizations in the world. Steeped in anti-Semitism and ideological opposition to any peaceful solution or compromise with Israel, from its inception Hamas has publicly proclaimed that it is committed to the destruction of the State of Israel, the establishment of an Islamic state in all of historic Palestine, and the elimination of Jews from the land. Hamas proudly and openly acknowledges that it uses terrorism and violence to achieve its political goals, claiming that its activities are a legitimate form of "resistance."

Since 1989, Hamas has been an officially designated terrorist organization and "unlawful organization" under Israeli law. Israeli law prohibits providing material support for terrorism and providing any service for any unlawful organization, including terrorist organizations.

Hamas first gained worldwide notoriety in the 1990's when it began dispatching suicide bombers who carried out bombings on packed buses and at crowded bus stops, restaurants, malls, hotels, and hospitals. Hamas has carried out scores of suicide bombings and other terror attacks against Israel, murdering more than 1,000 civilians and injuring many thousands more.

Hamas later expanded its terrorist capabilities by developing and launching missiles into Israel from Gaza, targeting Israeli civilian population centers. Between April 2001 and April 2012, Hamas fired more than 12,700 missiles and mortars into Israel—an average of three attacks every single day for 11 years. In the period from 2006-2011, Hamas's deadly missiles and mortars murdered at least 44 Israelis and injured over 1,600 others. This was in addition to other terrorist acts that Hamas continued to commit against Jews and Israelis in Israel.

In 1995, President Clinton issued Executive Order No. 12947 pursuant to the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.* ("IEEPA"),

designating Hamas and others as terrorist organizations, and banning the provision of <u>any</u> funds, goods, or services to, or for the benefit of specially designated terrorists ("SDT"). Violation of these prohibitions is a federal criminal offense. *See* 31 C.F.R. § 595.204; 50 U.S.C. § 1705.

In 1997, Hamas was officially designated a "foreign terrorist organization" ("FTO") pursuant to § 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189. Providing material support or resources to an FTO is a federal criminal offense under 18 U.S.C. § 2339B.

In 2001, Hamas was further designated a "specially designated global terrorist" ("SDGT") under Executive Order No. 13224. Federal law prohibits "making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any [SDGT]," and violation of these prohibitions is a federal criminal offense. *See* 31 C.F.R. § 594.204; 50 U.S.C. § 1705.

Facebook has received repeated complaints and warnings that providing services to Hamas and other FTO's violates 18 U.S.C. § 2339B. For example, in September 2013, the Israeli Human Rights Law organization Shurat HaDin-Israel Law Center wrote a letter to Facebook's CEO and General Counsel warning that providing assistance or support to designated terrorists is unlawful. The letter specifically included Hamas among a list of FTO's. However, Facebook refused to cease providing Facebook services to Hamas and other designated terrorists.

<u>**ARGUMENT**</u>

<u>**PART I**</u>
***FORCE V. FACEBOOK:*** **THE ATA LAWSUIT**

Facebook attacks the *Force* lawsuit on the basis of three alleged defects: 1) Facebook claims it is not subject to personal jurisdiction in this Court; 2) Facebook asserts that plaintiffs have failed to state a claim under the ATA; and 3) Facebook argues that it is entitled to immunity by virtue of the CDA. Facebook's arguments fail because the ATA provides for jurisdiction over Facebook via its nationwide service of process statute, the plaintiffs have alleged sufficient facts

to state their ATA claims against Facebook, and the CDA does not afford immunity to Facebook for providing support to Hamas in violation of the ATA and federal criminal law. Moreover, the CDA does not apply outside the territorial jurisdiction of the United States.

**A.      Personal Jurisdiction Over Facebook Is Proper Under the ATA**

Plaintiffs need only make a *prima facie* showing to defeat a motion to dismiss for lack of personal jurisdiction. *See Dorchester Fin. Secs., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013). This requirement is met when plaintiffs demonstrate: "(1) proper service of process upon the defendant; (2) a statutory basis for personal jurisdiction over the defendant; and (3) that [the court's] exercise of jurisdiction over the defendant is in accordance with constitutional due process principles." *Stroud v. Tyson Foods, Inc.*, 91 F. Supp. 3d 381, 385 (E.D.N.Y. 2015) (citing *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012)). In *Force*, each of these elements is met, and personal jurisdiction over Facebook exists, because: Facebook waived service of process; the ATA provides a statutory basis for personal jurisdiction on a nationwide basis; and exercising personal jurisdiction over Facebook in New York pursuant to the ATA does not offend Fifth Amendment due process principles.

**1.      Personal Jurisdiction Under Fed. R. Civ. P. 4(k)(1)(C) and the ATA**

Rule 4(k)(1)(C) states that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . when authorized by a federal statute." Thus, "[u]nder Rule 4(k)(1)(C), personal jurisdiction may be established through proper service of process upon a defendant pursuant to a federal statute that contains its own service provision." *Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264, 283 (E.D.N.Y. 2016) (citing 4B Wright & Miller et al., Federal Practice & Procedure § 1125 (4th ed.)). The ATA contains its own statutory service provision, which expressly authorizes nationwide service of process:

Any civil action under section 2333 of this title against any person may be

> instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent. Process in such a civil action may be served in any district where the defendant resides, is found, or has an agent.

18 U.S.C. § 2334(a). Accordingly, the ATA "establish[es] personal jurisdiction over a defendant properly served under the statute." *Weiss*, 176 F. Supp. 3d at 284 and n.9 (citing *Licci*, 673 F.3d at 59 n.8 (acknowledging the ATA's nationwide service of process provision as a possible basis for personal jurisdiction); *Stansell v. BGP, Inc.*, 2011 WL 1296881, at *3 (M.D. Fla. 2011); *Sokolow v. Palestine Liberation Org.*, 2011 WL 1345086, at *2 (S.D.N.Y. 2011); *Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1, 31-32 (D.D.C. 2010); *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 806-07 (S.D.N.Y. 2005); *IUE AFL-CIO Pension Fund v. Hermann*, 9 F.3d 1049, 1056 (2d Cir. 1993) (federal statute authorizing nationwide service of process may be used to establish personal jurisdiction)).

*Force* was originally filed in the SDNY. Facebook is licensed to do business in the State of New York (*Force*-FAC, ¶ 22), has a New York headquarters with more than 350,000 square feet of custom-designed office space and more than 1,300 employees at 770 Broadway in Manhattan (MTD, So Decl. ¶ 5), which is in the SDNY. Facebook's New York counsel executed a waiver of service (DE 7), which was filed in that court. Facebook subsequently filed a "Joint Motion to Transfer" the Force lawsuit to this District.

Facebook's being licensed to do business in New York, plus its significant business presence in New York, demonstrate that Facebook is "found" and "has an agent" in the SDNY. Accordingly, personal jurisdiction was properly established over Facebook in the SDNY, where the case was initiated, pursuant to the ATA's nationwide service of process statute.[1]

---

[1] Facebook did not challenge venue in the SDNY, nor does it challenge venue in this District. Indeed, Facebook consented to venue in this District when it filed a Joint Motion to

*(continued next page)*

2.      **Personal Jurisdiction Over Facebook Satisfies Fifth Amendment Due Process**

The next inquiry is whether the exercise of personal jurisdiction over Facebook satisfies constitutional due process. Because *Force* is based upon the ATA, a federal statute that provides exclusive federal jurisdiction and nationwide service of process, the proper inquiry is whether Facebook has sufficient minimum contacts with the United States as a whole. *Weiss*, 176 F. Supp. 3d at 285 (citing *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 4634541, at *18 (S.D.N.Y. Aug. 4, 2015); *Wultz v. Rep. of Iran*, 762 F. Supp. 2d 18, 25 (D.D.C. 2011); *In re Terrorist Attacks*, 349 F. Supp. 2d at 806 (holding where jurisdiction asserted under ATA service provision, "relevant inquiry…is whether the defendant has minimum contacts with the United States as a whole [to satisfy Fifth Amendment due process requirements], rather than . . . with the particular state in which the federal court sits.") (quoting *Estate of Ungar ex rel. Strachman v. Palestinian Auth.*, 153 F. Supp. 2d 76, 87 (D.R.I. 2001)) (alterations in original)).[2]

Facebook obviously has "minimum contacts" with the United States, and it cannot possibly meet its burden to make a "compelling case that the presence of some other considerations would render jurisdiction unreasonable" in this case. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002).

Therefore, Facebook's challenge to personal jurisdiction in the ATA case fails.[3]

## B.      The *Force* Plaintiffs Have Stated ATA Claims Against Facebook

On a Rule 12(b)(6) motion to dismiss, a court must accept all allegations of fact in the

---

Transfer the *Force* case to this District. (DE 16). Facebook's current motion to dismiss challenges personal jurisdiction in New York, not specifically in the EDNY. Since personal jurisdiction existed in the SDNY, jurisdiction remains even though the case was transferred to the EDNY on consent of all parties for consolidation with a related case.

