UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

STUART FORCE, individually and as
Administrator on behalf of the Estate of Taylor
Force, et al.,

                    Plaintiffs,

     -against-

FACEBOOK, INC.,

                    Defendant.

**MEMORANDUM & ORDER**

**16-CV-5158 (NGG) (LB)**

-------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiffs in the above-captioned action are the victims, estates, and family members of

victims of terrorist attacks in Israel. (1st Am. Compl. ("FAC") (Dkt. 28).) They assert various

claims against Facebook, Inc. ("Facebook") based on their contention that Facebook has

supported the terrorist organization Hamas by allowing that group and its members and

supporters to use Facebook's social media platform to further their aims.

      On May 18, 2017, the court dismissed Plaintiffs' first amended complaint without

prejudice for failure to state a claim upon which relief may be granted.[1] (May 18, 2017, Mem. &

Order ("May 18 M&O") (Dkt. 48).) Before the court are Plaintiffs' motions to alter the

judgment dismissing the first amended complaint (Mot. to Alter J. ("Recons. Mot.") (Dkt. 50))

and for leave to file a second amended complaint (Mot. for Leave to File 2d Am. Compl.

("Amendment Mot.") (Dkt. 52)). For the following reasons, the court DENIES both motions.

---

[1] In that order, the court also addressed the factually similar allegations in Cohen v. Facebook, Inc.,
No. 16-CV-4453, and dismissed the operative complaint in that case as well. (May 18 M&O.)

## I.    BACKGROUND

The court assumes familiarity with Plaintiffs' allegations and the court's prior decision granting Facebook's motion to dismiss Plaintiffs' first amended complaint. (See May 18 M&O.) In that opinion, the court specified that the dismissal was without prejudice. (Id. at 28.) On June 15, 2017, Plaintiffs filed two motions: first, a motion to alter the judgment, "retracting [the May 18 M&O] and issuing a modified opinion denying Facebook's motion to dismiss" (Recons. Mot.); and second, a motion for leave to file a second amended complaint, a copy of which Plaintiffs appended to their memorandum in support of that motion (Amendment Mot.; see also Proposed 2d Am. Compl. ("PSAC") (Dkt. 53-1)).

## II.   DISCUSSION

### A.    Motion to Alter the Judgment

Plaintiffs ask the court to reconsider its dismissal of the first amended complaint. The court concluded that all of the claims contained therein were barred by Section 230(c)(1) ("Section 230") of the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c)(1). That law states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Examining the myriad opinions considering the application of that law, the court concluded that each of Plaintiffs' claims and theories of liability sought to hold Facebook liable based on its role as the "publisher or speaker" of social media content generated by Hamas and affiliated individuals, and so were barred by the defense afforded by Section 230. (May 18 M&O at 17-23.) The court also held that applying Section 230 to the claims and theories at issue did not require an impermissible extraterritorial application of the CDA, as the relevant location for its extraterritoriality analysis was "the situs of the litigation." (Id. at 26.)

Plaintiffs contend that the court erred both in its determination that Section 230 applied to the claims raised in the first amended complaint and that the application of that law to those claims was not impermissibly extraterritorial. They seek reconsideration and rescission of the opinion dismissing their complaint pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. For the reasons that follow, the court sees no reason to reconsider its previous decision dismissing the first amended complaint.

1.  Legal Standard

"A motion for reconsideration should be granted only when the [moving party] identifies 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr., 729 F.3d 99, 104 (2d Cir. 2013) (quoting Virgin Atl. Airways v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992)). "It is well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012) (internal quotation marks and citation omitted). "[T]he standard for granting a Rule 59 motion for reconsideration is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked." Id. (quoting Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)) (alterations omitted). "The burden is on the movant to demonstrate that the Court overlooked controlling decisions or material facts that were before it on the original motion and that might materially have influenced its earlier decision." Schoolcraft v. City of New York, 248 F. Supp. 3d 506, 508 (S.D.N.Y. 2017); see also Levin v. Gallery 63 Antiques Corp., No. 04-CV-1504 (KMK), 2007 WL 1288641, at *2 (S.D.N.Y. Apr. 30, 2007) ("Motions for reconsideration allow

the district court to correct its own mistakes, not those of the Parties." (internal quotation marks and citations omitted)).

2.    Application

Plaintiffs argue that the court erred in (1) determining that the "focus" of Section 230 was on the "limitation of liability;" and (2) applying Section 230 to the claims against Facebook and, particularly, to claims raised under the Anti-Terrorism Act ("ATA") and Israeli law. (See generally Mem. in Supp. of Mot. for Recons. ("Recons. Mem. (Dkt. 51).) The court addresses these arguments in turn.

a.    "Focus" of Section 230

Plaintiffs first argue that the court erred in concluding that the presumption against extraterritoriality did not preclude application of Section 230 to the allegations raised in the first amended complaint. Plaintiffs take particular issue with the court's determination that Section 230's "focus" was on that section's "limitation on liability." (Recons. Mem. at 4 (quoting May 18 M&O at 25).) Plaintiffs argue both that the court's identification of the statutory "focus" was based on an overly narrow focus on the provision at issue in this litigation, Section 230(c)(1) (Recons. Mem. at 4-5), and that the court's conclusion that the statute's focus is on liability "wrongly conflates the effect of a statute with its focus," which is on the actions of interactive computer providers (id. at 5-8).