    [2] *See Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014) (noting several circuits have endorsed analyzing "contacts with the United States as a whole" for personal jurisdiction in cases arising under federal statutes that authorize nationwide service).

    [3] Personal jurisdiction is also proper in *Force* as discussed in Part II, Section A below.

complaint as true, and draw all reasonable inferences from the allegations in favor of the plaintiff. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). A motion to dismiss must be denied if the complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Facebook argues that the *Force* lawsuit fails to state a claim under the ATA on three grounds: 1) that the plaintiffs have not plausibly alleged that Facebook violated 18 U.S.C. §§ 2339A or 2339B, or committed an act of "international terrorism"; 2) that the plaintiffs were not injured "by reason of" Facebook's activities; and 3) that the plaintiffs have not plausibly alleged ATA claims for aiding and abetting and conspiracy liability. These contentions fail.

### 1. Facebook's Violation of 18 U.S.C. § 2339A and § 2339B Constituted "International Terrorism" Under 18 U.S.C. § 2331

Facebook argues that the "direct liability" ATA claims (Counts III and IV) do not plausibly allege that Facebook violated §§ 2339A or 2339B, or committed an act of "international terrorism." Facebook claims that: 1) plaintiffs failed to plausibly allege that Facebook had the requisite "knowledge" to violate §§ 2339A or 2339B; and 2) even if Facebook violated §§ 2339A or 2339B, these violations do not constitute an act of "international terrorism." (MTD at 38-40). Facebook's arguments fail because the detailed allegations in the *Force*-FAC more than suffice to create a reasonable inference that Facebook satisfied the *scienter* component of both material support statutes, and courts have held that violations of §§ 2339A and 2339B constitute "international terrorism" under 18 U.S.C. § 2331(1).

#### a) Facebook Violated §§ 2339A and 2339B

Title 18 U.S.C. §§ 2339A imposes criminal penalties upon:

[w]ho[m]ever provides material support or resources … knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [federal

-10-

terrorism crimes], or in preparation for, or in carrying out, the concealment of an escape from commission of any such violation, or attempts or conspires to do so.

18 U.S.C. § 2339A(a).

Title 18 U.S.C. § 2339B imposes criminal penalties upon "[w]ho[m]ever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so." 18 U.S.C. § 2339B(a)(1). Subsection 2339B(g)(6) defines "terrorist organization" as "an organization designated as a terrorist organization under Section 219 of the Immigration and Nationality Act" (*i.e.*, a designated "FTO"). Subsection 2339B(a)(1) provides that a person violates § 2339B if he has knowledge either that the beneficiary organization: 1) is a designated FTO; 2) has engaged or engages in "terrorist activity" (as defined in 8 U.S.C. § 1182(a)(3)(B)); or 3) has engaged or engages in "terrorism" (as defined by § 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

"Material support or resources" is defined for both § 2339A and § 2339B as follows:

(1) the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b); 18 U.S.C. § 2339B(g)(4).

Significantly, Facebook does <u>not</u> challenge the sufficiency of plaintiffs' allegations that Facebook provided its social media platform and related products and services to Hamas, its leaders, and affiliates. Indeed, the *Force*-FAC is replete with examples of Facebook accounts maintained and used by these organizations and individuals (*e.g.*, ¶¶ 118-125).

Facebook also does <u>not</u> challenge the sufficiency of plaintiffs' allegations that the resources and services it provided Hamas, its leaders, and affiliates constitute "material support

or resources" as defined by §§ 2339A and 2339B. The *Force*-FAC details many of these resources, which include use of Facebook's computer infrastructure, network, applications, tools, communications services, payment mechanisms, plugins for external websites, algorithms, and more (*e.g.*, ¶¶ 91-99, 519-542). Plaintiffs also give many examples of how Hamas uses and benefits from Facebook to promote and carry out its activities (*e.g.*, ¶¶ 100-115, 126-155).

Facebook does <u>not</u> challenge the sufficiency of plaintiffs' § 2339A allegations that the material support and resources it provided to Hamas, its leaders, and affiliates were "used in preparation for, or in carrying out, a violation of [federal crimes of terrorism]…." Plaintiffs provided many examples of such use in the *Force*-FAC. (¶¶ 126-155, and Part III thereof).

Moreover, the sophisticated platform and services that Facebook provides to Hamas are very valuable, yet they are provided to Hamas for free. This is an enormous benefit and support to Hamas, because it enables Hamas to direct funds that it would have had to spend for communications, software, networking, and other services, toward terrorist operations. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010) ("'Material support' is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups— legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds—all of which facilitate more terrorist attacks.").

As to § 2339B, Facebook does <u>not</u> challenge the sufficiency of plaintiffs' allegations that Hamas is a designated FTO, that Facebook knew Hamas is a designated FTO, and that Facebook knew Hamas had engaged and engages in terrorist activity within the meaning of § 2339B. The *Force*-FAC indeed provides factual support from which each of these elements may be reasonably inferred (*e.g.*, ¶¶ 68-90, 500-505).

Facebook's <u>sole</u> challenge as to §§ 2339A and 2339B concerns the sufficiency of

plaintiffs' allegations "to show *knowing* provision of support." (MTD at 39) (emphasis in original). However, Facebook's challenge is without merit.

In *Ahmad v. Christian Friends of Israeli Communities*, 2014 WL 1796322 (S.D.N.Y. 2014), a case alleging violation of §§ 2339A and 2339C (financing terrorism), the Court explained the scienter requirement as follows:

> In order to trigger liability under [§§ 2339A and 2339C of] the ATA, the recipient of a defendant's support need not be a designated foreign terrorist organization … But there must be some evidence — for instance, that the recipients of the aid have publicly stated terrorist goals or are associates of established terrorist organizations—from which a finder of fact could conclude that the defendant either knew, or was deliberately indifferent to the possibility, that it was supporting international terrorism.

*Id.* at *3 (citing *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 426, 428 (E.D.N.Y. 2013) (holding that civil liability under the ATA requires a defendant to at least "kn[o]w there was a substantial probability that [it] was supporting terrorists")).

Unlike § 2339A, violation of § 2339B does require that the beneficiary of a defendant's material support or resources actually be a designated FTO (and there is no dispute Hamas is a designated FTO). Yet § 2339B likewise does not require specific intent to support terrorism. As the Second Circuit recently held:

> For the purposes of § 2339B(a)(1), a defendant has knowledge that an organization engages in terrorist activity if the defendant has actual knowledge of such activity or if the defendant exhibited deliberate indifference to whether the organization engages in such activity. *See Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 428-29 (E.D.N.Y.2013); *In re Terrorist Attacks on September 11, 2001*, 740 F. Supp. 2d 494, 517 (S.D.N.Y.2010). A defendant exhibits deliberate indifference if it "knows there is a substantial probability that the organization engages in terrorism but ... does not care." *Boim*, 549 F.3d at 693.

*Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 208 (2d Cir. 2014). *See Goldberg v. UBS Ag*, 660 F.Supp.2d 410, 428 (E.D.N.Y. 2009)("plaintiffs have sufficiently pled that the defendant consciously disregarded the fact that it was supporting a terrorist organization, despite a strong

probability that [its] services would be used to further the organization's terrorist activities").

Courts apply a lenient standard for evaluating allegations of scienter, since proof of knowledge often depends upon inferences drawn from the evidence. *See Weiss*, 768 F.3d at 211 (2d Cir. 2014) (applying "lenient" standard for sufficiency of evidence of scienter for § 2339B on summary judgment); *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009) ("We are ... 'lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences,' because such issues are 'appropriate for resolution by the trier of fact.' ... The same holds true for allowing such issues to survive motions to dismiss.").

The *Force*-FAC contains many factual allegations plausibly demonstrating Facebook's knowledge, or at the very least deliberate indifference, to the fact that it provides services to Hamas. Plaintiffs alleged that Facebook <u>refused</u> to actively monitor its online social network to block Hamas's use of Facebook, and "[e]ven when Facebook has received complaints about Hamas's use of the platform, Facebook has at various times determined that the Hamas Facebook page did not violate Facebook's policies and permitted the page to remain, or deleted only a portion of the content on the Hamas Facebook page and permitted the site to remain active." (¶¶ 547-549). For example, Facebook received multiple complaints about a Hamas video calling for and depicting a suicide bombing of a bus full of Jews that appeared on several Hamas Facebook accounts, but Facebook replied that the video did not violate Facebook's "Community Standards." (¶ 512). As another example, in July 2014 Facebook closed Hamas spokesman Izzat al-Risheq's Facebook account, claiming that it does not tolerate terrorism; however, in January 2015 Facebook removed a single post (praising a Hamas terrorist attack in Tel Aviv) from al-Risheq's Facebook page but left the rest of his Facebook page intact. (¶¶ 550-554). Facebook has on occasion suspended selected Hamas-related Facebook accounts in response to public or government pressure, but later reactivated them, or consciously refrained from making any

-14-

effective or prolonged effort to ensure that the pages are not reestablished. (¶ 553).