Plaintiffs' arguments on this point do not come close to meriting reconsideration. The court notes that Plaintiffs at no point attempted to raise either of these arguments in their opposition to Facebook's motion to dismiss; in fact, the portions of Plaintiffs' brief discussing extraterritoriality do not even mention the word "focus." (See Pls. Mem. in Opp'n to Mot. to Dismiss ("Pls. MTD Opp'n") (Dkt. 40) at 30-31.) Plaintiffs provide no reason why they could not have presented such arguments in their initial briefing, and such new arguments have no

4

place in a motion for reconsideration. See, e.g., Schoolcraft, 248 F. Supp. 3d at 508. While

Plaintiffs now seek to take a new tack, "[a] party requesting reconsideration is not supposed to

treat the court's initial decision as the opening of a dialogue in which that party may then use

Rule [59(e)] to advance new facts and theories in response to the court's rulings." Id. at 509

(quoting Church of Scientology Int'l v. Time Warner, Inc., No. 92-CV-3024 (PKL), 1997 WL

538912, at *2 (S.D.N.Y. Aug. 27, 1997)).

Moreover, Plaintiffs identify no contrary authority that the court overlooked or

misapplied, as is normally required to obtain reconsideration. See Analytical Surveys, 684 F.3d

at 52. Instead, Plaintiffs contend the court's approach is generally at odds with Supreme Court

and Second Circuit opinions examining issues of extraterritoriality because the court failed to

adequately account for "statutory context." (Recons. Mem at 4-6.) Plaintiffs plainly misread the

court's opinion, however, which was explicit in basing its conclusion about the statute's focus on

its reading of Section 230 as a whole. (See May 18 M&O at 25-26 (examining policy statements

and substantive provisions of Section 230).)

Plaintiffs' second argument—that the court's holding that Section 230's focus is on

limiting liability "wrongly conflates the effect of a statute with its focus" (Recons. Mem.

at 6-7)—is likewise unsupported by any contrary authority. Plaintiffs wave their hands at two

recent Supreme Court decisions contemplating statutes other than the CDA and purport to draw

from those decisions the proposition that "no statute's focus can ever be to simply limit liability."

(Id. at 6-7 (citing Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247 (2010), and Kiobel v. Royal

Dutch Petroleum Co., 569 U.S. 108 (2013)).) However, those decisions offer no support for

such a broad generalization, as they examine only the particular statutes before the Court while

stressing that the touchstone of extraterritoriality analysis must be on the "focus of congressional

concern" in enacting the challenged statute. <u>Morrison</u>, 561 U.S. at 266. The court sees nothing in those opinions that disturbs its analysis of the CDA and certainly sees nothing that suggests that Congress's focus in enacting a statute can <u>never</u> be on limiting liability.

### b. The Scope of the CDA

Plaintiffs next argue that the court misapplied Section 230 to their claims against Facebook. (Recons. Mem. at 8-17.) Plaintiffs make two separate arguments: first, that the court failed to consider Plaintiffs' allegations and arguments that Facebook acted as an "information content provider," independent of content provided by Hamas-affiliated users (<u>id.</u> at 11-14); and second, that the court incorrectly extended Section 230's coverage to "valuable services" provided by Facebook (<u>id.</u> at 14-17). The court examines these arguments separately.

### i. Facebook's Role as "Information Content Provider"

Plaintiffs first contend that the court failed to address their contention that Facebook acted as an "information content provider" within the meaning of Section 230 and could not claim protection under that section. As noted in the court's original decision, the protection afforded by Section 230 applies only to claims "based on information provided by [an] information content provider" other than the defendant. (May 18 M&O at 18-19 (quoting <u>FTC v. LeadClick Media, LLC</u>, 838 F.3d 158, 173 (2d Cir. 2016)).) Plaintiffs now maintain that their claims have, in fact, always sought to hold Facebook liable for its own content, and not that generated by another "information content provider," <u>i.e.</u> Hamas and related entities, based on Facebook's alleged role in "networking" and "brokering" links among terrorists. (Recons. Mot. at 12.)

Plaintiffs' contention is completely disingenuous. In the current motion, Plaintiffs acknowledge in a footnote that "perhaps plaintiffs could have made their reliance on Facebook's productive conduct clearer in their briefing" but attribute this oversight to Facebook's supposed

failure to argue that it was not a content provider. (Recons. Mot. at 12 & n.9.) Plaintiffs'

contention is flatly refuted by Facebook's briefing on the original motion to dismiss, which

clearly argued that all of the offending content cited in Plaintiffs' complaint was "provided by

another information content provider, not by Facebook itself." (Def. Mem. in Supp. of MTD

(Dkt. 35) at 17-18.) Plaintiffs did not respond to this argument at any point, and in fact began

their opposition memorandum by stating that "[t]hese cases do not concern speech or content."

(Pls. MTD Opp'n at 1.) For Plaintiffs to now turn around and argue that its allegations are

largely about content that Facebook itself created borders on mendacious. More to the point, this

entirely new argument in support of liability is not suitably considered on a motion for

reconsideration, which "may not be used to advance new facts, issues or arguments not

previously presented to the Court." See Montblanc-Simplo GmbH v. Colibri Corp., 739 F. Supp.

2d 143, 147 (E.D.N.Y. 2010) (internal quotation marks and citations omitted).

       ii.    Facebook's Conduct as "Speaker or Publisher"

Plaintiffs next contend that the court "misapprehended" the scope of their claims in

failing to consider Plaintiffs' allegation that Facebook "provided . . . terrorists with valuable

services unrelated to publication . . . that do not fall within the traditional role of a publisher."

(Recons. Mem. at 16.) In particular, Plaintiffs contend that they are suing Facebook for

"developing, encouraging, and facilitating connections between terrorists," and not simply based

on its failure to "police its accounts" and remove terrorist-affiliated users. (Id.)