Plaintiffs also demonstrated that Hamas, its leaders, and affiliates, maintain Facebook accounts in their own names that openly display the emblems and symbols of Hamas. (¶¶ 118-125). Many of these individuals and entities are themselves specially designated global terrorists due to their Hamas affiliation. *Id.* Facebook, via its subsidiary Facebook Payments, Inc., is a registered money services business (*see* https://www.fincen.gov/msb-registrant-search), and as such is required to monitor its money service customers to comply with counter-terrorism regulations using the U.S. Treasury's publicly available list of specially designated terrorists and terrorist organizations. Facebook could easily have used the same list to ensure that it does not provide Facebook accounts to designated terrorists including Hamas. (¶ 505). Prominent politicians and government committees have also made public statements that social media companies, including Facebook, "need to do more" to deny services to terrorists, and that "[s]ocial media companies are consciously failing to combat the use of their sites to promote terrorism and killings." (¶¶ 513-518). Facebook's business relies on retaining and growing the number of active Facebook account users, and therefore Facebook benefits from only deleting selected messages and leaving Hamas accounts active. (¶¶ 557-560). The many allegations and examples provided in the *Force*-FAC sufficiently show that Facebook knowingly, or at least with deliberate indifference, provided its services to and for the benefit of Hamas and its affiliates.

> **b)**   ***Violation of §§ 2339A and 2339B Constitutes "International Terrorism"***

Facebook argues that, even if plaintiffs can demonstrate that Facebook violated §§ 2339A and 2339B by providing material support and resources to Hamas, plaintiffs' "direct claims" do not sufficiently demonstrate that Facebook committed an act of "international terrorism" within the meaning of 18 U.S.C. § 2331(1).

Facebook cites no case law in support of this argument, for indeed the consensus is that

violations of §§ 2339A and 2339B constitute acts of "international terrorism" as defined under the ATA. *See Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*, 291 F.3d 1000, 1015 (7th Cir. 2002) ("Because Congress intended to impose criminal liability for funding violent terrorism, we find that it also intended through sections 2333 and 2331(1) to impose civil liability for funding at least as broad a class of violent terrorist acts. If the plaintiffs could show that defendants violated either section 2339A or section 2339B, that conduct would certainly be sufficient to meet the definition of 'international terrorism' under sections 2333 and 2331); *Linde v. Arab Bank*, 97 F. Supp. 3d 287, 322 (E.D.N.Y., 2015) ("Completing a wire transfer generally cannot be described as 'violent' or 'dangerous to human life' in the colloquial sense. But … providing material support to a terrorist organization is an act 'dangerous to human life.' … The same is true for the requirement that the act 'appear to be intended' to intimidate."); *Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 426 (E.D.N.Y., 2013) ("Violations of Sections 2339B and 2339C are considered to be acts of 'international terrorism' under Section 2333(a)"); *Goldberg v. UBS Ag*, 660 F. Supp.2d at 426-27 (same, collecting cases).

Accordingly, this claim is without merit.

### 2.      Plaintiffs Were Injured "by reason of" an Act of International Terrorism

Facebook also contends that the *Force* plaintiffs' "direct claims" under the ATA fail to sufficiently allege that Facebook's provision of material support and resources to Hamas was a proximate cause of their injuries. Quoting *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013), Facebook argues that plaintiffs do not allege that Facebook "'was a participant in the terrorist attacks that injured plaintiffs [or their loved ones]' or that it funded those attacks." (MTD at 33). But these are clearly not the only allegations that would meet the standard of proximate cause.

In *Rothstein v. UBS AG*, 708 F.3d at 94-96, plaintiffs who were suing for injuries from Hamas terror attacks argued that "causation could be presumed" under the ATA based upon the

allegation that UBS "committed a *per se* violation of a statute" prohibiting giving U.S. currency to Iran. The Second Circuit rejected this argument, holding that the "by reason of" language in § 2333(a) demonstrates Congress's intent that liability under the ATA requires a showing of "proximate cause." *Id.* Similarly, in *O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sep. 11, 2001)*, 714 F.3d 118, 124 (2d Cir. 2013), the Second Circuit applied *Rothstein*, and held that allegations that defendants gave money to charity organizations known to support terror did not sufficiently allege proximate cause, because the plaintiffs did not allege that either the defendants or the charities actually gave money to al-Qaeda, the group that carried out the attacks at issue.

In *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 432 (E.D.N.Y. 2013), the Court recognized that "the Second Circuit in *Rothstein* held that the phrase 'by reason of' [in § 2333(a)] requires that Plaintiffs show that their damages were proximately caused by Defendant." The Court stated that "[a]s the term is 'ordinarily used,' proximate cause requires a showing that Defendant's actions were 'a substantial factor in the sequence of responsible causation,' and that the injury was 'reasonably foreseeable or anticipated as a natural consequence.'" *Id.* (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)).

*Strauss* distinguished *Rothstein* on the ground that in *Rothstein* currency was provided to Iran, which was not claimed to be the terrorist group that carried out attacks but rather a sponsor of a terrorist group, whereas in *Strauss* the plaintiffs were injured by Hamas and alleged that defendants had provided money to Hamas front groups.[4] *Strauss* explained that such differences are important "because Congress has specifically found that 'foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an

---

[4] *Strauss* held that providing material support to organizations controlled by Hamas is no different than providing material support directly to Hamas for purposes of the ATA. *Strauss*, 925 F. Supp. 2d at 435.

-17-

organization facilitates that conduct.'" *Id.* (quoting AEDP, Pub. L. 104–32, § 301(a)(7), 110 Stat. 1214, 1247 (1996)). For example, even "the social services provided by Hamas and its front groups are integral to building popular support for its organization and goals, which then facilitates its ability to carry out violent attacks. *Id.* at 434 (citing *Boim*, 549 F.3d at 698). Accordingly, *Strauss* held that "plaintiffs who bring an ATA action are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard. Such a task would be impossible and would make the ATA practically dead letter." *Id.*

More recently, *Linde,* 97 F. Supp. 3d at 324, addressed proximate cause under the ATA, and concluded that "neither [*Rothstein* nor *Al Rajhi*] held that but-for causation is a requirement of the ATA." *Linde* explained that "[p]roximate cause is a legal inquiry—focusing largely on foreseeability—that asks whether X and Y are sufficiently connected to justify holding one accountable for the other as a matter of legal policy." *Id. Linde* rejected a "but-for" causation requirement, pointing to "Congress' intent to impede terrorism by 'the imposition of liability at any point along the causal chain of terrorism,'" plus the fact that such a standard would make it impossible for victims of terrorist attacks to hold supporters of terrorist groups liable, and would thus "eviscerate the civil liability provisions of the ATA." *Id.* at 326. *Linde* agreed with *Strauss* and found proximate cause to be satisfied if it could be inferred that the defendant's material support "was a substantial reason that Hamas was able to perpetrate the terrorist attacks at issue, and that Hamas' increased ability to carry out deadly attacks was a foreseeable consequence" of providing such material support. *Id.* at 328-29 (quoting *Strauss*, 925 F. Supp. 2d at 432).

The *Force*-FAC alleges detailed facts showing Hamas's extensive use of Facebook's services and resources since at least 2011 to carry out essential functions of the organization and its terrorist activities. These resources strengthen Hamas internally as an organization (for example by providing communication, logistics, and networking capabilities, and freeing-up

funds for other terrorist activities), as well as externally (for example by enabling Hamas to build local public support for its terrorist operations, generate a cult of hatred, violence, and death, and recruit more followers to carry out attacks). Plaintiffs provided specific examples of how Hamas, its leaders, and affiliates used Facebook leading up to, in the course of, and after each specific attack at issue, to bolster their terrorist operations and make such attacks more likely, and more effective in intimidating Israelis and encouraging followers to carry out attacks. Plaintiffs have thus sufficiently alleged proximate causation, and Facebook's challenge is without merit.

### 3.    Facebook Aided, Abetted, and Conspired With Hamas

With the enactment of JASTA, 18 U.S.C. § 2333(d) now explicitly authorizes substantive causes of action for aiding and abetting and conspiracy liability for victims of terrorism:

> In an action under [18 U.S.C. § 2333(a)] for an injury arising from an act of international terrorism committed, planned, or authorized by an [FTO] … liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person[5] who committed such an act of international terrorism.