In the court's view, however, it has already addressed Plaintiffs' argument and need not

revisit its conclusions on that point. It is true that the court's previous opinion focused largely on

whether Facebook's provision of accounts to Hamas-affiliated users could meaningfully be

separated from its role as a "publisher or speaker" of content produced by users, with the court

concluding that "Facebook's choices as to who may use its platform are inherently bound up in

its decisions as to what may be said on its platform, and so liability imposed based on its failure to remove users would equally "derive[] from [Facebook's] status or conduct as a 'publisher or speaker.'" (May 18 M&O at 21 (quoting LeadClick Media, 838 F.3d at 175).) While Plaintiffs now seek to distinguish between "making [Facebook's] system available to terrorists and a terrorist organization" and "provid[ing] [] terrorists with valuable services" through such access (Recons. Mem. at 16), this is a distinction without a difference: the "valuable services" at issue are part and parcel of access to a Facebook account, and so imposing liability on that basis would again effectively turn on "Facebook's choices as to who may use its platform." (May 18 M&O at 21.) Plaintiffs are merely attempting to rehash arguments that the court has already considered and rejected, which are insufficient to merit reconsideration.[2] See Shrader, 70 F.3d at 257 ("[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided.").

    *c.*      *Interplay Between the CDA and the ATA*

Plaintiffs next argue that, even if Section 230 would otherwise apply to the challenged conduct, it cannot apply here because such application "would be in direct conflict with the ATA." (Recons. Mem. at 19.) Though presented in several ways, Plaintiffs' essential argument is two part: (1) the ATA's goal of imposing expansive civil liability for harms resulting from terrorism is at odds with immunity under Section 230; and (2) because the ATA was adopted and amended after the CDA, it supersedes Section 230. (Id. at 17-23.)

---

[2] Plaintiffs make the related argument that the court simply erred in its conclusion that Section 230 protects Facebook from liability based on its provision of user accounts and platform services to Hamas-affiliated users. (Recons. Mem. at 17-18.) However, Plaintiff provides no contrary controlling authority, but only argues the court unduly expanded the scope of Section 230's coverage beyond that envisioned by the Second Circuit. (Id. at 18.) As with Plaintiffs' more indirect attack on the court's holding discussed above, the court sees no reason to permit relitigation of issues already decided simply because Plaintiffs are dissatisfied with the court's prior decision.

At the outset, the court notes that it is skeptical that this argument is properly raised in the instant motion, as it can hardly be said to have been fully presented previously. Plaintiffs first advanced this argument in a single line in a footnote in their brief opposing Facebook's motion to dismiss. (See Pls. MTD Opp'n at 27 n.6 ("Even if there were a conflict between the limited immunity granted by the CDA and the liability imposed by the ATA, the ATA would control as its later enactment would be a tacit limiting of the CDA.").) Expanding this line to encompass five pages of their present briefing seems to the court to be the very definition of impermissibly "advanc[ing] . . . arguments not previously presented to the court." Schoolcraft, 248 F. Supp. 3d at 508 (internal quotation marks and citations omitted).

Even if Plaintiffs' argument is not waived, however, it is meritless. Quoting from the preamble to the most recent amendment to the ATA, Plaintiffs contend that immunizing Facebook under Section 230 frustrates Congress's purpose of "provid[ing] civil litigants with the broadest possible basis . . . to seek relief against entities . . . that have provided material support, whether directly or indirectly, to foreign organizations or persons that engage in terrorist activities."[3] (Recons. Mem. at 21 (quoting Justice Against Sponsors of Terrorism Act ("JASTA"), § 2(b), Pub. L. No. 114-222, 130 Stat. 852, 853).) Plaintiffs do not suggest that the ATA explicitly limits Section 230 immunity, however, but instead argue that the ATA's later-in-time enactment and the broad policy statements quoted above implicitly displace Section 230 with respect to ATA-based civil actions. (Id. at 21-23.)

"When it is claimed that a later enacted statute creates an irreconcilable conflict with an earlier statute, the question is whether the later statute, by implication, has repealed all or, more

---

[3] While it is not necessary to the decision here, the court notes that, whatever their interpretive value, statements of purpose contained in the preamble to a statute are not part of the substantive scope of the law itself. See, e.g., 73 Am. Jur. 2d Statutes § 101 (2d ed. updated Nov. 2017).

typically, part of the earlier statute." Garfield v. Ocwen Loans Servicing, LLC, 811 F.3d 86, 89 (2d Cir. 2016). "[R]epeals by implication are not favored." In re Stock Exch. Options Trading Antitrust Litig., 317 F.3d 134, 144 (2d Cir. 2003) (quoting United States v. Borden Co., 308 U.S. 188, 198 (1939)). Accordingly, courts must not "infer a statutory repeal unless the later statute expressly contradicts the original act or unless such construction is absolutely necessary in order that the words of the later statute shall have any meaning at all." Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 662 (2007) (internal quotation marks and citations omitted, and alterations omitted); see also Radzanower v. Touche Ross & Co., 426 U.S. 148, 155 (1976) ("The statutory provisions at issue here cannot be said to be in 'irreconcilable conflict' in the sense that there is a positive repugnancy between them or that they cannot mutually co-exist."). "[A] statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." Nat'l Ass'n of Home Builders, 551 U.S. at 663 (quoting Radzanower, 426 U.S. at 153).

The court sees no reason to conclude that the ATA impliedly abrogated Section 230, as each statute can be enforced without depriving the other of "any meaning at all." Id. at 662. The ATA's civil recovery provisions create a broad right of recovery for U.S. nationals injured by acts of international terrorism, without differentiating based on the particular defendants against whom claims are raised. 18 U.S.C. § 2333. In enacting Section 230, however, Congress "was focusing on the particularized problems of [providers and users of interactive computer services] that might be sued in the state or federal courts," Radzanower, 426 U.S. at 153, limiting the liability of a narrow subset of defendants for a particular type of claims. Thus, the ATA's general cause of action for victims of international terrorism cannot be said to "expressly contradict[]" the CDA, nor does the Section 230's limitation on certain theories of liability

deprive the ATA of "any meaning at all." Nat'l Ass'n of Home Builders, 551 U.S. at 662. Said differently, the two acts can be read without any conflict: Section 230 provides a limited defense to a specific subset of defendants against the liability imposed by the ATA.