18 U.S.C. § 2333(d)(2). In enacting JASTA, Congress directed that the decision in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) "provides the proper legal framework for how such liability should function in the context of chapter 113B of title 18, United States Code." JASTA § 2(a)(5). An earlier ATA case explained the significance of *Halberstam*:

> In *Halberstam*, the Court of Appeals for the D.C. Circuit, relying heavily on The Restatement (Second) of Torts, § 876 (1979) ["Restatement"], upheld civil aiding and abetting liability, and also civil conspiracy liability, against a woman [Hamilton] who had knowingly and substantially assisted her co-defendant [Welch], a murderer, by performing otherwise legal services, such as acting as banker, bookkeeper and secretary, knowing that these activities assisted his illegal activities, <u>even though she had no specific knowledge of, or intent to commit, the particular illegal activity</u>, *i.e.*, murder, with which she and he were civilly

---

[5] Section 2333(d)(1) provides that, for subsection (d), the term "person" has the meaning giving in 1 U.S.C. § 1, where the word "person" is defined to "include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."

<u>charged</u>. As the court stated, "Although her own acts were neutral standing alone, they must be evaluated in the context of the enterprise they aided, *i.e.*, a five-year-long burglary campaign against private homes." *Halberstam*, 705 F.2d at 488. The Court noted that "the implications of tort law in this area [civil remedies for criminal acts] as a supplement to the criminal justice process and possibly as a deterrent to criminal activity cannot be casually dismissed." *Halberstam*, 705 F.2d at 489.

*Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 583-84 (E.D.N.Y. 2005) (emphasis added).

        **a)**     ***Aiding and Abetting***

*Halberstam* identified the following elements for an aiding and abetting claim:

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation.

*Halberstam*, 705 F.2d at 477. Applying these elements to the facts in that case, *Halberstam* explained that the first was fulfilled when co-defendant Welch killed the victim (Halberstam) during a burglary; the second was fulfilled because defendant Hamilton "had a general awareness of her role in a continuing criminal enterprise"; and the knowledge requirement of the third was satisfied because the evidence supported the inference that Hamilton assisted Welch "with knowledge that [Welch] had engaged in illegal acquisition of goods." *Id.* at 488. Regarding Hamilton's knowledge, *Halberstam* clarified that:

> It was not necessary that Hamilton knew specifically that Welch was committing burglaries. Rather, when she assisted him, it was enough that she knew he was involved in some type of personal property crime at night—whether as a fence, burglar, or armed robber made no difference—because violence and killing is a foreseeable risk in any of these enterprises.

*Id.* The Court explained that the extent of liability for aiding and abetting is based upon foreseeability. *Id.* at 484. Hamilton was liable for the murder committed by Welch as "a natural and foreseeable consequence of the activity Hamilton helped Welch to undertake." *Id.* at 488.

      Applying these elements to the *Force* claims that Facebook aided and abetted Hamas, the first element is satisfied, because plaintiffs alleged they were injured by terrorist operations

carried out by Hamas, the party to whom plaintiffs allege Facebook provided assistance. The second element is satisfied because Facebook at the very least "had a general awareness of its role" in Hamas's terrorist activities through Hamas's use of Facebook's platform and services. As discussed above, the *Force*-FAC contains numerous allegations and examples of Hamas, its leaders, and affiliates openly maintaining and using Facebook accounts in their own names and with the emblems and symbols of Hamas, many over a period of years (*e.g.*, ¶¶ 118-125). Plaintiffs have alleged that Facebook has <u>refused</u> to monitor, identify, and shut down Hamas-affiliated Facebook accounts, and even when Facebook received complaints about such sites, "Facebook has at various times determined that the Hamas Facebook page did not violate Facebook's policies and permitted the page to remain, or deleted only a portion of the content on the Hamas Facebook page and permitted the site to remain active." (¶¶ 547-549). In light of these allegations, Facebook's argument that a Facebook spokesman's statement that "[t]here are no pages of Hamas on Facebook" in 2014 "negates any inference that Facebook **knew** itself to be providing services to Hamas" (MTD at 37), is flawed. In fact, given the plaintiffs' allegations, including the continuous criticism Facebook has received for failing to monitor and shut down Hamas accounts, the statement actually strengthens the inference that Facebook knew it was providing services to Hamas but chose to consciously disregard that fact and claim ignorance. *See Halberstam*, 705 F.2d at 486 ("even [Hamilton's] protestations at trial that she knew absolutely nothing about Welch's wrongdoing—combine[d with other evidence] to make the district court's inference that she knew he was engaged in illegal activities acceptable, to say the least"). Lastly, the knowledge component of the third element of aiding and abetting is satisfied because, as discussed above, plaintiffs' allegations support the inference that Facebook has provided its services to Hamas with knowledge that Hamas had engaged in terrorist activity. *See Id*. at 488 (it was enough that Hamilton knew that Welch was involved in some type of crime for

which violence and killing is a foreseeable risk).

The final component of the third element is whether the defendant's assistance was "substantial." *Halberstam* explained: "Aiding-abetting focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct." *Id.* at 478. The Court noted that "many variables enter[] into the equation on how much aid is 'substantial aid,'" but focused on five factors from the Restatement: 1) "the nature of the act encouraged"; 2) "the amount [and kind] of assistance given"; 3) "the defendant's absence or presence at the time of the tort"; 4) "his relation to the tortious actor"; and 5) "the defendant's state of mind." *Id.* at 483-84 (addition in original). The Court also added a sixth factor: "duration of the assistance provided." *Id.*

Facebook attempts to narrow the scope of this inquiry and minimize the assistance it provided by claiming that the "principle violations were the individual attacks" of kidnapping, shooting, striking, and stabbing the victims by individual perpetrators. (MTD at 35-36). However, this is directly contrary to *Halberstam*. In assessing the liability of defendant Hamilton for a murder committed by her co-defendant Welch during a burglary, the *Halberstam* court stated: "[W]e first look at the nature of the act assisted, here a long-running burglary enterprise… Although her own acts were neutral standing alone, they must be evaluated in the context of the enterprise she aided, *i.e.,* a five-year-long burglary campaign against private homes." 705 F.2d at 488. Likewise, the principle violation in *Force* is Hamas's ongoing engagement in international terrorism, for which violence and killing is not only a foreseeable risk, but an integral part of Hamas's activities and goals. While Facebook argues that "any assistance provided by Facebook is not the type of assistance that 'might matter' to the attacks" (MTD at 35), the *Force*-FAC provides many ways in which Hamas uses Facebook to further its terrorist enterprise.

Examining the "amount [and kind] of assistance given" in *Halberstam*, the court stated:

"although the amount of assistance Hamilton gave Welch may not have been overwhelming as to any given burglary in the five-year life of this criminal operation, it added up over time to an essential part of the pattern." 705 F.2d at 488. Similarly in *Force*, Facebook is alleged to have been providing its platform and services to Hamas since at least 2011, all the while turning a blind eye to Hamas's use of Facebook to promote and carry out its terrorist activities, and refusing to actively identify and close Hamas-affiliated accounts.

The third and fourth factors that *Halberstam* considered, "the defendant's absence or presence at the time of the tort" and "his relation to the tortious actor," were not deemed controlling in *Halberstam* as it was not significant that the defendant "was admittedly not present at the time of the murder or even at the time of any burglary," and regarding the defendant's relationship to the murderer, the Court stated, "we accord it a low priority in our calculus." *Id.* These factors should be even less important in *Force*, since the cases discussed in *Halberstam* all involved individual defendants, whereas Facebook is a corporation. Nevertheless, the *Force*-FAC describes Hamas's integration of Facebook throughout its operations, including recruitment, communications, networking, and logistics. Moreover, by turning a blind eye to Hamas's use of its platform, Facebook "enables Hamas terrorists to come out of hiding and present a public face under their own brand and logo, and under the brand and logo of an American company: Facebook." (*Force*-FAC ¶ 116). Thus, "Facebook lends a sense of authenticity and legitimacy to Hamas as an organization that can operate openly and with impunity, notwithstanding the murderous crimes it commits and its status as an illegal terrorist organization." (¶ 115).

The final two factors discussed in *Halberstam* are the defendant's state of mind and the duration of assistance provided. In *Force*, plaintiffs' allegations more than suffice to show that Facebook knew it was providing services to Hamas but deliberately refused to use its technology

or resources to actively identify Hamas Facebook accounts and shut them down for years.