In contrast to the direction provided by the Supreme Court and Second Circuit to act cautiously in inferring statutory repeal, Plaintiffs urge an approach that would treat any statute that imposes liability and which was enacted after the CDA as implicitly limiting the reach of Section 230 absent an affirmative contrary statement. This approach would effectively reverse the presumption against inferring repeal and is patently inconsistent with the law outlined above.[4]

Accordingly, the court sees no reason to conclude that the ATA implicitly limited or repealed Section 230 or any other part of the CDA or to reconsider its prior opinion on that basis.

### d. Application of the CDA to Plaintiffs' Israeli Law Claims

Plaintiffs' final argument is that the court erred in applying Section 230 to Plaintiffs' Israeli-law claims. (Recons. Mem. at 24-25.) Plaintiffs argue that court should have conducted a conflict-of-laws analysis, which would have demonstrated that Israeli (as opposed to New York) law applied to a number of Plaintiffs' claims. (Id. at 24-25.) From this, Plaintiffs contend that the court should not have applied Section 230 to the Israeli law claims, as the CDA "is a feature of American law that has no corollary in Israel." (Id. at 25.)

Plaintiffs' argument misunderstands the court's prior opinion, which addressed the issue raised. Noting that Plaintiffs contended that Section 230 "does not apply to claims based in foreign law," the court assumed that the Plaintiffs' Israeli tort claims were properly presented

---

[4] Plaintiffs make the related argument that the court's interpretation of Section 230 "yields results that can only be described as 'absurd'" when applied to the ATA. (Recons. Mem. at 23-24.) This argument, which is unsupported by citation to legal authority, is not properly presented on a motion for reconsideration, and so the court does not address it.

and concluded those claims were barred in any event. (May 18 M&O at 27 n.14.) In coming to this determination, the court examined the enumerated exceptions to Section 230's grant of immunity, and concluded that the absence of any carve-out for claims based on foreign law indicated that no such exception was intended. (Id.)

To the extent that Plaintiffs argue that a conflict-of-laws analysis prevents the application of federal statutes to foreign-law-based claims, the argument is unsupported in law or logic. Plaintiffs point to no authority for the notion that the decisional rules applied in a conflict-of-laws analysis require courts in this country to ignore governing sources of federal law when applying claims raised under the laws of other nations,[5] nor is the court aware of any such authority. Further, Plaintiffs' suggestion appears to be fundamentally at odds with supremacy of federal law over state law. When conducting a conflict-of-laws analysis, federal courts look to the law of the forum state, in this case New York. Cf., e.g., Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 672 F.3d 155, 157 (2d Cir. 2012) ("A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state." (internal quotation marks and citation omitted)). It is almost too obvious to state that New York law, including the law governing conflict of laws, could not direct courts to disregard federal law. Cf. Figueroa v. Foster, 864 F.3d 222, 227 (2d Cir. 2017) ("Under the Supremacy Clause of the Constitution, state and local laws that conflict with federal law are without effect." (internal quotation marks and citation omitted)). Finally, the court notes

---

[5] Instead, Plaintiffs cite to cases considering conflicts of law between the laws of individual states and other states or foreign nations or between the laws of two foreign nations. See Licci ex rel. v. Lebanese Canadian Bank, SAL, 672 F.3d 155, 157-58 (2d Cir. 2012); Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 331-339 (2d Cir. 2005) (same as to New York and Thai law); Cooney v. Osgood Mach., Inc., 81 N.Y.2d 66, 75 (N.Y. 1993) (same as to New York and Missouri law); Schultz v. Boy Scouts of Am., Inc., 65 N.Y.2d 189, 194-204 (N.Y. 1985) (same as to New York and New Jersey law); Wultz v. Islamic Rep. of Iran, 755 F. Supp. 2d 1, 78-80 (D.D.C. 2010) (same as to laws of China and Israel).

that the application of Section 230's affirmative defense to Israeli claims is sensible under the circumstances, as it avoids the perverse result that plaintiffs could bring claims in American courts under foreign law that would be barred if brought under federal or state law.

Accordingly, and again assuming that Israeli law, not New York law, applies to the cited claims, the court is not convinced that its prior decision was erroneous.

*　　*　　*　　*

For the foregoing reasons, Plaintiffs' motion to alter the judgment pursuant to Federal Rule of Civil Procedure 59(e) is DENIED.

### B.　　Motion to Amend the Complaint

In the alternative, Plaintiffs move to amend their complaint a second time and propose new allegations which, in their account, correct the deficiencies in their prior complaint. (Amendment Mot.; Pls. Mem. in Supp. of Amendment Mot. ("Amendment Mem.") (Dkt. 53); see also PSAC.) After considering the proposed second amended complaint, the court concludes that Plaintiffs fail to allege facts that would support any of the asserted causes of action against Facebook. Their motion to amend is accordingly denied.

### 1.　　Legal Standard

Under Federal Rule of Civil Procedure 15(a), a party may amend its complaint either with its opponent's written consent or with leave of the court.[6] Fed. R. Civ. P. 15(a)(2). Courts "should freely give leave [to amend] when justice so requires." Id. Accordingly, requests to amend should be generally be granted absent a showing of "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . [or] futility of amendment.'" Conforti v.

---

[6] Rule 15(a) also permits amendment once as a matter of course within set time periods. That provision is not relevant here, however, not least because Plaintiffs have already amended their complaint once before.

Sunbelt Rentals, Inc., 201 F. Supp. 3d 278, 290-91 (E.D.N.Y. 2016) (quoting Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)) (alterations in original). In considering whether an amendment would be "futile," courts apply the same standard of legal sufficiency as that employed in motions to dismiss, see Thea v. Kleinhandler, 807 F.3d 492, 496-97 (2d Cir. 2015), considering whether the proposed amended complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

Leave to amend may be granted post-judgment. "As a procedural matter, '[a] party seeking to file an amended complaint postjudgment must first have the judgment vacated or set aside pursuant to [Rules] 59(e) or 60(b).'" Williams v. Citigroup Inc., 659 F.3d 208, 213 (2d Cir. 2011) (quoting Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008)). In such cases, however, "Rule 15's liberality must be tempered by considerations of finality." Id.