The foregoing analysis of the *Force* plaintiffs' allegations in light of *Halberstam* shows the plaintiffs have properly stated a claim of aiding and abetting liability against Facebook under the ATA, and Facebook's motion to dismiss is without merit.

### b) Conspiracy

*Halberstam* identified the elements of conspiracy as: 1) "an agreement to do an unlawful act or a lawful act in an unlawful manner"; 2) "an overt act in furtherance of the agreement by someone participating in it"; and 3) injury caused by the act." 705 F.2d at 487. The Court explained that "[t]he prime distinction between civil conspiracies and aiding-abetting is that a civil conspiracy involves an agreement to participate in a wrongful activity." *Id.* at 488. The rationale is that "[a]n agreement to participate in a wrongful course of action suffices to create vicarious liability." *Id.* at 479.

*Halberstam* stated further: "[C]ourts have to infer an agreement from indirect evidence in most civil conspiracy cases. The circumstances of the wrongdoing generally dictate what evidence is relevant or available in deciding whether an agreement exists." *Id.* at 486. Moreover, "[p]roof of a tacit, as opposed to explicit, understanding is sufficient to show agreement." *Id.* at 477 (citing W. Prosser, Law of Torts Sec. 46, at 292 (4th ed. 1971); 16 Am. Jur. 2d Conspiracy § 68 (1979)). *Halberstam* held that "[t]he long-running nature of the scheme is also crucial to the inference of agreement—Hamilton's knowledge and aid over five years makes some kind of accord extremely likely—perhaps only a tacit accord, but that is enough." 705 F.2d at 487.

Facebook attempts to skirt responsibility by focusing on an absurdly narrow and incorrect reading of plaintiffs' claims, arguing that plaintiffs "have not plausibly alleged that Facebook conspired with the [individual] perpetrators of the attacks." (MTD at 37). But the *Force* plaintiffs alleged very clearly that "Facebook conspired with Hamas." (*Force*-FAC ¶ 573). Plaintiffs

alleged and provided examples of occasions when "Facebook has suspended selected Hamas-related Facebook accounts (for example, in response to public or government pressure) but later reactivated them, or shut down or blocked a Hamas Facebook account while consciously refraining from making any effective or prolonged effort to ensure that the pages are not re-established using another account identifier." (¶ 553)

For example, in July 2014 the press reported that Facebook had removed the Facebook account of official Hamas spokesman Izzat al-Risheq, but by January 2015 al-Risheq was again openly using Facebook in his own name to promote Hamas terrorism. (¶ 554). When Facebook learned that al-Risheq posted a message on January 21, 2015 praising a terrorist attack on a city bus in Tel Aviv that wounded 12 Israelis, Facebook removed the message but did not suspend, block, or close al-Risheq's Facebook account. (¶¶ 550-551). Facebook took no action against Hamas's official "Media Office" Facebook page (adorned with the Hamas emblem and using its own name), which quoted al-Risheq's statement verbatim the same day and even attributed the statement to al-Risheq in English. (¶¶ 552, 554). This should be no surprise, since Facebook has refused to take steps itself to identify Hamas accounts, and even when such accounts are reported, Facebook has permitted the pages to remain. (¶¶ 512, 518, 547-49).

*Linde*, 384 F. Supp. 2d at 571, applied *Halberstam* to deny defendant bank's motion to dismiss a claim that the bank had conspired with Hamas and other terrorist groups, concluding:

> [Plaintiffs] adequately alleged that Arab Bank knowingly and intentionally agreed to provide services to organizations it knew to be terrorist organizations and that they were injured by an overt act which was done in furtherance of the common scheme. It is not necessary that they allege that Arab Bank either planned, or intended, or even knew about the particular act which injured a plaintiff.

384 F. Supp. 3d at 584. L*inde* further explained:

> [m]aterial support given to a terrorist organization can be used to promote the organization's unlawful activities, regardless of donor intent. Once the support is given, the donor has no control over how it is used….Moreover, all material

support given to such organizations aids their unlawful goals.

*Id.* at 586 (quoting *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1134, 1136 (9th Cir. 2000), *cert. denied*, 532 U.S. 904, 121 S. Ct. 1226 (2001)) (internal quotation marks omitted).

Facebook's knowledge of the terrorist nature of Hamas and its pattern of turning a blind eye and knowingly allowing Hamas accounts to remain open and active over the course of years provide evidence of Facebook's tacit agreement to provide services and resources to Hamas—in violation of federal law—to promote and carry out its activities. ((¶ 555). Plaintiffs were injured by Hamas terror attacks, which were "a reasonably foreseeable consequence" of providing material support to a terrorist organization. *See Halberstam*, 705 F.2d at 487. Accordingly, plaintiffs' allegations are sufficient to state a claim for conspiracy under the ATA.

## C.      The CDA Does Not Bar the ATA Claims

Facebook contends that the *Force* plaintiffs' claims are barred as a matter of law by the CDA. The relevant provision of the CDA states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).

The language of § 230(c)(1) makes it clear that the CDA only addresses claims that depend upon treating Facebook as the "speaker" or "publisher" of another party's content. *See Shiamili v. Real Estate Grp. of N.Y., Inc.*, 17 N.Y.3d 281, 289 (2011) ("section 230 . . . generally immuniz[es] Internet service providers from liability for third-party content wherever such liability depends on characterizing the provider as a 'publisher or speaker' of objectionable material"). The CDA does not immunize Facebook's violation of the ATA or federal criminal statutes that prohibit the provision of material support and resources to terrorists, which form the

basis of plaintiffs' claims.[6] Facebook's violation of §§ 2339A and 2339B does not depend upon the content that Hamas or its operatives post, nor do plaintiffs' claims depend on characterizing Facebook as the publisher or speaker of Hamas's content.

In support of its claim of CDA immunity, Facebook cites numerous cases in footnote 2 and page 10 of its brief addressing various forms of objectionable "content" posted by third-parties on websites. However, none of these cases applies to the facts of this case in which it is provision of services, not "objectionable content," that forms the basis of plaintiffs' claims.

Facebook wants to characterize this case about "content" rather than material support and resources, so that it can continue the practice it has engaged in for more than half a decade: substituting its own self-defined "Community Standards," which Facebook claims to use to decide whether to censor a particular post if another user happens to report the post as "offensive," for the absolute federal criminal prohibitions on providing its services to terrorists under §§ 2339A and 2339B and Executive Orders 12947 and 13224. This practice is coupled with Facebook's refusal to use available resources and technology to identify and shut down Hamas and other terrorist accounts in order to feign ignorance as to their existence, in the face of repeated reports and criticism that it is allowing these groups to openly operate on Facebook. Facebook cannot hide behind the CDA to evade responsibility for its conduct.

Thus, in its motion, Facebook claims: "Facebook has zero tolerance for terrorism. It condemns terrorist actions, prohibits terrorist content on Facebook, and swiftly removes any reported terrorist content." (MTD at 1) (emphasis added). First, such self-serving claims by

---

[6] See CDA, 47 U.S.C. § 230(e)(1): "Nothing in this section shall be construed to impair the enforcement of . . . any . . . Federal criminal statute." It must also be noted that the ATA was enacted later and amended (most recently via JASTA a few months ago), and thus post-dates by far the enactment of the CDA. Even if there were a conflict between the limited immunity granted by the CDA and the liability imposed by the ATA, the ATA would control as its later enactment would be a tacit limiting of the CDA.

Facebook are not drawn from allegations in the *Force*-FAC, and are not properly introduced by Facebook in a Rule 12(b)(6) motion to dismiss. More significant, however, is Facebook's tacit acknowledgement that in practice, it ignores terrorists' use of its services unless it receives a complaint, and even then Facebook's focus is on whether or not to remove "terrorist content," not to completely shut down terrorists' accounts and cease providing services to the terrorists.

In upholding 18 U.S.C. § 2339B, the U.S. Supreme Court specifically credited State Department testimony that: "'[t]he experience and analysis of the U.S. government agencies charged with combating terrorism strongly suppor[t]' Congress's finding that <u>all</u> contributions to foreign terrorist organizations further their terrorism." *Holder,* 561 U.S. at 33 (quoting McKune affidavit) (emphasis added).[7] The Court rejected a claim that prohibiting the provision of non-violent services to a foreign terrorist organization violated the provider's First Amendment right to "free speech," and explained the necessity of the prohibition as follows:

> The material-support statute is, on its face, a preventive measure—it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur. . . .
>
> [P]laintiffs simply disagree with the considered judgment of Congress and the Executive that providing material support to a designated foreign terrorist organization—even seemingly benign support—bolsters the terrorist activities of that organization. That judgment, however, is entitled to significant weight, and we have persuasive evidence before us to sustain it. Given the sensitive interests in national security and foreign affairs at stake, the political branches have adequately substantiated their determination that, to serve the Government's interest in preventing terrorism, it was necessary to prohibit providing material support in the form of training, expert advice, personnel, <u>and services</u> to foreign terrorist groups, even if the supporters meant to promote only the groups' nonviolent ends.