2.    Application

In their proposed second amended complaint ("PSAC"), Plaintiffs propose to add a number of allegations that fall into four primary categories: (1) "[f]actual background and legislative statements involved in the enactment of the federal antiterrorism statutes at issue" (Amendment Mem. at 4); (2) allegations that Facebook violated the ATA by providing material support to Hamas in the form of "personnel" and "expert assistance" (id. at 3-4), and that Facebook's assistance to Hamas "freed-up money and other resources for Hamas and the terrorists to carry out the terrorist acts that severely injured the Plaintiffs" (id. at 7); (3) allegations related to Facebook users' ability to "self-publish" (id. at 4); and (4) Allegations demonstrating that Facebook's actions pertaining to its provision of material support and resources to Hamas occurred" outside of the United States (id. at 6). Additionally, Plaintiffs

14

propose adding a new claim under 18 U.S.C. § 2339C(c) based on Facebook's purported concealment of material resources provided to Hamas, as well as factual allegations related to that claim. The court examines each of these categories of proposed amendments and, for the reasons that follow, denies the motion to amend as futile.

a.    *Allegations Regarding Antiterrorism Statutes*

The first category of new proposed new allegations pertains only to the background of the two antiterrorism statutes at issue here, the ATA and JASTA. (Id. at 4.) These allegations include a history of the ATA's enactment (PSAC ¶¶ 2-7, 18-53), including specifically the act's civil enforcement provisions (id. ¶¶ 38-44). Plaintiffs' evident purpose in introducing this background is to demonstrate that civil claims for material support fall outside of Section 230's grant of immunity based on an exception within that section, which states that "[n]othing in this section shall be construed to impair the enforcement of . . . any . . . Federal criminal statute." 47 U.S.C. § 230(e)(1). Plaintiffs contend that the background and legislative history of the ATA and JASTA show that the creation of civil remedies for violations of criminal statutes prohibiting terrorism were meant to facilitate "enforcement" of those statutes.[7] (Pls. Reply in Supp. of Amendment Mot. ("Amendment Reply") (Dkt. 59) at 2-3.)

Plaintiffs' arguments are unpersuasive. The court addressed Section 230's exception for enforcement of federal criminal laws in its previous opinion, noting that "most courts that have examined" that subsection have concluded that it does not "inhibit immunity as to civil liability

---

[7] Plaintiffs also argue that the text and legislative history of the ATA and, particularly, JASTA, demonstrate that "Congress deems ATA claims supremely important, and insofar as other statute or regulations—including the CDA—are inconsistent with this most recent expression of Congress's intent, the ATA claims must prevail." (Pls. Reply in Supp. of Amendment Mot. ("Amendment Reply") (Dkt. 59) at 4-6.) This argument effectively retreads Plaintiffs' contention that the ATA and JASTA implicitly repeal the CDA to the extent of any conflict. For the same reasons that it denied the motion for reconsideration, the court concludes that Plaintiffs' proposed amendments on this point are futile.

15

predicated on federal criminal statutes." (May 18 M&O at 21 n.11.)  In this regard, the court

finds particularly convincing the First Circuit's conclusion that Section 230(e)(1)'s specific

reference to "criminal statutes," viewed alongside other exceptions within Section 230 that apply

equally to civil and criminal remedies, indicates that Congress only intended to exclude criminal

prosecutions through that exception.[8]  Jane Doe No. 1 v. Backpage.com, 817 F.3d 12, 23 (1st

Cir. 2016).  The court agrees with this reasoning and concludes that the "enforcement"[9] of

"Federal criminal statutes" in this context was intended only to extend to enforcement <u>by means

of a criminal proceeding</u>.

Accordingly, the court finds these new allegations regarding the history and purpose of

the ATA and JASTA to be insufficient to overcome previously identified shortcomings in

Plaintiffs' first amended complaint.

> b.    *Additional Material Support Allegations and Self-Publication*

Plaintiffs' proposed complaint also attempts to refine its allegations that Facebook

provided material support to terrorism so as to avoid involving implicating Facebook's role as a

---

[8] Plaintiffs attempt to distinguish <u>Jane Doe</u> and other cases cited in the court's previous opinion on the basis that the statutes cited therein "permitted recovery of compensatory damages, <u>not</u> punitive or exemplary damages [as] permitted by the ATA." (Amendment Reply at 3 (emphasis in original).)  However, the First Circuit reasoned in <u>Jane Doe</u> from the language of the statute itself that Section 230(e)(1) excepts only criminal actions to enforce criminal statutes, 817 F.3d at 23, which means that the purposes of a particular civil action are irrelevant.  Further, the court notes that Plaintiffs appear to be incorrect in their contention that the statute at issue in <u>Jane Doe</u> does not permit punitive damages in civil suits.  While the statute and Second Circuit case law do not provide direct guidance on the point, the Ninth Circuit concluded that the civil remedies available under that section include punitive damages.  See <u>Ditullio v. Boehm</u>, 662 F.3d 1091, 1098 (9th Cir. 2011); <u>see also</u> <u>Walia v. Veritas Healthcare Solutions, L.L.C.</u>, No. 13-CV-6935 (KPF), 2015 WL 4743542, at *10 n.15 (S.D.N.Y Aug. 11, 2015).