---

[7] The affidavit added: "Given the purposes, organizational structure, and clandestine nature of foreign terrorist organizations, it is highly likely that <u>any</u> material support to these organizations will ultimately inure to the benefit of their criminal, terrorist functions— regardless of whether such support was ostensibly intended to support non-violent, non- terrorist activities." *Id.* (emphasis added).

*Holder*, 561 U.S. at 36 (emphasis added).

The only federal case to date to address the issue of the CDA in the context of an ATA claim is a lone district court decision in *Fields v. Twitter*, 2016 WL 4205687 (N.D. Cal. 2016). The district court in *Fields* determined that a claim that Twitter permitted ISIS to use Twitter "as a tool for spreading extremist propaganda, raising funds, and attracting new recruits," was barred by the CDA because it sought to "treat Twitter as a publisher." *Id.* at *6. The *Fields* court added that, if the plaintiffs had challenged the provision of accounts more directly "it would be just as barred" by the CDA as "publishing activity" because it involves Twitter exercising its discretion about "what third-party content may be posted online." *Id.*

*Fields* was plainly wrongly decided and an outlier, and in any case is factually distinguishable from *Force*. First, neither Twitter nor Facebook has discretion about whether or not to provide resources and services to ISIS or Hamas. These entities are designated FTO's, and it is a federal crime for Twitter or Facebook to provide services to these groups, regardless of content. Moreover, the immunity that flows from the CDA is only immunity from being treated as the "speaker or publisher" of another party's content. Liability under §§ 2339A and 2339B and the ATA is about providing services to designated FTO's and thereby engaging in international terrorism, not whether content is attributed to Twitter or Facebook.

*Fields* is also factually distinct from *Force* because *Fields* involved a "lone wolf" attacker and no allegations of how ISIS's use of Twitter was connected to the attack at issue. In contrast, the *Force* plaintiffs were injured by Hamas operatives, and plaintiffs have alleged how Facebook's provision of services and resources to Hamas substantially contributed to Hamas's ability to carry out the attacks at issue and the attacks were a foreseeable consequence of the support provided by Facebook. Thus, the CDA does not bar plaintiffs' ATA claims.

## D.    The CDA Does Not Have Extraterritorial Application

Facebook's reliance upon CDA immunity fails for another reason: Facebook provides aid, support, and resources to HAMAS and other terrorists in and around Israel, plaintiffs in both *Force* and *Cohen* suffered injury in Israel, and the *Force*-FAC and *Cohen*-FAC assert claims against Facebook under Israeli law. The CDA, however, does not apply outside the territorial jurisdiction of the United States. Accordingly, insofar as Facebook relies upon the CDA for immunity for actions and claims that arose abroad, Facebook's claim of immunity must fail.

In 2010 the Supreme Court reaffirmed the "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *Morrison v. Australia National Bank*, 130 S. Ct. at 2877 (quoting *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, (1991) (*Aramco*) (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)). The Court said this principle is "a canon of construction, or a presumption about a statute's meaning," which "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters." *Id.* (citing *Blackmer v. United States*, 284 U.S. 421, 437 (1932); *Smith v. United States*, 507 U.S. 197, 204, n. 5 (1993)).[8] Accordingly, the Court in *Morrison* held that, "'unless there is the affirmative intention of the Congress clearly expressed' to give a statute extraterritorial effect, 'we must presume it is primarily concerned with domestic conditions.'" *Id.* (quoting *Aramco* at 248). Moreover, the presumption against extraterritorial effect "applies regardless of whether there is a risk of conflict between the American statute and a foreign law." *Id.* at 2878 (citing *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 173-174 (1993)). Put simply, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Id.* at 2878.

---

8 *See also Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013) (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)) (explaining that this canon "reflects the 'presumption that United States law governs domestically but does not rule the world'").

Since the CDA "gives no clear indication of an extraterritorial application," under *Morrison*, the CDA has no extraterritorial application. In fact, the text of the CDA reinforces the presumption that Congress only intended the statute to apply domestically. For example, Congress's findings recited in section (a) of the CDA refer to the Internet and other interactive computer services that are "available to individual Americans," that have flourished "to the benefit of all Americans," and upon which "Americans" increasingly rely. 47 U.S.C. § 230(a)(1), (4), (5). The CDA also describes as part of the "policy of the United States" the preservation of a "vibrant and competitive free market" in these services "unfettered by Federal or State regulation." *Id.* at § 230(b)(2).[9] Likewise, in prescribing the CDA's "[e]ffect on other laws," § 230(e) refers only to federal, State, and local laws; there is no mention of foreign law.

The CDA thus does not have extraterritorial application, and does not provide immunity to Facebook for its activities abroad, particularly as to plaintiffs' claims under Israeli law.

1.      **Plaintiffs' Israeli Tort Claims**

Both *Force* and *Cohen* include claims under Israeli law for: 1) negligence under Israel's *Civil Wrongs Ordinance (New Version)—1972* ("CWO") §§ 35-36; 2) breach of statutory duty under CWO § 63; and 3) vicarious liability under CWO §§ 12 and 15.

The elements of Israeli tort law are: 1) duty; 2) breach; 3) causation; and 4) damages. *See Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1, 57-81 (2010) (providing a detailed discussion of Israeli tort law). As to negligence, Israel's CWO § 35 provides (in translation):

> When a person does some act which in the circumstances a reasonable prudent person would not do, or fails to do some act which in the circumstances such a person would do, . . . then such act or failure constitutes carelessness and a person's carelessness as aforesaid in relation to another person to whom he owes a duty in the circumstances not to act as he did constitutes negligence. Any person

_____

[9] *But see* CDA, 47 U.S.C. § 230(e)(1): "Nothing in this section shall be construed to impair the enforcement of . . . any . . . Federal criminal statute."

who causes damage to any person by his negligence commits a civil wrong. *Wultz*, 755 F. Supp. 2d at 57-58. CWO § 36 clarifies that the words "another person" in the second to last sentence of § 35 apply to all persons to whom injury was foreseeable. *Id.* Thus, under Israeli law, every actor has a duty wherever "a reasonable person ought in the circumstances to have contemplated as likely" that his act or omission will affect another. *Id.* Israeli law incorporates two types of duties: a subjective "concrete duty," which applies wherever an actor, in light of the facts and circumstances, could have foreseen that his act or omission would yield a harm; and an objective "notional duty," which applies wherever, as a matter of Israeli policy, the actor ought to have foreseen the harm (without regard to the particular facts). *Id.* at 58-59.

"Breach of statutory duty" under Israeli law (CWO § 63) is a civil private right of action "for the violation [of] any enactment of the Knesset [Israel's Parliament], including penal enactments, so long as certain elements are met." *Wultz*, 755 F. Supp. 2d at 67. The relevant portion of the statute reads (in translation):

> Breach of a statutory duty consists of the failure by any person to perform a duty imposed upon him by any enactment other than this Ordinance, being an enactment which, . . . as intended to be for the benefit or protection of any other person, whereby such other person suffers damage of a kind or nature contemplated by such enactment . . .

*Id.*[10]

Although termed "vicarious liability," Israel's CWO § 12 is not the same as the American concept of vicarious liability; rather it is a separate cause of action against a person who

---

[10] The enactments upon which plaintiffs' breach of statutory duty rely are: Israel's *Prevention of Terrorism Ordinance*, 5708-1948, §§ 1, 4 (praise, support, or calls for support of terrorism prohibited); Israel's *Penal Law*, 5737-1977, §§ 134, 136, 144-45, and 148 (banning incitement to violence and terror, material support for terrorism); and Israel's *Defense Regulations (Emergency Period)*, 1945, §§ 84-85 (provision of any service for any unlawful organization, including groups engaged in terrorist activities, prohibited).

participates in, assists, advises, or solicits an act or omission committed or about to be committed

by another person, or who orders, authorizes, or ratifies such an act or omission. *Id.* at 80-81.

CWO § 15 also recognizes action against a person for the acts or omissions of a party with whom

he contracts if, among other things, he was negligent in selecting the contractor, authorized or

ratified the acts of the contractor, or if the contract was entered into for an unlawful purpose.