[9] Plaintiffs point to a statement by the Second Circuit that "the ATA's legislative history reflects that Congress conceived of the ATA, at least in part, as a mechanism for protecting the public's interests through private enforcement."  <u>Linde v. Arab Bank, PLC</u>, 706 F.3d 92, 112 (2d Cir. 2013).  The court is not convinced that this language, which appears in dicta and arose in the entirely different context of international comity analysis, implies that private suits to enforce the ATA are, in effect, on the same footing as are prosecutions under that law.  Moreover, as stressed above, the task before the court is not to interpret the ATA, but to determine the meaning of Section 230(e)(1).  As the court has already determined that Section 230's reference to "enforcement . . . of any . . . Federal criminal statutes" is specific to criminal prosecutions, it need not ascertain whether civil provisions of other statutes were envisioned as providing a secondary means of enforcement.

publisher or speaker of third-party content. First, Plaintiffs attempt to differentiate Facebook from other websites by stressing that Facebook users register to "design and create their own internet website," from which they are free to "self-publish" content without Facebook purporting to act as "editor, publisher, or speaker" of its users' postings. (PSAC ¶ 127-28.) Second, Plaintiffs add new allegations regarding the types of "material support" that Facebook provides. They characterize Facebook as providing "personnel" to Hamas by "making Hamas leaders, operatives, and recruits available to Hamas to conspire, plan, prepare, and carry out terrorist activity." (PSAC ¶ 223.) Plaintiffs also contend that Facebook provides "expert services" to Hamas-affiliated users by allowing them access to its platform and, through such access, "highly advanced software, algorithms, computer servers and storage, communications devices, [and] computer applications" that Facebook provides to all users. (Id. ¶¶ 123-24; see also Amendment Mem. at 5.)

Plaintiffs' additional allegations do nothing to address the shortcomings in their theories of liability identified in the court's previous decision. With respect to the allegations regarding "self-publication," Plaintiffs misinterpret the scope of Section 230's immunity. Plaintiffs repeatedly stress that users' introduction of information onto Facebook's eponymous platform occurs without Facebook "exercis[ing] any editorial discretion when providing registered accounts or over what users publish on their own [] accounts." (Amendment Reply at 8.) From this, Plaintiffs appear to suggest that Facebook cannot be exercising any editorial or publication functions protected by Section 230 which, they imply, require some specific selection with respect to the particular users or postings that may appear on its platform. This argument misunderstands the court's prior decision: In the court's view, Facebook's decision to keep its platform as an open forum, available for registration and posting without prior approval from

Facebook, is itself an exercise of editorial discretion. (May 18 M&O at 21.) As noted by the First Circuit:

> [the plaintiffs-appellants'] well-pleaded claims address the structure and operation of the [defendant-appellee's] website, that is, [defendant's] decisions about how to treat postings. Those claims challenge features that are part and parcel of the overall design and operation of the website (such as the lack of phone number verification, the rules about whether a person may post after attempting to enter a forbidden term, and the procedure for uploading photographs). Features such as these, which reflect choices about what content can appear on the website and in what form, are editorial choices that fall within the purview of traditional publisher functions.

Jane Doe, 817 F.3d at 21. The same reasoning supports both the court's previous decision and its conclusion here that allegations regarding "self-publication" do not exempt Plaintiffs' claims from Section 230's coverage: Facebook's decisions regarding the "overall design and operation of its website," including the criteria (or lack thereof) for obtaining an account and posting on the platform are themselves "editorial choices that fall within the purview of traditional publisher functions." Id.; see also Fields v. Twitter, Inc., 217 F. Supp. 3d 1116, 1124 (N.D. Cal. 2016) (holding that the defendant's "decisions to structure and operate itself as a 'platform . . . allow[ing] for the freedom of expression of hundreds [of] millions of people around the world,' and, through its hands-off policy, allowing [a terrorist group] to obtain 'dozens of accounts on its social network' 'reflect choices about what [third-party] content can appear on [Twitter] and in what form.'" (internal quotation marks and citations omitted; alterations in original)). Plaintiffs' new allegations that these policies allow users to join Facebook's platform and to "self-publish" without Facebook's prior approval do not alter the conclusion that Facebook's decisions regarding the structure of its platform fall within the traditional functions of a publisher and so that Plaintiffs' theory relies only on a "duty . . . derive[d] from [Facebook's] status or conduct as a 'publisher or speaker.'" LeadClick Media, 838 F.3d at 175.

Plaintiffs' new allegations regarding Facebook's alleged provision of "personnel" and "expert services" to Hamas and Hamas-affiliated users suffer from the same flaw. Plaintiffs claim that "technological tools" Facebook provided to its users, and that these tools are unrelated to the content of the underlying communications. (Amendment Reply at 8; see also Amendment Mem. at 4-5.) Plaintiffs contend these tools provided to users "extend[] far beyond providing or performing traditional services of a publisher," and so are not within the scope of the services of a 'publisher.'" (Amendment Reply at 7-8.) At root, however, these theories again derive from a claimed duty on Facebook's part to prevent certain users from using its platform and seek to impose liability based on Facebook's decision to allow free access to, and use of, its platform and forum. Said differently, Facebook is alleged to have violated a duty to prevent certain users from accessing and using its platform. As discussed above and in this court's previous dismissal of Plaintiffs' claims, Section 230 shields Facebook from such claims, as "Facebook's choices as to who may use its platform are inherently bound up in its decisions as to what may be said on its platform, and so liability imposed based on its failure to remove users would equally 'derive[] from [Facebook's] status or conduct as a 'publisher or speaker.'"" (May 18 M&O at 21 (quoting LeadClick Media, 838 F.3d at 175).)