### 2.      Applicability of Israeli Tort Law

New York conflict law begins with determining whether the laws at issue actually

conflict. *Matter of Allstate Ins. Co.*, 81 N.Y.2d 219, 223 (1993). The question is whether there is

an "actual conflict" of law as applied to the specific facts of this case (regardless of whether that

conflict would yield a different result as to liability). *Finance One Pub. Co. v. Lehman Bros.*

*Special Fin.*, 414 F.3d 325, 331 (2d Cir. 2005) (quoting *Tronlone v. Lac d'Amiante du Quebec,*

*Ltee*, 297 A.D.2d 528, 747 N.Y.S.2d 79 (1st Dep't 2002)). Differences in substantive law

conflict where there exists "a 'significant *possible* effect on the outcome of the trial.'" *Finance*

*One*, 414 F.3d at 331 (citation omitted) (emphasis in original). Thus a conflict exists when the

jurisdictions involved provide different substantive rules and those differences are "'relevant' to

the issue at hand." *Id.*

Here, while the primary elements of negligence (breach, duty, causation, damage) are the

same under New York and Israeli law, courts have found that a conflict of law analysis is

warranted because there are substantive differences in Israeli negligence law, particularly

regarding duty and foreseeability, which would have a significant possible effect on the outcome

of litigation. *See Wultz v. Bank of China, Ltd.*, 811 F. Supp. 2d 841, 850 (S.D.N.Y. 2011). The

court in *Elmaliach v. Bank of China, Ltd.* explained some of these differences:

> As discussed most fully in *Wultz I*, the Israeli law of negligence "differs slightly"
> from New York law in that duty is divided into fact and notional duty and
> depends on foreseeability (755 F. Supp. 2d at 58). Under Israel's CWO, the

analysis of whether a duty is owed involves an inquiry into whether a reasonable person could have foreseen the occurrence of the damage under the particular circumstances alleged; whether as a matter of policy, a reasonable person ought to have foreseen the occurrence of the particular damage; and whether the occurrence causing the damage was foreseeable (id. at 58-59). This differs from New York law, where the foreseeability of harm does not define duty and, absent a duty running directly to the injured person, there is no liability in damages, however careless the conduct or foreseeable the harm (*see 532 Madison Ave. Gourmet Foods v Finlandia Ctr.*, 96 NY2d 280, 289 [2001]).

*Elmaliach v. Bank of China, Ltd.*, 110 A.D.3d 192, 201 (1st Dep't 2013). Moreover, the "breach of statutory duty" and "vicarious liability" provisions contained in Israel's CWO are unique foreign substantive laws that have no equivalent under New York law. *Id; see also Wultz v. Bank of China, Ltd.*, 811 F. Supp. 2d at 850. Thus, conflict of law analysis is appropriate in this case.

Upon establishing a conflict in tort law, New York courts employ an "interest analysis" to determine which of competing jurisdictions has the greatest interest in having its law applied in the lawsuit. *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 521 (1994); *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 197 (1985). The interest analysis involves two questions: "(1) what are the significant contacts and in which jurisdiction are they located; and (2) whether the purpose of the law [at issue] is to regulate conduct or allocate loss." *Padula*, 84 N.Y.2d at 521.

As to the second question, the Israeli laws upon which Plaintiffs base their Israeli causes of action all have the regulation of conduct as their primary purpose. A statute that "in effect dictates the standard of care required" for a claim "falls within the category of conduct regulating rather than loss-allocating." *Devore v. Pfizer Inc.*, 58 A.D.3d 138, 141 (1st Dep't 2008). A claim for negligence is clearly a conduct-regulating law. *HSA Residential Mortg. Servs. of Texas v. Casuccio*, 350 F. Supp. 2d 352, 364 (E.D.N.Y. 2003). Israel's unique "breach of statutory duty" claim and the underlying enactments at issue in this case are also conduct-regulating, as they are designed to uphold statutorily imposed duties to prevent terrorism, violence, and incitement, and to make it more difficult for terrorists to operate. Similarly, Israel's unique "vicarious liability"

claim is conduct-regulating because, unlike an American employer liability claim, the Israeli law

is not designed to allocate loss, but among other things to deter a person from participating in,

assisting, advising or soliciting another party's act or omission.

Where a conduct-regulating tort has been committed, "the law of the jurisdiction where

the tort occurred will generally apply because that jurisdiction has the greatest interest in

regulating behavior within its borders." *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993).

Generally, the "place of the tort" is defined by "the place where the last event necessary to make

the actor liable occurred." *Schultz*, 65 N.Y.2d at 195. Thus, "[w]here the defendant's negligent

conduct occurs in one jurisdiction and the plaintiff suffers injuries in another, 'the place of the

wrong is considered to be the place where the last event necessary to make the actor liable

occurred,' that is, 'where the plaintiffs' injuries occurred.'" *Elmaliach*, 110 A.D.3d at 203

(quoting *Schultz*, 65 N.Y.2d at 195; and citing *Devore v Pfizer*, 58 A.D.3d at 141). In this case,

that place is Israel. While Facebook's relevant actions were in multiple locations, including

Israel, New York, and Ireland (and possibly California), Facebook's liability attached as a result

of events in Israel, where Hamas attacks occurred and 20,000 Israeli plaintiffs remain exposed to

enhanced risk from Hamas due to Facebook's actions.[11] The injury to plaintiffs caused by

Facebook's actions—"the last event necessary"—undoubtedly occurred and continues to occur

in Israel. Therefore, as Israel is the place of injury, Israel's law should be applied in these cases.

There is no reason to deviate from this well-established place of injury rule here. While

---

[11] *See e.g.*, *Greenberg, Trager & Herbst, LLP v. HSBC Bank USA*, 17 N.Y.3d 565, 576 (2011) ("To establish a cause of action sounding in negligence, a plaintiff must establish the existence of a duty on defendant's part to plaintiff, breach of the duty and damages.") (Emphasis added) (Citation omitted); *see also Nader v. Gen. Motors Corp.*, 31 A.D.2d 392, 395 (1st Dep't 1969) ("The injury . . . is the humiliation and outrage to plaintiff's feelings, resulting from the telecast. The last event necessary to make the defendant liable was not the final act in publication of the telecast . . . but the reaction of the telecast on [plaintiff's] sensibilities.") (Internal citation and quotation marks omitted).

Israel, New York, and California each have an interest in regulating Facebook's conduct, Israel's interests in having its laws apply in these cases far outweigh those of New York or California. These cases concern Facebook providing services to terrorists located in Israel, Gaza, and the West Bank. These terrorists use Facebook to facilitate their terrorist activity, and they specifically target and carry out their attacks in Israel. Israel is the domicile of the 20,000 Israeli plaintiffs in *Cohen*. It is the place where plaintiffs are suffering injury and the greatest impact of the attacks is felt. Israel "has a strong interest in seeing that its aggrieved citizens obtain redress for wrongs committed upon them." *See K.T. v. Dash*, 37 A.D.3d 107, 114 (1st Dep't 2006); *Oveissi v. Islamic Rep. of Iran*, 573 F.3d 835, 842-43 (D.C. Cir. 2009) (implying that when the domiciliaries of a particular locale are targeted, that locale has the greatest interest in having its laws apply). Moreover, by specifically legislating that its anti-terror statutes (upon which plaintiffs' "breach of statutory duty" claim is based) apply extraterritorially, Israel has demonstrated its strong interest in having its laws apply in cases such as this. *See Wultz*, 755 F. Supp. 2d at 68-70.

Because the laws at issue are "conduct-regulating" and the "interest analysis" clearly demonstrates that Israel has the greatest interest in having its laws apply in this case, Plaintiffs' claims under Israeli law are properly before this Court.

## PART II
### *COHEN V. FACEBOOK:* THE INJUNCTION LAWSUIT

### A.    Facebook Is Subject to Personal Jurisdiction in New York

Facebook claims it is not subject to general jurisdiction in this Court because New York is not its place of incorporation or principal place of business. (MTD at 27-30) (citing, *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846 (2011) and *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014)). However, *Daimler* recognized that a corporation could be subject to

personal jurisdiction where its "affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum state." *Daimler*, 134 S. Ct. at 761 (citations and internal quotations omitted). Moreover, under CPLR § 301, "a defendant may be subject to general jurisdiction [in New York] by virtue of its physical presence, domicile, consent, or 'doing business' in New York." *Beach v. Citigroup Alternative Investments LLC*, 2014 WL 904650, at *6 (S.D.N.Y. 2014).