Moreover, like Plaintiffs' first amended complaint, Plaintiffs' new allegations regarding Facebook's claimed provision of "personnel" and "expert services" again "rely on content to establish causation and, by extension, Facebook's liability," a theory already rejected by this court. (May 18 M&O at 22.) As Plaintiffs' proposed amended complaint makes clear, their theory that Facebook makes "personnel" available to Hamas depends on the content of communications on Facebook's website: Plaintiffs seek to hold Facebook liable for providing a publication forum for Hamas and its leaders, operatives, and recruits, "to conspire, plan, prepare,

19

and carry out terrorist activity." (SAC ¶ 223.) This is fundamentally no different than Plaintiffs'

prior argument that "Facebook contributed to their harm by allowing Hamas to use its platform

to post particular offensive content." (May 18 M&O at 22.) Likewise, both the "personnel" and

"expert services" allegations appear to rest in large part on allegations that Facebook's

networking algorithms recommend content to account holders. However, as Facebook points

out, "the features of Facebook that [P]laintiffs criticize operate solely in conjunction with . . .

content posted by Facebook users." (See Def. Opp'n to Amendment Mot. ("Amendment

Opp'n") (Dkt. 57) at 5 (emphasis in original); see also PSAC ¶¶ 611-22 (describing how

Facebook's algorithms connect "users to one another and to groups and events that they will be

interested in based on the information in their user profiles and online activities"). Plaintiffs'

new allegations would again simply seek to hold Facebook liable solely on the basis of the

website's role in hosting and re-publishing content generated by Hamas-affiliated users.[10]

Bound up as they are in the content that Hamas-affiliated users provide, the court concludes that

these new claims remain subject to the immunity afforded under Section 230 and so cannot

provide a basis for liability as to Facebook.[11]

---

[10] Plaintiff also proposes to add new allegations regarding additional "predicate" acts of terrorism by Hamas. (PSAC ¶¶ 648-49; Amendment Mem. at 7.) Plaintiffs contend that these additional predicate acts support the conclusion that "Facebook's liability does not depend upon attributing the content of Hamas' Facebook posts to Facebook." (Amendment Mem. at 7.) In particular, Plaintiffs point to the "aiding and abetting" charges brought under JASTA and argue that "once Facebook . . . provid[es] material support to Hamas, Facebook is liable under [JASTA] for any reasonably foreseeable injury that may result from Hamas's use of that material support." (Amendment Reply at 9.) These proposed amendments do nothing to address or sidestep the basis for the court's prior dismissal of Plaintiffs' claims: regardless of the predicate acts at issue, the only basis that Plaintiffs propose for imposing liability on Facebook for "aiding and abetting" or providing "material support" to those terroristic crimes is Facebook's decision to permit Hamas-affiliated users to use its platform. The court has repeatedly rejected that theory, and so the proposed amendments do not further Plaintiffs' entitlement to relief.

[11] Plaintiffs also propose alleging that, because of its use of Facebook, Hamas was able to "allocate other financial resources to terrorist activities." (Amendment Reply at 10; see also PSAC ¶ 219.) Plaintiffs are correct that this allegation could support a claim under the material support statutes. See, e.g., Holder v. Humanitarian Law Project, 561 U.S. 1, 30 (2010). In light of the court's conclusion that the Plaintiffs' material support claims are not viable because they rely on theories barred by Section 230, however, these allegations do not support Facebook's liability.

*c.* *Extraterritoriality Allegations*

Plaintiffs' proposed amendments include a number of factual allegations regarding Facebook's conduct outside of the United States, which Plaintiffs contend "support [their] contention that the CDA does not apply to claims involving violation of laws outside of the territorial jurisdiction of the United States." (Amendment Reply at 10; PSAC ¶¶ 629-32.) The court need not dwell on these new allegations. The court concluded in its prior opinion that, for purposes of the extraterritoriality analysis, the relevant territorial relationships are based "where redress is sought and immunity is needed"—the situs of the litigation. (May 18 M&O at 27.) Plaintiffs' new allegations obviously do not suggest that the situs of this litigation has changed, but are better viewed as part of their tenacious effort to convince the court to reconsider its prior extraterritoriality analysis. The court has already declined to do so, and so concludes that these new allegations fail to advance Plaintiffs' claims.

*d.* *"Concealment" of Material Support*

Plaintiffs' final set of new allegations relates to their new claim that Facebook "concealed" its provision of material support to Hamas in violation of the ATA. Specifically, Plaintiffs allege that Facebook's "Community Standards," which purport to prevent terrorists and terrorist organizations to use the platform, "conceal" both Facebook's own provision of material support to Hamas and the separate use of the platform by terrorists to provide material support to Hamas. (Amendment Mem. at 6.)

The relevant section of the material support statutes prohibits covered individuals and entities[12] from "knowingly conceal[ing] or disguis[ing] the nature, location, source, ownership,

---

[12] Specifically, the prohibition applies to individuals and entities in the United States or outside of the United States if they are either "a national of the United States or a legal entity organized under the laws of the United States (including any of its States, districts, commonwealths, territories, or possession)[.]" 18 U.S.C. § 2339C(c)(1)(A)-(B). Facebook does not argue that it falls outside this coverage.

21

or control of any material support or resources, or any proceeds of such funds . . . knowing or

intending that the support or resources are to be provided, or . . . were provided, in violation of

section 2339B[.]" 18 U.S.C. § 2339C(c)(2)(A). Thus, in order to violate that provision, the

entity must have knowingly "concealed" or "disguised" material support provided to a

designated foreign terrorist organization[13] but need not necessarily have provided the material

support itself.

   In the court's view, allegations brought under that section against Facebook, if plausibly

pled, would escape Section 230's coverage. In its opposition to the amendment, Facebook

argues strenuously that the "concealment claim boils down to a challenge to who may use

Facebook and what content they share" and so seeks to impose liability on the same basis already

rejected by the court. (Def. Suppl. Opp'n to Amendment Mot. (Dkt. 60) at 3.) It may be true

that a concealment claim based only on Facebook's own purported provision of material support

would fail: As noted, Section 2339C(c) requires a predicate violation of Section 2339B, 18

U.S.C. § 2339C(c)(2)(A), and the court has already held that Facebook cannot be held liable

under that statute based on Plaintiffs' theories. Plaintiffs also contend, however, that Facebook's

statements in the Community Standards "conceal" acts by Hamas members and supporters that

provide material support to Hamas using Facebook's platform. (Amendment Mem.. at 6 ("By its

actions and deceptions, Facebook also conceals the Hamas leaders' and affiliates' own provision

of personnel (themselves) via their Facebook accounts." (emphasis in original)); PSAC

¶¶ 222-24.) Said differently, unlike the other theories of liability proposed by Plaintiffs, the

"concealment" claim does not seek to hold Facebook liable for failing to prevent Hamas and its

---

[13] 18 U.S.C. § 2339B applies only to material support provided to designated foreign terrorist organizations. 18
U.S.C. § 2339B(a).

affiliates from obtaining accounts or posting offensive content. (See May 18 M&O, at 21-22.)