### 1.   Facebook Consented to Jurisdiction Via New York's Registration Statute

Facebook consented to general personal jurisdiction in New York when it registered to do business in New York pursuant to N.Y. Bus. Corp. Law § 1301. As a condition for being authorized to do business in New York, Facebook had to designate the New York secretary of state as its agent for service of process. N.Y. Bus. Corp. Law § 304(a) and (b). Historically, New York courts have interpreted these provisions as consent to general personal jurisdiction.[12] Even after *Goodyear* and *Daimler*, New York courts have held that registration in New York as a foreign corporation constitutes consent to personal jurisdiction for purposes of CPLR § 301.[13]

---

[12] *See* CPLR § 301, Alexander, Supplementary Practice Commentaries, McKinney's Cons. Laws of N.Y. CPLR C301:6 (2015); *see also*, *e.g.*, *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 170, 175 (1939); *Bagdon v. Philadelphia & Reading Coal & Iron Co.*, 217 N.Y. 432, 436-38 (1916) (consent to jurisdiction based on New York registration statute "is a real consent"); *Rockefeller Univ. v. Ligand Pharms.*, 581 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (defendant's "unrevoked authorization to do business and its designation of a registered agent for service of process amount to consent to personal jurisdiction in New York").

[13] *See*, *e.g.*, *Zucker v. Waldman*, 46 Misc. 3d 1214(A), 9 N.Y.S.3d 596 (N.Y. Sup. 2015) (foreign corporation could have been subjected to personal jurisdiction in New York by consent had it registered to do business in New York); *Bailen v. Air & Liquid Systems Corp.*, 2014 WL 3885949, at *4-5, 2014 NY Slip Op 32079(U) (N.Y. Sup. Co. 2014) ("although *Daimler* clearly narrows the reach of New York courts in terms of its exercise of general jurisdiction over foreign entities, it does not change the law with respect to personal jurisdiction based on consent"); *Beach*, 2014 WL 904650, at *7 ("[n]otwithstanding these limitations [in *Goodyear* and *Daimler*], a corporation may consent to jurisdiction in New York under CPLR § 301 by registering as a foreign corporation and designating a local agent"); *see also B & M Kingstone, LLC v. Mega Int'l Commercial Bank Co.*, 131 A.D.3d 259, 264-65, 15 N.Y.S.3d 318 (N.Y. App. Div.),

*(continued next page)*

Moreover, an amendment to N.Y. Bus. Corp. Law § 1301 currently pending in the New York State Senate, would codify this case law:

> (E) A foreign corporation's application for authority to do business in this state, whenever filed, constitutes consent to the jurisdiction of the courts of this state for all actions against such corporation. A surrender of such application shall constitute a withdrawal of consent to jurisdiction.

New York State Senate Bill S4846 (https://www.nysenate.gov/legislation/bills/2015/S4846).

### 2.    Facebook Is Subject to Personal Jurisdiction in New York Under CPLR § 301 Because it Does Business in New York

Facebook's New York presence is also so substantial that it satisfies the "doing business" prong of CPLR § 301. Facebook maintains more than 561,000 square feet of office space in New York and employs more than 1,300 employees in its New York office, which comprise nearly 5% of its employees worldwide. (MTD, So Decl. ¶5, Farren Decl. ¶ 6). These employees work in Global Marketing Solutions, Technology, and Business Development. *Id.* Among other things, they release daily updates and improvements to Facebook's social media platform and services worldwide. (*Cohen*-FAC ¶ 11). Facebook also maintains New York bank accounts holding more than $700 million in cash, cash equivalents, and marketable securities. *Id.*

It has long been the law in New York that "[a] foreign corporation is amenable to suit in New York courts under CPLR § 301 if it has engaged in such a continuous and systematic course of 'doing business' there that a finding of its 'presence' in this jurisdiction is warranted." *Mejia-*

---

leave to appeal dismissed, 26 N.Y.3d 995, 41 N.E.3d 74 (2015) (foreign bank consented to jurisdiction by registering with state department of financial services).

Although the Second Circuit rejected consent jurisdiction under Connecticut's registration statute in *Brown v. Lockheed Martin Corp.*, 814 F.3d 619 (2d Cir. 2016), the decision was limited to Connecticut's statute, which the court held was "ambiguous," unlike New York's statute and caselaw. The court distinguished New York's statute, stating: "[t]he registration statute in the state of New York has been definitively construed to accomplish [consent to general jurisdiction], and legislation has been introduced to ratify that construction of the statute." *Id.* The court agreed that jurisdiction may be constitutional under other statutes. *Id.*

*Haffner v. Killington, Ltd.*, 119 A.D.3d 912, 990 N.Y.S.2d 561 (2014) (collecting cases).[14] Certainly, Facebook is "present" in New York under the traditional doing business standard.

### 3.      Facebook is "At Home" in New York

Facebook is "at home" in New York even under *Goodyear* and *Daimler*. The Supreme Court left open the possibility for personal jurisdiction over a corporation in a location other than its place of incorporation or principal place of business. *See Daimler*, 134 S. Ct. at 761, n. 19 (corporation's in-forum operations can be so substantial as to render it at home in the forum). *Goodyear* and *Daimler* involved foreign defendant corporations being sued on the basis of contacts of their in-state subsidiaries or affiliates. In contrast, Facebook is registered to do business in New York, maintains a substantial presence here and conducts extensive business activities here. The other cases cited and relied upon by Facebook all involve situations where the foreign corporation had no—or extremely limited—presence in the forum state.[15]

### 4.      Facebook is Subject to Specific Jurisdiction Under CPLR § 302

Specific jurisdiction is appropriate because the causes of action arise out of Facebook's "transact[ion] of any business within the state" or "tortious act within the state CPLR § 302 (a). Facebook has a New York engineering hub where employees release updates and improvements

---

[14] *See also Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 537 (1967); *Mejia-Haffner*, 990 N.Y.S.2d at 561; *S. Seas Holding Corp. v. Starvest Grp., Inc.*, 46 Misc. 3d 1226(A), 13 N.Y.S.3d 853 (2d Dep't 2015) (discussing New York's pre-*Daimler* doing business standard as good law).

[15] In *Sonera Holdings*, defendant Turkish company had no physical presence in New York and was not registered to do business there. *Sonera Holdings B.V. v. Cukorova Holding A.S.*, 750 F.3d 221, 225 (2d Cir.), cert. denied, 134 S. Ct. 2888 (2014) ("*Daimler* and *Goodyear* d[o] not hold that a corporation may be subject to general jurisdiction only in a forum where it is incorporated or has its principal place of business") (citations and internal quotations omitted); *Cont'l Indus. Grp., Inc. v. Equate Petrochemical Co.*, 586 F. App'x 768, 769-70 (2d Cir. 2014) (no allegation that defendant was "at home" in New York); *Gucci*, 768 F.3d at 135 (Bank of China's New York branch relatively insignificant for its overall business); *Del Castillo v. PMI Holdings N. Am. Inc.*, 2015 WL 3833447, at *3 (S.D. Tex. 2015) (general jurisdiction proper over out-of-state defendant with Texas office and local registered agent).

every day to its users worldwide. Facebook's New York engineers are thus directly responsible for developing, improving, and providing certain Facebook services that terrorists use to further their activities, including Facebook's mobile platform, messaging, and payment services.

**B.      The *Cohen* Plaintiffs Have Standing to Sue Facebook**

The three basic elements of standing are: (1) injury-in-fact to plaintiff; (2) causation by defendant; and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

To meet the first element, a plaintiff must allege an "injury-in-fact," meaning an "invasion of legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560. Where plaintiff seeks declaratory or injunctive relief, he "must show he is suffering an ongoing injury or faces an immediate threat of injury." *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011). The requirement to show that the injury is "fairly traceable" to the defendant's actions is "lower than proximate cause." *Rothstein*, 708 F.3d at 92. Finally, the redressability element does not require plaintiff to show that the relief will solve or eliminate the injury entirely. *Mass. v. EPA*, 127 S. Ct. 1438, 1458 (2007).

The *Cohen* plaintiffs, 20,000 Israeli citizens who live in Israel, have alleged that the Israeli statutes at issue were passed to protect the plaintiffs and impose a duty upon Facebook to refrain from providing aid support and resources to terrorist groups. Plaintiffs have shown that Facebook breached this duty, and they suffer ongoing intimidation and coercion as part of the civilian population targeted by such terrorism. Finally, an order by the Court requiring Facebook to comply with its legal duty and take active steps to cease providing services and resources to terrorists will be a major step in depriving terrorists of resources and would likely affect the scope, intensity, and frequency of such attacks, thus reducing the ongoing injury to plaintiffs. Thus, Facebooks' challenge to the *Cohen* plaintiffs' standing to bring this action is without merit.

**CONCLUSION**

For the reasons set forth herein, the defendants' motion should be denied in all respects.

Dated:   Brooklyn, New York
         December 20, 2016

                                   Yours,

                                   THE BERKMAN LAW OFFICE, LLC
                                   *Attorneys for the plaintiffs*


                           by:   _____
                                   Robert J. Tolchin

                                   111 Livingston Street, Suite 1928
                                   Brooklyn, New York 11201
                                   (718) 855-3627