Instead, Plaintiffs argue that Facebook's own actions conceal or disguise material support to

Hamas provided by others. The court agrees that, thus construed, the concealment cause of

action does not fall within the coverage of Section 230, as it does not "inherently require[] the

court to treat [Facebook] as the publisher or speaker of content provided by another," or

"derive[] from [Facebook's] status or conduct as a 'publisher or speaker.'" (Id. at 20 (quoting

LeadClick Media, 838 F.3d at 175).

This does not end the inquiry, however, as Plaintiffs must still set forth sufficient

allegations "to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (internal

quotation marks and citation omitted). The key question in this instance is whether the proposed

amendments set forth a sufficient factual basis for the court to conclude that Facebook

"concealed" or "disguised" material support to Hamas provided using its platform. The statute

does not define those terms, nor does any court appear to have interpreted them in the context of

this or similar statutes.[14] "[W]here a statute does not define a term, we give the term its ordinary

meaning." EMI Christian Music Grp., Inc. v. MP3Tunes, LLC, 844 F.3d 79, 89 (2d Cir. 2016)

(internal quotation marks and citation omitted). The Merriam-Webster dictionary defines

"conceal" as, inter alia, "to prevent disclosure or recognition of," Conceal, Merriam-Webster

Online Dictionary, https://www.merriam-webster.com/dictionary/conceal (last visited

Jan. 8, 2018), and "disguise" as, inter alia, "to obscure the existence or true state or character of,"

Disguise, Merriam-Webster Online Dictionary, https://www.merriam-

---

[14] Similar language appears in 18 U.S.C. § 2339A (criminalizing "conceal[ing] or disguise[ing] the nature, location, source, or ownership of material support or resources") and various places in 18 U.S.C § 1956 (defining money laundering transaction to include transactions intended "to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity"). The court reviewed cases interpreting the terms "conceal" and "disguise" in the context of those statutes as well, but found no helpful guidance.

webster.com/dictionary/disguise (last visited Jan. 8, 2018).  Thus, in order to avoid the

conclusion that leave to amend should be denied as futile, Plaintiffs must present facts sufficient

to show that Facebook's actions either prevented "disclosure or recognition" of Hamas' use of its

platform or "obscured the existence or true state or character" of that use.

After examining the allegations set forth in the proposed amended complaint, the court

concludes that Plaintiffs fail to set forth a plausible claim that Facebook "concealed" or

"disguised" the use of its platform by Hamas and its member and supporters.  As noted,

Plaintiffs' claims that Facebook conceals Hamas's presence on its platform are based solely on

allegedly false claims in Facebook's "Community Standards" and public statements by the

company that it does not permit terrorists or terrorist organizations to use the website.  (See Pls.

Suppl. Mem. in Supp. of Amendment Mot. (Dkt. 61) at 5-6; see also, e.g., PSAC ¶¶ 172-74,

583-89.)  Plaintiffs do not allege, however, that such false statements had the effect of preventing

anyone from discovering that Hamas or its members were using Facebook's platform.  At most,

the policy statements and public pronouncements to which Plaintiffs point have the effect of

concealing or disguising Facebook's factual willingness to abide such use, but not the fact of the

use itself.  To the contrary, the complaint is replete with allegations that "HAMAS, its leaders,

spokesmen, and members have openly maintained and used official Facebook accounts" (PSAC

¶ 9), use those accounts to draw attention to their activities (PSAC ¶ 165), and that this use of the

platform by Hamas and other, similar groups has been widely recognized by the public

(id. ¶¶ 590-98).  Against these allegations, the court sees no plausible claim that Facebook's

statements—or any other action by the company, for that matter—did anything to "prevent

disclosure or recognition" or "obscure the existence or true . . . character of" the use of its platform to support Hamas.[15]

*    *    *    *

Accordingly, Plaintiffs' motion to amend their complaint is pursuant to Federal Rules of Civil Procedure 15(a), 59(e), and 60(b) is denied. Moreover, as the proposed amendments fail to correct the deficiencies identified by the court's decision dismissing Plaintiffs' first amended complaint, the court concludes that it is appropriate to deny the motion with prejudice. See, e.g., Curtis v. Citibank, N.A., 204 F. App'x 929, 932 (2d Cir. 2006) (summary order) (holding that dismissal with prejudice was within the court's discretion where plaintiff had notice of and failed to correct deficiencies in complaint).

## III. CONCLUSION

For the foregoing reasons, Plaintiffs' motions to amend the judgment (Dkt. 50) and to file a second amended complaint (Dkt. 52) are DENIED WITH PREJUDICE.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      January 17, 2018

NICHOLAS G. GARAUFIS
United States District Judge

---

[15] In their supplemental brief in support of the concealment claim, Plaintiffs also request leave to amend their complaint—again—to include allegations related to testimony by Facebook's general counsel before the United States Senate. (Pls. Suppl. Mem. in Supp. of Amendment Mot. at 9-10.) Plaintiffs do not, however, state how this information would support any of their claims, leaving the court without any basis to assess the utility or futility of such amendments. Particularly in light of court's existing judgment against Plaintiff, the court finds that considerations of finality outweigh any interest in allowing Plaintiffs to submit another round of amendments and denies the motion accordingly. Cf. Williams, 659 F.3d at 213 ("Where . . . a `party does not seek leave to file an amended complaint until after judgment is entered, Rule 15's liberality must be tempered by considerations of finality.").